C. Anderson Parker, Federal Bar No. 567726
andy@psd.law
  *Pro hac vice pending*
Miguel Andrés Sánchez-Ross, Federal Bar No. 743446
andres@psd.law
  *Pro hac vice pending*
**PARKER SANCHEZ & DONNELLY PLLC**
700 Louisiana St., Suite 4520
Houston, TX 77002
(713) 659-7200 (Telephone)
(713) 659-7203 (Facsimile)

John F. Kurtz, Jr., ISB No. 2396
jfk@kurtzlawllc.com
**KURTZ LAW PLLC**
910 W Main Street, Ste 364
Boise, ID 83702
(208) 287-8167 (Telephone)
(208) 287-8130 (Facsimile)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PayServices Bank, an Idaho corporation<br><br>Plaintiff,<br><br>v.<br><br>The Democratic Republic of the Congo; Ministry of State in Charge of the Portfolio of the Democratic Republic of the Congo; Julie Mbuyi Shiku; Doudou Roussel Fwamba Likunde; Anthony Nkinzo Kamole; Andre Wameso Nkualoloki; Célestin Mukeba Muntuabu; Norbert Eholo Eoni; Jean Pierre Dikoma Kitengie; Aphy Badaga Mubagwa; Sandra Tshibonge Mbiye; and Jean-Luc Mugogwa Katshelewa<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff, PayServices Bank, an Idaho Corporation, including its affiliates and shareholders, ("PayServices"), by and through its counsel of record, and for its causes of action against Defendants, alleges as follows:

## I. NATURE OF THE ACTION

1. In late 2023, the government of the Democratic Republic of the Congo ("DRC") invited Idaho-based Plaintiff PayServices to its embassy in Washington D.C. to present a plan for the "ITAM Congo-Kinshasa" project, a joint venture to revitalize the DRC's state-owned bank and digitize and modernize the entire national economy of the DRC.

2. PayServices agreed to this proposed contract and poured over $72 million in technology and services into the DRC to begin this joint venture. Subsequently several corrupt DRC officials (the "Individual Defendants"), working outside the DRC President's knowledge, conspired to demand bribes from PayServices. When those demands were refused by PayServices, the Individual Defendants then conspired to sabotage and breach the contract and end the ITAM Congo-Kinshasa project, presumably to the benefit of competing technology companies who would, in contrast, pay these bribes to the Individual Defendants.

3. PayServices brings this suit to recover its investment in the DRC and recover its damages from Defendants' breach of contract.

## II. THE PARTIES

4. **Plaintiff PayServices Bank** ("PayServices" or "Plaintiff") is an Idaho corporation with its principal place of business at 950 W. Bannock Street, Suite 1100, Boise, ID 83702. PayServices is, and was at all relevant times, a U.S. financial institution in good standing.

5. **Defendant The Democratic Republic of the Congo** (the "DRC") is a foreign state and sovereign.

6. **Defendant Ministry of State in Charge of the Portfolio of the DRC** (the "Ministry") is an agency or instrumentality of the DRC, and the official entity that executed the binding Subscription Agreement with PayServices. Upon information and belief, it acts as the "holding company" for the DRC's state-owned enterprises, including its state-owned bank "CADECO."

7. **Defendant Julie Mbuyi Shiku** ("Shiku") is, upon information and belief, the current Minister of Portfolio and was the Deputy Chief of Staff at the Ministry of Finance at the time of the initial breach and a cousin of the President. She is sued in her individual capacity for acts committed *ultra vires* and outside the scope of her lawful authority. Specifically, she is sued for soliciting private kickbacks and obstructing a Presidential mandate for personal enrichment.

8. **Defendant Doudou Roussel Fwamba Likunde** ("Fwamba") is, upon information and belief, the current Minister of Finance. He is sued in his individual capacity for engaging in a private extortion scheme during a visit to the United States, conduct which abandoned his official duties and served no governmental function.

9. **Defendant Anthony Nkinzo Kamole** ("Nkinzo") is, upon information and belief, the President's Chief of Staff. He is sued exclusively in his individual capacity for acts taken ultra vires and outside the scope of his lawful authority. Specifically, he is sued for intentional interference with the President's schedule to conceal a criminal bribery scheme.

10. **Defendant Andre Wameso Nkualoloki** ("Wameso") is, upon information and belief, the current Governor of the DRC Central Bank and former Deputy Chief of Staff to the President. He is sued exclusively in his individual capacity for acts committed ultra vires and outside the scope of his lawful authority. Specifically, Wameso is sued for insubordination in defiance of direct Presidential mandates and for the misappropriation of Plaintiff's proprietary

trade secrets to solicit business from third-party competitors (including Visa) for personal gain. This unauthorized conversion of intellectual property constitutes a private commercial venture unrelated to legitimate governmental functions.

11.  **Defendant Célestin Mukeba Muntuabu** ("Mukeba") is, upon information and belief, the current General Manager of CADECO, reporting to Defendant Shiku. He is sued in his individual capacity for conspiring with a private foreign entity (PCES) to steal intellectual property, an act not authorized by the DRC government.

12.  **Non-Party Co-Conspirators:** The Individual Defendants conspired with PCES Akiba ('PCES'), a North Macedonian entity, and its CEO Gjorgji Gjorgjievski. Although not named as Defendants herein, these actors served as the mechanism by which the Individual Defendants sought to steal Plaintiff's intellectual property and breach the State's contractual exclusivity obligations.

13.  **Defendant Norbert Eholo Eoni** ("Eoni") is, upon information and belief, a member of the CADECO board. He is sued exclusively in his individual capacity for, inter alia, breaching his fiduciary duties to the joint venture by actively working to undermine PayServices to conceal, upon information and belief, nefarious activities.

14.  **Defendant Jean Pierre Dikoma Kitengie** ("Kitengie") is, upon information and belief, the former chairman of CADECO. He is sued exclusively in his individual capacity for, inter alia, conspiring with Defendant Eoni to sabotage the PayServices project.

15.  **Defendant Aphy Badaga Mubagwa** ("Mubagwa") is, upon information and belief, an advisor to the DRC President on economy, finance and trade. He is sued exclusively in his individual capacity for, inter alia, soliciting a bribe from PayServices during a U.S. delegation visit and subsequently drafting a false report to undermine the company.

16.     **Defendant Sandra Tshibonge Mbiye** ("Mbiye") is, upon information and belief, the CEO of the DRC National Post and a cousin of the President. The DRC National Post is the government's postal service company. She is sued exclusively in her individual capacity for, inter alia, admitting her intent to breach both her company's and her ministry's signed agreement with PayServices, and, upon information and belief, accepting a €5 million bribe to steal the project.

17.     **Defendant Jean-Luc Mugogwa Katshelewa** ("Mugogwa") is, upon information and belief, the Deputy Coordinator in charge of Technology and Planning at the Democratic Republic of Congo's Digital Development Agency. He is sued exclusively in his individual capacity for, inter alia, together with Mubagwa, drafting and disseminating a false report intended to undermine Plaintiff's efforts to establish a data center and server farm within the DRC in compliance with national data localization laws. Upon information and belief, Mugogwa's actions were designed to compel Plaintiff to instead host its data with "Raxio," a newly established local company in which Mugogwa maintained a direct or indirect financial and personal interest.

### III.     JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action against a foreign state and its agency (the DRC and the Ministry of Portfolio) pursuant to 28 U.S.C. § 1330 and 28 U.S.C. § 1331, as Plaintiff's claims arise under the Foreign Sovereign Immunities Act ("FSIA").

19.     **Jurisdiction over the DRC and the Ministry of Portfolio:** The DRC and the Ministry are not immune from jurisdiction pursuant to the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2). This action is based upon:

- A commercial activity carried on in the United States by the DRC (the execution of the Idaho-governed Subscription Agreement); and

- An act outside the United States in connection with a commercial activity of the DRC elsewhere that caused a direct effect in the United States (the DRC's breach of its contractual obligations by obstructing and blocking the remittance of a $20 million payment to PayServices, an Idaho corporation, causing massive financial losses in Idaho);

The "Subscription Agreement," states:

- "This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Idaho."; and

- "...the undersigned irrevocably submits to the jurisdiction of the federal or state courts located in the State of Idaho, which submission shall be exclusive..."

**The DRC, the cabinet of the President, and the Ministry of Portfolio** agreed to the exclusive jurisdiction of Idaho courts, waiving any argument for sovereign immunity.

20. **Personal Jurisdiction over the Individual Defendants (Shiku, Fwamba, et al.):** This Court has specific personal jurisdiction over the non-sovereign Defendants (the "Individual Defendants"). These Defendants engaged in intentional tortious conduct (including interference with contract and civil conspiracy) that was expressly aimed at PayServices. These Defendants knew or should have known that PayServices is an Idaho corporation and that the brunt of the financial injury from their conduct would be felt in Idaho. This exercise of jurisdiction comports with the "effects test" and federal due process.

21.     **Venue:** Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (f)(1) as a substantial part of the events and omissions giving rise to the claim occurred in this district. Venue is also proper pursuant to the Subscription Agreement's exclusive forum selection clause.

## IV.     FACTUAL ALLEGATIONS

22.     This is a civil action arising from the bad-faith breach of a landmark joint venture between Plaintiff PayServices, an Idaho corporation, and the Democratic Republic of the Congo ("DRC"). This venture, known as the "ITAM Congo-Kinshasa" project, was personally approved by the DRC President and designed to digitize the nation's entire economy. The DRC's state-owned bank projected the project to generate over $8 billion USD in potential revenue, which was to be shared equally between PayServices and the DRC.

23.     As alleged herein, after inducing PayServices to invest over $72 million to build the platform, several corrupt subordinate officials (the "Individual Defendants") conspired to sabotage the project in direct defiance of the DRC President's orders. This conspiracy, which involved soliciting millions in bribes and attempting to steal PayServices' intellectual property, was designed to defraud PayServices of its investment and its contractual 50% share of the $8 billion project. This is a civil action for breach of contract, tortious interference with contract, civil conspiracy, and unjust enrichment. This action arises from a coordinated and bad-faith scheme by officials of a foreign state to defraud an Idaho corporation in a business transaction.

24.     The President of the DRC, Felix Antoine Tshisekedi Tshilombo, personally approved and directed the implementation of a multi-billion-dollar joint venture with PayServices to digitize the DRC's national economy. The financial keystone of this venture was a U.S.-based, Idaho-governed contract for a $20 million investment in PayServices.

COMPLAINT AND DEMAND FOR JURY TRIAL – 7

25. As alleged herein, this was part of a conspiracy by subordinate officials (the "Individual Defendants"), acting for their own personal gain and in direct contravention of express mandates from the Head of State. These actions were ultra vires and constituted a private acts for personal enrichment, legally distinct from the authorized conduct of the DRC.

26. After inducing PayServices to begin performance—and after PayServices had invested over $72 million in technology and services into the DRC—the DRC and the Individual Defendants breached the core investment agreement by blocking the contractually-mandated payment.

27. As detailed in contemporaneous correspondence from the DRC's own state-owned bank CADECO, this breach was calculated to cause not only the loss of PayServices' $72 million investment but also the loss of over $8 billion in projected revenue for the DRC, half of which was contractually owed to PayServices.

28. The resulting breach by the DRC was not a simple default but was created by the bad faith acts of the individual defendants. As alleged herein, it involved a conspiracy by the Individual Defendants to solicit bribes, sabotage the project in direct defiance of presidential orders, and steal PayServices' intellectual property by installing a competitor in direct violation of binding exclusivity agreements.

29. The parties initially connected in earnest in late 2023, the DRC government invited PayServices to its embassy in Washington D.C. to present a plan for the "ITAM Congo-Kinshasa" project, a joint venture to revitalize the DRC's state-owned bank, CADECO, and digitize the national economy.

30. From January to March 2024, the DRC government, with full presidential authorization, executed a series of binding, exclusive agreements with PayServices, including the

"MOU with CADECO" (establishing a 50/50 revenue-share) and agreements with the Ministries of Digitalization, Health, Handicap, and the Post.

31. Crucially, the joint venture was structured to provide the DRC with a strategic geopolitical advantage. As memorialized in the project documents, the parties agreed that PayServices would grant the DRC regional exclusivity, ensuring PayServices did not "make the same agreement with a direct neighbor of the DRC." In exchange, the DRC committed to the investment to PayServices. Relying on this covenant, PayServices rejected opportunities with neighboring nations. Defendants used this exclusivity to "string along" PayServices, freezing Plaintiff's ability to mitigate damages.

32. On March 13, 2024, the DRC (via the Ministry of Portfolio) executed the "Subscription Agreement," the U.S-based financial keystone of the project. This contract obligated the DRC to pay PayServices $20,000,000 USD within 14 days.

33. The "ITAM Congo-Kinshasa" project brochure, part of the signing package, confirmed this $20M payment was the catalyst to "open a representative office in the DRC" which would "work directly on the local market in collaboration with CADECO."

34. While the $20,000,000 payment had been duly funded and was ready for transfer, DRC officials, including Shiku and others, unlawfully blocked and prevented PayServices from transferring the funds out of the country after the 14-day deadline, thereby breaching the parties' agreement.

35. This failure was not a simple default but a deliberate act of bad faith. Upon information and belief, the funds were blocked by **Defendant Shiku**, abusing her position and acting in direct contravention of the State's interests, demanded a 10% bribe ($2,000,000 USD), as a corrupt condition for permitting the transfer of the $20,000,000 to PayServices' U.S. account.

This solicitation was a private 'frolic' for personal gain and was not an act authorized by the sovereign. PayServices, a U.S. corporation subject to the Foreign Corrupt Practices Act (FCPA), refused this solicitation. **Defendant Shiku's** blockage of the payment, in retaliation for Plaintiff's refusal to pay the bribe, constituted the DRC's initial breach of the Subscription Agreement.

36. In reliance on the agreements and continued promises to pay and fully execute the project, PayServices began performance, investing its own capital to deploy its core banking system for CADECO.

37. On April 9, 2025, the CADECO GM confirmed this in the "CADECO letter to Central Bank," admitting: (a) the DRC was in breach; (b) PayServices had already invested $72 million; (c) the breach would cause an $8 billion revenue loss; and (d) expressing serious concern about the deliberate blockage of the transfer.

38. In May 2025, Plaintiff secured a direct meeting with DRC President Felix Tshisekedi. At this meeting, the President expressed his full support for the project and, upon information and belief, was shocked to learn of the blockages. The President personally "reaffirmed commitment to unblock funds and revive JV project" and issued a direct order to **Defendant Andre Wameso Nkualoloki** (then Deputy Chief of Staff) to resolve the transfer within "two weeks." This direct Presidential Order establishes that the State's official position was to proceed. Consequently, any subsequent actions by Individual Defendants to demand bribes for themselves and block the contractual transfer of funds to PayServices were acts of insubordination and ultra vires conduct, stripping them of any claim to conduct-based immunity.

39. Defendant Wameso, acting outside his authority, acknowledged the direct presidential mandate to resolve the transfer and then intentionally sabotaged it. By defying the

President's 'two-week' order, Wameso abandoned his role as a faithful state agent and acted as a rogue individual to protect the conspiracy.

40. Upon assuming his role as Governor of the Central Bank of the DRC, **Defendant Andre Wameso Nkualoloki** immediately began implementing financial reforms and policies that drew directly on the proprietary intellectual property, trade know-how, and technical expertise of PayServices—information he had acquired solely through his official mandate to address the transfer of funds owed to PayServices, and through at least one meeting between PayServices and the President in which he participated. Defendant Wameso subsequently used these reforms, in or around October 2025, to portray himself as a national saviour and financial innovator, publicly taking credit before the DRC Parliament and national media for the purported appreciation of the Congolese franc against the U.S. dollar. In making these representations, Defendant Wameso attributed the currency increase to a weakened U.S. dollar, when in fact it resulted from the proprietary know-how and intellectual property developed and perfected by PayServices over decades of investment and research—know-how designed to foster improved trade partnerships for the United States and to enhance the standard of living of local populations in the DRC.

41. In September 2024, at a meeting in New York City, Defendant Fwamba personally solicited a bribe from PayServices. Upon information and belief, Olga Kadima, an assistant and advisor to Defendant Fwamba, actively participated in this solicitation. When PayServices' representatives rebuffed the demand, Olga Kadima warned Defendant Fwamba that "he's not in Congo and there are witnesses." At this, Defendant Fwamba "switched gears" and, in furtherance of the conspiracy, directed PayServices to create a new, pretextual paper trail to allow for the bribe that Fwamba was demanding, stating: "Send me a letter saying you want to come to invest... I will then invite you to come so you can convince me in my office behind closed doors..." In or around

March 2025, Olga Kadima sent a message to PayServices to follow up on this pretextual "behind closed doors" meeting. PayServices again refused to participate in this corrupt scheme.

42. While Defendant Fwamba and his co-conspirators delayed the project to solicit bribes, they knowingly kept PayServices in a state of commercial paralysis. Defendant Fwamba's request for a 'behind closed doors' meeting was not a diplomatic negotiation but a solicitation for a private criminal enterprise. By demanding a "pretextual paper trail," Fwamba abandoned his official role to instead act as a private conspirator.

43. Compounding and likely in collaboration with this bribery, **Defendant Nkinzo** (the President's Chief of Staff) abused his access to the President to intentionally prevent PayServices from attending a scheduled meeting in New York. This was not a policy decision but a personal act of interference designed to keep the President in the dark regarding the bribery demands made by his co-conspirators.

44. In late 2025, **Defendant Shiku** installed **Defendant Mukeba** as the new GM of CADECO. Mukeba then conspired with non-party conspirators Gjorgjievski and PCES to violate PayServices' exclusive contract and steal its intellectual property, all while failing to fulfill his duties to CADECO customers with USD accounts on the PayServices platform.

45. PayServices issued a "Cease and Desist Letter" on September 22, 2025, putting Mukeba, Gjorgjievski, and PCES on formal notice of the exclusive contracts. Upon information and belief, despite a written reply agreeing to comply, Defendants continued their conspiracy.

46. Other officials, including CADECO board members Eoni and Kitengie, and presidential advisor Mubagwa, participated in the conspiracy by feigning support while actively undermining PayServices, in Mubagwa's case after his own bribery demand was refused during a U.S. visit.

47.     **Defendant Mbiye**, CEO of the National Post, likewise admitted her intent to breach her ministry's signed contract with PayServices, stating she would steal the project and give it to Irish "friends" who had allegedly paid her a €5 million bribe.

48.     On or about November 20, 2025, Defendant Wameso, acting in his individual capacity and in furtherance of the conspiracy to convert Plaintiff's intellectual property for private gain, met with executives of Visa (a U.S.-based competitor) to establish a "Financial Innovation Center."

49.     Upon information and belief, the "roadmap" and technical architecture Defendant Wameso is presenting to Visa as his own "vision" is, in fact, the proprietary "ITAM" architecture designed, funded, and delivered by PayServices. Defendant Wameso lacks the technical background to generate these plans independently; he is simply rebranding Plaintiff's proprietary work product to engage new vendors.

50.     This conduct creates imminent, irreparable harm. If Defendant Wameso is permitted to implement Plaintiff's exclusive architecture with a third-party competitor like Visa, Plaintiff's bargained-for exclusivity will be permanently destroyed, and its proprietary trade secrets will be irretrievably disclosed to the public domain, rendering a monetary judgment inadequate.

51.     PayServices seeks to recover its direct damages, its $72 million in invested capital, and its share of the lost profits from the joint venture, which total in excess of $4,092,000,000.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Breach of Contract – Subscription Agreement)
(Against Defendants DRC and The Ministry of Portfolio)

52.     Plaintiff realleges and incorporates all preceding paragraphs.

53.     The Subscription Agreement is a valid, binding, and enforceable contract.

54. Plaintiff fully performed all obligations required of it under the contract.

55. Defendants DRC and the Ministry of Portfolio breached the Subscription Agreement by blocking the transfer of the $20,000,000 USD.

56. As a direct and proximate result, Plaintiff has been damaged in an amount not less than $20,000,000 USD, plus interest.

## SECOND CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing) (Against Defendants DRC and The Ministry of Portfolio)

57. Plaintiff realleges and incorporates all preceding paragraphs.

58. The Subscription Agreement and its related agreements contained an implied covenant of good faith and fair dealing.

59. Defendants DRC and the Ministry breached this covenant through acts of bad faith, including but not limited to:

- Unilaterally withholding the $20M transfer required to capitalize the joint venture, despite direct orders from the President to release the funds;
- Actively attempting to circumvent their own exclusivity clauses by conspiring with competitors.

60. As a direct and proximate result, Plaintiff has suffered substantial damages.

## THIRD CLAIM FOR RELIEF
### (Consequential Damages Arising from Breach of Contract) (Against Defendants DRC and The Ministry of Portfolio)

61. Plaintiff realleges and incorporates all preceding paragraphs.

62. At the time of executing the Subscription Agreement, it was known and foreseeable to the DRC and the Ministry that their $20 million payment was the foundational component of the entire ITAM project.

COMPLAINT AND DEMAND FOR JURY TRIAL – 14

63. It was known and foreseeable, as evidenced by the "ITAM Congo-Kinshasa" project brochure and the "MOU with CADECO," that a breach of the Subscription Agreement would destroy the joint venture and cause PayServices to lose its entire invested capital and all future profits.

64. The DRC's breach of the Subscription Agreement was a direct and proximate cause of these foreseeable consequential damages, which were quantified by the DRC's own agent, the CADECO GM, in the "CADECO letter to Central Bank," as:

- Lost Investment: $72,000,000 USD in technology and services.
- Lost Profits: An amount to be proven at trial, representing Plaintiff's contractual 50% share of the joint venture's revenue, which the DRC's own agents projected would exceed $8 billion USD.

65. As a direct and proximate result of the breach, Plaintiff has suffered consequential damages in an amount to be proven at trial, comprising the loss of Plaintiff's capital investment and the loss of reasonably foreseeable future profits.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Contract and Prospective Economic Advantage)
### (Against All Individual Defendants)

66. Plaintiff realleges and incorporates all preceding paragraphs.

67. Plaintiff held valid, binding contracts and a legitimate prospective economic relationship with the DRC and its ministries.

68. All Individual Defendants, as well as PCES and Gjorgjievski, knew of these contracts and relationships.

69. These Defendants, acting outside the scope of any legitimate employment, for their own personal gain, and in defiance of the President's direct orders (including, upon information

and belief, soliciting/accepting bribes), intentionally and unlawfully interfered with these contracts by, inter alia, blocking payments, demanding bribes, sabotaging project resolution in defiance of presidential orders, and conspiring to install a competitor.

70. This interference was not justified and was the proximate cause of the breach of the contracts and the destruction of the joint venture, directly causing Plaintiff's damages.

71. Additionally, by enforcing the parties' exclusivity agreement through false assurances while secretly sabotaging performance, Defendants caused PayServices to forego lucrative opportunities in neighboring jurisdictions. This resulted in a massive opportunity cost and loss of market share in the Central African region, damages distinct from the contract value.

## FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### (Against All Individual Defendants)

72. Plaintiff realleges and incorporates all preceding paragraphs.

73. The Individual Defendants shared a common objective with non-party co-conspirators (Gjorgjievski and PCES): to commit the torts of fraud and intentional interference with Plaintiff's contracts and prospective economic advantage, and to unlawfully appropriate the ITAM project (and its profits) for themselves and their associates, all while deceiving the DRC President.

74. These Defendants had a meeting of the minds and agreed to commit these unlawful acts.

75. These Defendants committed numerous overt acts in furtherance of the conspiracy, including but not limited to: soliciting bribes, blocking payments, defying direct presidential orders, installing a complicit GM at CADECO, sharing confidential PayServices IP with PCES, and making false reports.

76. As a direct and proximate result of this conspiracy, Plaintiff was harmed and suffered the damages outlined herein.

### SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment / Quantum Meruit – In the Alternative)
### (Against Defendants DRC and The Ministry of Portfolio)

77. Plaintiff realleges and incorporates all preceding paragraphs.

78. In the alternative, Plaintiff conferred a substantial, non-gratuitous benefit upon the DRC and the Ministry by designing and deploying a core banking platform valued at over $72,000,000.

79. The DRC and the Ministry, through CADECO, were aware of, accepted, and retained this benefit, as confirmed by the "CADECO letter to Central Bank" (certifying 93% completion).

80. It would be unjust for Defendants to retain this $72 million benefit without paying its reasonable value.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues and claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants, jointly and severally, as follows:

A. For compensatory damages on the First Claim for Relief in the amount of **$20,000,000** against Defendants the DRC and the Ministry;

B. For consequential damages on the Third Claim for Relief in an amount to be proven at trial;

C.     For damages for Tortious Interference and Civil Conspiracy against the Individual Defendants in their individual capacities in an amount to be proven at trial, including all compensatory, consequential, and punitive damages allowed by law;

D.     In the alternative, for restitution on the Sixth Claim for Relief in an amount not less than **$72,000,000**;

E.     For pre-judgment and post-judgment interest at the maximum rate allowed by law;

F.     For reasonable attorneys' fees and costs incurred in this action pursuant to the Subscription Agreement and/or Idaho Code § 12-120(3); and

G.     For such other and further relief as the Court deems just and proper.

DATED: January 8, 2026

Respectfully submitted,

C. Anderson Parker, Fed. Bar No. 567726
andy@psd.law
*Pro hac vice pending*
Miguel Andrés Sánchez-Ross, Fed. Bar No. 743446
andres@psd.law
*Pro hac vice pending*
**PARKER SANCHEZ & DONNELLY PLLC**
700 Louisiana St., Suite 4520
Houston, TX 77002
(713) 659-7200 (Telephone)
(713) 659-7203 (Facsimile)
*Pro hac vice pending*

_____
John F. Kurtz, Jr., ISB No. 2396
jfk@kurtzlawllc.com
**KURTZ LAW PLLC**
910 W Main Street, Ste 364
Boise, ID 83702
(208) 287-8167 (Telephone)
(208) 287-8130 (Facsimile)

COMPLAINT AND DEMAND FOR JURY TRIAL – 18