UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF IDAHO

PayServices Bank,

              Plaintiff,

v.

The Democratic Republic of Congo, et al.,

              Defendants.

Case No. 1:26-cv-00009-REP

**DECLARATION OF JULIE SHIKU**

I, **Julie Shiku**, make this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746, and declare the following to be true:

1. I am the Minister of Portfolio of the Democratic Republic of Congo (the "DRC"), which is one of 53 members of the Government of the DRC, headed by the Prime Minister, Judith Suminwa Tuluka.

2. I am a defendant in the above-captioned action (the "Action"), and submit this declaration in support of my motion to dismiss the Action under Rule 12(b) of the Federal Rules of Civil Procedure.

3. I became Minister of Portfolio on 8 August 2025, a fact that is reflected on the English language "History – Ministry of Portfolio" page of the Ministry of Portfolio's publicly accessible website, available at https://portefeuille.gouv.cd/historique/. Attached hereto as **Exhibit**



**A** is a true and correct print-to-PDF version of such webpage.

4.    In the DRC, all presidential decrees are published in a publicly accessible official government gazette, called the *Journal Officiel de la République Démocratique du Congo* (the "*Journal Officiel*"). Attached hereto as **Exhibit B** is a true and correct PDF version of the special edition of the *Journal Officiel* of 30 July 2025, which includes the presidential decree, *Ordonnance n° 25/238 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'une Entreprise du portefeuille de l'Etat dénommée Caisse générale D'épargne du Congo, en sigle «CADECO SA »* (the "CADECO Nomination Presidential Decree"), along with a certified translation of the front page of this edition of *Journal Officiel* and of the CADECO Nomination Presidential Decree.

5.    The Ministry of Portfolio provided me from its files a signed "Subscription Agreement" purportedly between "PayServices Bank" as "Company' and the "Ministry of State in charge of the Portfolio" as "The Purchaser," dated 13 March 2024. I believe that this is the document referenced in Paragraphs 6, 19, 32, 35, 53, 55, 62, 63, and 64 of the complaint in this Action (the "Complaint"), although I do not necessarily agree that any of the allegations contained in such paragraphs are true. A true and correct copy of this "Subscription Agreement" is attached hereto as **Exhibit C**.

6.    The Ministry of Portfolio also provided me from its files a PDF version of a French-language brochure titled, "ITAM Congo-Kinshasa." I believe that this is the brochure referenced in Paragraphs 33 and 63 of the Complaint, although I do not necessarily agree that any of the allegations contained in such paragraphs are true. A true and correct copy of this brochure, along with a certified translation of the same, is attached hereto as **Exhibit D**.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Kinshasa, République Démocratique du Congo

Julie Shiku

26. 05. 26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the  26  day of May, 2026, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| John F. Kurtz | jfk@kurtzlawllc.com |
| Andy Parker | andy@parkersanchez.com |
| Miguel Andrew Sanchez-Ross | andres@parkersanchez.com |
| Tyler J. Anderson | tanderson@hawleytroxell.com |
| Kenneth Charles Shumard | kshumard@hawleytroxell.com |
| Alyson Anne Foster | alyson@dempseyfoster.com |
| Brian P. Maloney | maloney@sewkis.com |
| Malavika Rao | rao@sewkis.com |
| Philip M. Musolino | pmusolino@musolinoanddessel.com |
| Jacob Northrop Matt | jmatt@kmclaw.com |
| Jennifer Marie Reinhardt | jtessmer@kmclaw.com |
| Sylvia J. Rolinski | sjr@rolinski.com |
| J. Will Varin | willvarin@varinthomas.com |

/s/ Jennifer M. Aiko
Jennifer M. Aiko
OF HOLLAND & HART LLP

# EXHIBIT A

# HISTORY - MINISTRY OF PORTFOLIO

HOME  ~  HISTORICAL

---

## Historical

The **Ministry of State Holdings** was established as a **ministerial department in 1975** , as an extension of the state mechanisms put in place to manage state holdings. The **Institute for State Holdings Management (IGP)** , previously created by **Ordinance-Law No. 70/072 of November 20, 1970** , was responsible for managing the state's portfolio and real estate assets. The IGP was dissolved when the state created the **Department (Ministry) of State Holdings** by **Ordinance No. 75/167 of June 20, 1975** , which defined its responsibilities.

In the following years, the structuring of the oversight and monitoring became more refined: the **High Council of the Portfolio (CSP)** was established by **Ordinance No. 89-033 of January 30, 1989** as a specialized body to assist the Government in **monitoring and controlling** public enterprises and managing shareholdings.

A major turning point came in **2008** with the package of reforms concerning public enterprises:

- **Law No. 08/007 of July 7, 2008** (transformation of public enterprises),
- **Law No. 08/009 of July 7, 2008** (regulation of public establishments),
- **Law No. 08/010 of July 7, 2008** (organization and management of the State portfolio), supplemented by Law No. 08/008 (State divestment). These texts modernize governance, clarify the statutes, and strengthen the role of the State as shareholder.

In **2013** , texts were introduced **to operationalize and clarify** this governance:

- **Decree No. 13/002 of January 15, 2013** (organization of the representation of the State-shareholder in the General Meeting),
- **Decree No. 13/036 of September 3, 2013** (creation, organization and operation of the CSP, updating the 1989 framework).

Finally, Ordinance **No. 22/003 of January 7, 2022** reaffirms the **responsibilities of the Ministry of Portfolio** (creation, transformation of public enterprises, supervision of participations, etc.), confirming its strategic role in national economic governance.

**Ministers of Portfolio (chronological order)**

- **Gilbert Kiakwama kia Kiziki** — **1977** (then again **1983–1986** as *Finance, Budget and Portfolio* ).
- **Jean-Gualbert Nyembo Shabani** — **August 19, 1977** (State Commissioner for the Portfolio), then **January 5, 1979** (back at the Portfolio).
- **Pierre Pay-Pay wa Syakassighe** — **Nov. 5, 1982 – Nov. 1, 1983** (≈ 1 year).
- **Christophe Mboso N'Kodia Pwanga** — **July 6, 1994 – (reshuffles 1996/1997)** within the Kengo governments (at least confirmed in 1994).

- **Babi Mbayi** — **May 23, 1997 – January 3, 1998** ( *Plan, Portfolio and Development* under L.-D. Kabila).
- **Augustin Katumba Mwanke** — **17 Jan. 2001 – 17 Nov. 2002** ( *Minister of State in charge of the Portfolio* ).
- **Célestin Vunabandi** — **2004 – 2006** .
- **Jeannine Mabunda Lioko** — **February 5 2007 – April 6, 2012** (Gizenga & Muzito governments).
- **Louise Munga Mesozi** — **2012 – 2015** (Matata I government).
- **Wivine Mumba Matipa** — **2016 – 2019** .
- **Clément Kuete Nymi Bemuna** — **2019 – 2021** (Ilunga government).
- **Adèle Kahinda Mayina** — **2021 – 2024** (Sama Lukonde government).
- **Jean-Lucien Bussa Tongba** — **June 12, 2024 – August 7, 2025** (Suminwa I government; handover mid-August 2025).
- **Julie Mbuyi Shiku** — **since August 8, 2025** ( **Suminwa II** government ).

707, Avenue Wagenia, Kinshasa, Gombe Commune, Democratic Republic of Congo

info@portefeuille-gouv.cd

**+243 ...........................**

**Quick Access**

▸ Welcome

▸ The ministry

▸ The General Secretariat

▸ Directions

▸ Responsibilities (Missions)

▸ Historical

▸ High Council

**Institutional Websites**

▸ TEXTS & LAWS

▸ COMPANIES

▸ NEWS

▸ PROJECTS

▸ PARTNERS

▸ MEDIA LIBRARY

▸ CONTACT

**Follow us on**

  

Case 1:26-cv-00009-REP    Document 46-4    Filed 05/26/26    Page 8 of 114

All rights reserved © 2025 Ministry of Portfolio

# EXHIBIT B

Première partie

66ᵉ année

n° spécial

# JOURNAL OFFICIEL

## de la
## République Démocratique du Congo

Cabinet du Président de la République

Kinshasa – 30 juillet 2025

## SOMMAIRE

### PRESIDENCE DE LA REPUBLIQUE

19 juillet 2025 - Ordonnance n° 25/230 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Agence Nationale d'Aménagement du Territoire, en sigle « ANAT», col. 3.

19 juillet 2025 - Ordonnance n° 25/231 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds National d'Aménagement du Territoire, en sigle « FONAT », col. 5.

19 juillet 2025 - Ordonnance n° 25/232 portant nomination des membres du Conseil d'administration et de la Direction générale d'une Entreprise du portefeuille de l'Etat dénommée Congo Ressources, en sigle « CORES SA », col. 7.

19 juillet 2025 - Ordonnance n° 25/233 portant nomination des membres du Conseil d'administration et de la Direction générale d'un établissement public dénommé Fonds d'Intervention Pour l'Environnement, en sigle « FIPE», col. 8.

19 juillet 2025 - Ordonnance n° 25/234 portant nomination des membres du Conseil d'administration et de la Direction générale d'un établissement public dénommé Autorité de Régulation du Marché de Carbone en République Démocratique du Congo, en sigle « ARMCA », col. 10.

19 juillet 2025 - Ordonnance n° 25/235 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds de Promotion de l'Industrie, en sigle « FPI », col. 12.

19 juillet 2025 - Ordonnance n° 25/236 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds de Développement du Service Universel, en sigle « FDSU », col. 14.

19 juillet 2025 - Ordonnance n° 25/237 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Institut des Musées Nationaux du Congo, « IMNC » en sigle, col. 16.

19 juillet 2025 - Ordonnance n° 25/238 portant nomination des membres du Conseil d'administration et de la Direction générale d'une Entreprise du portefeuille de l'Etat dénommée Caisse générale D'épargne du Congo, en sigle « CADECO SA », col. 18.

19 juillet 2025 - Ordonnance n°25/239 portant nomination d'un Gouverneur de la Banque Centrale du Congo « BCC », col. 20.

19 juillet 2025 - Ordonnance n°25/240 portant nomination d'un membre du Conseil d'administration d'un Etablissement public dénommé Caisse Nationale de Sécurité Sociale, en sigle « CNSS », col 22.

19 juillet 2025 - Ordonnance n°25/241 portant nomination de deux membres au sein des services personnels du Chef de l'Etat, col. 23.

19 juillet 2025 - Ordonnance n°25/242 portant nomination d'un Directeur de cabinet adjoint du Président de la République, col. 25.

### GOUVERNEMENT

#### Cabinet du premier ministre

09 juin 2025 - Décret n°25/24 portant Statut de l'Artiste et du Professionnel de la Culture en République Démocratique du Congo, col. 26.

————————

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

## PRESIDENCE DE LA REPUBLIQUE

**Ordonnance n°25/230 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Agence Nationale d'Aménagement du Territoire, en sigle « ANAT »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n° 24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-ministres ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°21/08 du 30 décembre 2021 portant création, organisation et fonctionnement d'un Établissement public dénommé Agence Nationale d'Aménagement du Territoire, en sigle « ANAT », spécialement en ses articles 1,3,4,6 et 13 ;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

## ORDONNE

### Article 1

Sont nommés Membres du Conseil d'Administration de l'Agence Nationale d'Aménagement du Territoire, en sigle « ANAT », les personnes ci-après :

1.    Monsieur **Bofete Bononga Pierre-Parfait** ;

2.    Madame **Oniemba Amamvo Carine** ;

3.    Monsieur **Manshimba Manshimba Pascal** ;

4.    Madame **Bokoya Bangosema Gertrude** ;

5.    Monsieur **Mawete Lela Blaise**.

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1.    Monsieur **Bofete Bononga Pierre-Parfait**, Président du Conseil d'administration ;

2.    Madame **Oniemba Amamvo Carine**, Directeur général ;

3.    Monsieur **Nyembo Tampakanya Jean Paul**, Directeur général adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

Le Ministre d'Etat, Ministre de l'Aménagement du Territoire est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

30 juillet 2025     Journal Officiel de la République Démocratique du Congo     *Première partie* – n° spécial

**Ordonnance n°25/231 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds National d'Aménagement du Territoire, en sigle « FONAT »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°21/09 du 30 décembre 2021 portant création, organisation et fonctionnement d'un Établissement public dénommé Fonds National d'Aménagement du Territoire, en sigle « FONAT », spécialement en ses articles 1,3,7,9 et 12 ;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

**ORDONNE**

## Article 1

Sont nommés Membres du Conseil d'Administration du Fonds National d'Aménagement du Territoire, en sigle « FONAT », les personnes ci-après :

1.  Monsieur **Kalele Malobo Camy Richard** ;

2.  Madame **Ngbo Yamange Libote Jeanne** ;

3.  Monsieur **Atale Dimuka Mbadu Adolphe** ;

4.  Madame **Aminata Namasia Bazego**;

5.  Madame **Muika Mutumbe Clarisse-Baby**.

## Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1.  Monsieur **Kalele Malobo Camy Richard**, Président du Conseil d'administration ;

2.  Madame **Ngbo Yamange Libote Jeanne**, Directeur général ;

3.  Monsieur **Musole Mwanamupenzi Moise**, Directeur général adjoint.

## Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

## Article 4

Le Ministre d'Etat, Ministre de l'Aménagement du Territoire est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

**Ordonnance n°25/232 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction génerale d'une entreprise du portefeuille de l'Etat dénommée Congo Ressources, en sigle « CORES SA »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 69, 79 et 81 alinéa 1, point 6 ;

Vu la Loi n°08/010 du 07 juillet 2008 fixant les règles relatives à l'organisation et à la gestion du portefeuille de l'Etat, spécialement en ses articles 2, 3, 9, 10, 11, 13 et 16 ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance 24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vices-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu le Décret n°13/055 du 13 décembre 2013, tel que modifié et complété par le Décret n°23/14 du 12 avril 2023 portant statut des Mandataires publics dans les entreprises du portefeuille de l'Etat ;

Vu les statuts de la société Congo Ressources « CORES SA » ;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

**ORDONNE**

**Article 1**

Sont nommés Membres du Conseil d'administration de la Société dénommée Congo Ressources, en sigle « CORES SA », les personnes dont les noms suivent :

1. Monsieur **Kankolongo Mulaja Léon ;**

2. Madame **Kule Dale Alda** ;

3. Monsieur **Ilanga Bakonga Reagan** ;

4. Madame **Ekumbaki Baindja Nathalie** ;

5. Madame **Belinda Ntumba**.

**Article 2**

Sont nommés aux fonctions spécifiées, en regard de leurs noms, les personnes suivantes :

1. Monsieur **Kankolongo Mulaja Léon**, Président du Conseil d'Administration ;

2. Madame **Kule Dale Alda**, Directrice générale ;

3. Monsieur **Impeto Pengo Sébastien**, Directeur général adjoint.

**Article 3**

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

**Article 4**

Le Ministre du Portefeuille est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

———————

**Ordonnance n°25/233 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds d'Intervention Pour l'Environnement, en sigle « FIPE »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant

révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu, telle que modifiée et complétée à ce jour, la Loi n°11/009 du 09 juillet 2011 portant principes fondamentaux relatifs à la protection de l'environnement ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°20/031 du 31 octobre 2020 portant statuts, organisation et fonctionnement d'un Établissement public dénommé Fonds d'Intervention Pour l'Environnement, en sigle « FIPE », spécialement en ses articles 11, 12, 13, 15, 19 et 20;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

### ORDONNE

### Article 1

Sont nommés Membres du Conseil d'Administration du Fonds d'Intervention Pour l'Environnement, en sigle « FIPE », les personnes ci-après :

1.  Monsieur **Ngindu Biduaya Cédric** ;

2.  Monsieur **Ngadi Muanda Manassé** ;

3.  Madame **Mbombo Muamba Stéphanie** ;

4.  Monsieur **Toirambe Bamoninga Benjamin**;

5.  Monsieur **Mukuna Luabing Erick**.

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1.  Monsieur **Ngindu Biduaya Cédric**, Président du Conseil d'administration ;

2.  Monsieur **Ngadi Muanda Manassé**, Directeur général ;

3.  Monsieur **Anthony Ndala**, Directeur général adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

La Ministre d'Etat, Ministre de l'Environnement et Développement Durable est chargée de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

———————

**Ordonnance n°25/234 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Autorité de Régulation du Marché de Carbone en République Démocratique du Congo, en sigle « ARMCA »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu, telle que modifiée et complétée à ce jour, la Loi n°11/009 du 09 juillet 2011 portant principes fondamentaux relatifs à la protection de l'environnement ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°23/22 du 14 juin 2023 portant création, organisation et fonctionnement d'un Établissement public dénommé Autorité de Régulation du Marché de Carbone, en sigle « ARMCA », spécialement en ses articles 5, 6, 7, 8, 9, 11 et 14 ;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

### ORDONNE

### Article 1

Sont nommés Membres du Conseil d'Administration de l'Autorité de Régulation du Marché de Carbonne, en sigle « ARMCA », les personnes ci-après :

1. Monsieur **Moliba Bankanza Jacques Célestin ;**

2. Monsieur **Nsimba-Bissimpi Guy ;**

3. Monsieur **Massamba Wa Massamba Ferdinand ;**

4. Monsieur **Kibambe Kikangala André ;**

5. Monsieur **Longunza-Malassi Joseph.**

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1. Monsieur **Moliba Bankanza Jacques Célestin**, Président du Conseil d'Administration ;

2. Monsieur **Nsimba-Bissimpi Guy**, Directeur Général ;

3. Madame **Likunde Mboyo Fifi**, Directeur Général Adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

La Ministre d'Etat, Ministre de l'Environnement et Développement Durable est chargée de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

**Ordonnance n°25/235 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds de Promotion de l'Industrie, en sigle « FPI »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Revu l'Ordonnance n°23/228 du 12 décembre 2023 portant nomination des membres du Conseil d'Administration et de la Direction Générale d'un Établissement public dénommé Fonds de Promotion de l'Industrie, en sigle « FPI » ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°09/64 du 03 décembre 2009 fixant les statuts d'un Établissement public dénommé Fonds de Promotion de l'Industrie, en sigle « FPI », spécialement en ses articles 1,12,14,15 et 19 ;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

### ORDONNE

### Article 1

Sont nommés Membres du Conseil d'Administration du Fonds de Promotion de l'Industrie, en sigle « FPI », les personnes ci-après :

1. Madame **Katumwa Mukalay Vicky** ;

2. Monsieur **Ntumba Batukonke Herve Claude**;

3. Monsieur **Lothape Madimbo Nelson** ;

4. Monsieur **Massamba Kinuani** ;

5. Madame **Wa Nzambi Lussambo Abigaël**.

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1. Madame **Katumwa Mukalay Vicky**, Président du Conseil d'Administration ;

2. Monsieur **Ntumba Batukonke Herve Claude**, Directeur général ;

3. Monsieur **Mastaki Birindwa Blaise**, Directeur général adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

Le Ministre de l'Industrie et Développement des Petites et Moyennes Entreprises, et Petites et Moyennes Industries est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

**Ordonnance n°25/236 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un Etablissement public dénommé Fonds de Développement du Service Universel, en sigle « FDSU »**

Le Président de la République,

Vu la Constitution, telle que modifiée et complétée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution, spécialement en ses articles 79 et 81 ;

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements publics ;

Vu la Loi n°20/017 du 25 novembre 2020, relative aux Télécommunications et aux Technologies de l'Information et de la Communication ;

Vu le Décret-loi n°017/2002 du 03 octobre 2002 portant Code de conduite de l'Agent public de l'Etat ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n° 24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu, tel que modifié et complété à ce jour, le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissements publics;

Vu le Décret n°22/51 du 30 décembre 2022 portant création, organisation et fonctionnement d'un Établissement public dénommé Fonds de Développement du Service Universel « FDSU », spécialement en ses articles 11, 12, 12, 13, 14 et 20;

Vu les dossiers personnels des intéressés ;

Considérant la nécessité et l'urgence ;

Sur proposition du Gouvernement,

### ORDONNE

### Article 1

Sont nommés Membres du Conseil d'Administration du Fonds de Développement du Service Universel « FDSU », les personnes ci-après :

1. Monsieur **Kalonda Kiomba Adolphe**;

2. Monsieur **Binene A Kadiat Paterne** ;

3. Monsieur **Muteba Lutanda Delphin** ;

4. Monsieur **Betu Kabamba Alain**;

5. Madame **Bassiala Nlandu Djema**.

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1. Monsieur **Kalonda Kiomba Adolphe**, Président du Conseil d'Administration ;

2. Monsieur **Binene A Kadiat Paterne**, Directeur Général ;

3. Madame **Lepas Kanda Marie-Laure**, Directeur général adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

Le Ministre des Postes, Télécommunications et Numérique est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

**Ordonnance n°25/237 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'un établissement public dénommé Institut des Musées Nationaux du Congo, « IMNC » en sigle**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n° 11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en ses articles 69, 79 et 81 alinéa 1er point 5 et 6 ;

Vu la Loi n°08/009 du 07 juillet 2008 portant dispositions générales applicables aux

Établissements Publics, spécialement en ses articles 8, 9 et 12;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères, spécialement en son article 1er, B-42 ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Revu l'Ordonnance n°22/148 du 31 août 2022 portant nomination des Membres du Conseil d'Administration et de la Direction Générale d'un Établissement Public dénommé Institut des Musées Nationaux du Congo, en sigle « IMNC » ;

Vu le Décret n° 09/52 du 3 décembre 2009 fixant les statuts d'un Établissement Public dénommé Institut des Musées Nationaux du Congo, en sigle « IMNC », spécialement en ses articles 1er, 7, 8, 9, 10, 14 et 23;

Vu le Décret n°13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les Établissement Publics, spécialement en ses articles 3, 4, et 5 ;

Vu les dossiers personnels des intéressés ;

Vu la nécessité et l'urgence ;

Sur proposition du Gouvernement ;

### ORDONNE

### Article 1

Sont nommés membres du Conseil d'Administration de L'Institut des Musées Nationaux du Congo, en sigle « IMNC » :

1.  Monsieur **Cokola Ntwali Prince** ;
2.  Monsieur **Siala Siala Simon** ;
3.  Madame **Bwembola Lotigo Modestine** ;
4.  Madame **Mafuta Nkoyi Bernadette** ;

5.  Monsieur **Tshiunza Kabangu Serge**.

### Article 2

Sont nommés aux fonctions spécifiées en regard de leurs noms, les Personnes ci-après :

1.  Monsieur **Cokola Ntwali Prince**, Président du conseil d'Administration ;
2.  Monsieur **Siala Siala Simon**, Directeur Général;
3.  Madame **Mughole Mbambu Juliette**, Directeur Général Adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

La Ministre de la Culture, Arts et Patrimoine est chargée de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

———————

**Ordonnance n°25/238 du 19 juillet 2025 portant nomination des membres du Conseil d'administration et de la Direction générale d'une Entreprise du portefeuille de l'Etat dénommée Caisse générale D'épargne du Congo, en sigle « CADECO SA »**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n° 11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en ses articles 69, 79 et 81 ;

Vu la Loi n°08/007 du 07 juillet 2008 portant dispositions générales relatives à la transformation des Entreprises Publiques, spécialement en ses articles 2 et 4 ;

30 juillet 2025                    Journal Officiel de la République Démocratique du Congo                    *Première partie* – n° spécial

Vu la Loi n°08/010 du 07 juillet 2008 fixant les règles relatives à l'organisation et à la gestion du portefeuille de l'Etat, spécialement en ses articles 3, 9, 10, 11 et 13 ;

Vu l'Ordonnance n°22/003 du 7 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Revu l'Ordonnance n°22/226 du 11 novembre 2022 portant nomination des Membres du Conseil d'administration et de la Direction générale d'une Entreprise du Portefeuille de l'Etat dénommée Caisse Générale d'Epargne du Congo, en sigle « CADECO SA » ;

Vu le Décret n°13/055 du 13 décembre 2013 portant statut des mandataires publics dans les entreprises du portefeuille de l'Etat, spécialement en ses articles 3, 4 et 5 ;

Vu les Statuts de la « Caisse Générale d'Epargne du Congo », en sigle « CADECO SA » ;

Vu les dossiers personnels des intéressés ;

Vu la nécessité et l'urgence ;

Sur proposition du Gouvernement ;

## ORDONNE

### Article 1

Sont nommés membres du Conseil d'Administration de la Caisse Générale d'Epargne du Congo, en sigle « CADECO SA », les personnes ci-après :

1.  Madame **Malangu Kabedi-Mbuyi**;

2.  Monsieur **Mukeba Muntuabu Célestin** ;

3.  Monsieur **Nyanguila Mukendi Moise** ;

4.  Monsieur **Kabwa Yaleyi Henry** ;

5.  Monsieur **Belo Pindi Jacqueline** ;

6.  Monsieur **Mwenze Wakadilo Rosen** ;

7.  Monsieur **Eholo Eoni Norbert** ;

8.  Monsieur **Litangi Madika Jean-Bedel** ;

9.  Madame **Maboya Damanzo Annie**.

### Article 2

Sont nommés aux fonctions en regard de leurs noms et post-noms et prénoms, les personnes ci-après :

1.  Madame **Malangu Kabedi-Mbuyi** : Président du Conseil d'administration ;

2.  Monsieur **Mukeba Muntuabu Célestin** : Directeur général ;

3.  Monsieur **Luvuezo Tela Boyoma Christian** : Directeur général adjoint.

### Article 3

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 4

Le Ministre du Portefeuille est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

———————

**Ordonnance n°25/239 du 19 juillet 2025 portant nomination d'un Gouverneur de la Banque Centrale du Congo « BCC »**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n° 11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en ses articles 79, 81, 176, 177 et 221;

Vu la Loi organique n° 18/027 du 13 décembre 2018 portant organisation et fonctionnement de la Banque

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

Centrale du Congo, spécialement en ses articles 1er, 3, 33, 35, 36, 37, 38, 52, 53, 54, 57 et 64 ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/ 003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Revu l'Ordonnance n°21/041 du 12 juillet 2021 modifiant et complétant l'Ordonnance n°21/036 du 30 juin 2021 portant nomination d'un Gouverneur et des Vice-Gouverneurs de la Banque Centrale du Congo ;

Vu le dossier personnel de l'intéressé ;

Vu la nécessité et l'urgence ;

Sur proposition du Gouvernement ;

Le Conseil des Ministres entendu,

## ORDONNE

### Article 1

Est nommé Gouverneur de la Banque Centrale du Congo, Monsieur **André WAMESO NKUALOLOKI**.

### Article 2

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 3

Le Ministre des Finances est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

_____

**Ordonnance n° 25/240 du 19 juillet 2025 portant nomination d'un membre du Conseil d'administration d'un Etablissement public dénommé Caisse Nationale de Sécurité Sociale, en sigle « CNSS »**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n° 11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en ses articles 69, 79, 81 et 221 ;

Vu la Loi n° 08/009 du 07 juillet 2008 portant dispositions générales applicables aux Établissements Publics, spécialement en ses articles 2, 6, 7, 8, 9 ,11 et 12 ;

Vu la Loi n° 16/009 du 15 juillet 2016 fixant les règles relatives au régime général de Sécurité sociale, spécialement en ses articles 8, 9, 10 et 11 ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant Organisation et Fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n° 24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n° 24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'Etat, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Revu l'Ordonnance n°22/213 du 11 novembre 2022 portant nomination des Membres du Conseil d'Administration d'un Établissement Public dénommé Caisse Nationale de Sécurité Sociale, en sigle « CNSS » ;

Vu le Décret n° 18/027 du 14 juillet 2018 portant création, organisation et fonctionnement d'un établissement public dénommé Caisse Nationale de Sécurité Sociale, en sigle « CNSS », spécialement en ses articles 1er, 9, 10, 11, 12 et 27 ;

Vu le Décret n° 13/056 du 13 décembre 2013 portant statut des Mandataires publics dans les

30 juillet 2025     Journal Officiel de la République Démocratique du Congo     *Première partie* – n° spécial

Établissements publics, spécialement en ses articles 3, 4 et 5 ;

Vu le dossier personnel de l'intéressée ;

Vu la nécessité et l'urgence ;

Le Conseil des Ministres entendu ;

### ORDONNE

### Article 1

Est nommé Membre du Conseil d'Administration de la Caisse Nationale de Sécurité Sociale, en sigle « CNSS », Madame **Samu Bakekolo Huguette**.

La susnommée remplace Madame Kusuamina Basola Yvonne.

### Article 2

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 3

Le Ministre de la Santé Publique, Hygiène et Prévoyance Sociale est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Première ministre

––––––––––

**Ordonnance n°25/241 du 19 juillet 2025 portant nomination de deux membres au sein des services personnels du Chef de l'Etat**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n° 11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en son article 79 ;

Vu l'Ordonnance n°21/010 du 05 mars 2021 portant organisation et fonctionnement du Cabinet du Président de la République, spécialement en ses articles 3 et 31 ;

Vu l'Ordonnance n°24/058 du 11 juin 2024 portant nomination d'un Directeur de Cabinet du Président de la République ;

Revu l'Ordonnance n°25/163 du 06 mars 2025 portant nomination des membres des Services personnels du Chef de l'Etat ;

Vu la nécessité et l'urgence ;

### ORDONNE

### Article 1

Sont nommés membres au sein des Services personnels du Chef de l'Etat, aux fonctions spécifiées en regard de leurs noms, les personnes ci-après :

1. Monsieur **Kalenga Kazadi Roger**, Porte-parole Adjoint du Chef de l'Etat ;

2. Monsieur **Vedoso Wayikwa Medi**, Chargé des Missions du Chef de l'Etat, en charge des analyses stratégiques.

### Article 2

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 3

Le Directeur de Cabinet du Président de la République est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

––––––––––

**Ordonnance n°25/242 du 19 juillet 2025 portant nomination d'un Directeur de cabinet adjoint du Président de la République**

Le Président de la République,

Vu la Constitution, telle que modifiée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en son article 79 ;

Vu l'Ordonnance n°25/173 du 14 mars 2025 portant organisation et fonctionnement du Cabinet du Président de la République, spécialement en ses articles 3 et 4 ;

Vu l'Ordonnance n°24/058 du 11 juin 2024 portant nomination d'un Directeur de Cabinet du Président de la République ;

Revu l'Ordonnance n°25/159 du 06 mars 2025 portant nomination des Directeurs de Cabinet Adjoints du Président de la République ;

Vu la nécessité et l'urgence ;

## ORDONNE

### Article 1

Est nommé Directeur de Cabinet Adjoint du Président de la République en charge des Questions Economiques et Financières, Monsieur **Nyembwe Musungaïe André.**

### Article 2

Sont abrogées toutes les dispositions antérieures contraires à la présente Ordonnance.

### Article 3 :

Le Directeur de Cabinet du Président de la République est chargé de l'exécution de la présente Ordonnance qui sort ses effets à la date de sa signature.

Fait à Kinshasa, le 19 juillet 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

_____

## GOUVERNEMENT

### Cabinet du Premier ministre

**Décret n°25/24 du 09 juin 2025 portant statut de l'artiste et du professionnel de la culture en République Démocratique du Congo**

La Première Ministre,

Vu la Constitution, telle que modifiée par la Loi n°11/002 du 20 janvier 2011 portant révision de certains articles de la Constitution de la République Démocratique du Congo du 18 février 2006, spécialement en son article 92 ;

Vu la Loi organique n°22/003 du 03 mai 2022 portant protection et promotion des droits de la personne avec handicap ;

Vu la Loi n°015/2002 du 16 octobre 2002 portant Code du travail, telle que modifiée et complétée par la Loi n°16/010 du 15 juillet 2016 ;

Vu la Loi n°09/001 du 10 janvier 2009 portant protection de l'enfant ;

Vu la Loi n°16/009 du 15 juillet 2016 fixant les règles relatives au régime général de la sécurité sociale ;

Vu l'Ordonnance-loi n°86-033 du 05 avril 1986 portant protection des droits d'auteur et des droits voisins ;

Vu l'Ordonnance-loi n°25-030 du 12 mars 2025 portant principes fondamentaux relatifs à la culture et aux arts en République Démocratique du Congo, spécialement en son article 10 ;

Vu l'Ordonnance n°22/003 du 07 janvier 2022 fixant les attributions des Ministères ;

Vu l'Ordonnance n°24/022 du 1er avril 2024 portant nomination d'un Premier Ministre ;

Vu l'Ordonnance n°24/039 du 28 mai 2024 portant nomination des Vice-premiers ministres, des Ministres d'État, des Ministres, des Ministres Délégués et des Vice-Ministres ;

Vu l'Ordonnance n°24/88 du 11 octobre 2024 portant organisation et fonctionnement du Gouvernement, modalités de collaboration entre le Président de la République et le Gouvernement ainsi qu'entre les membres du Gouvernement ;

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

Considérant l'adhésion de la République Démocratique du Congo respectivement à la Convention de Berne du 09 septembre 1886 sur la protection des œuvres littéraires et artistiques et la Convention de l'UNESCO de 2005 sur la protection et la promotion de la diversité des expressions culturelles ;

Considérant les recommandations de l'atelier sur le statut de l'artiste et des professionnels de la culture organisée les 1er et 02 juillet 2024 par l'Organisation Internationale de la Francophonie, OIF en sigle, à Libreville en République Gabonaise ;

Considérant la recommandation sur la condition de l'artiste, adoptée par la Conférence générale de l'UNESCO, réunie en sa vingt et unième session à Belgrade, du 23 septembre au 28 octobre 1980 ;

Vu l'urgence et la nécessité ;

Sur proposition de la Ministre de la Culture, Arts et Patrimoine ;

Le Conseil des Ministres entendu ;

### DECRETE

### Chapitre 1 : Des dispositions générales

### Article 1 : De l'objet

Le présent Décret détermine le statut de l'artiste et du professionnel de la culture en République Démocratique du Congo.

### Article 2 : Du champ d'application

Le présent Décret s'applique à l'artiste et au professionnel de la culture ainsi qu'aux relations de collaboration et de partenariat de ces derniers avec toute personne qui concourt à la création, à la production, à la diffusion et à la conservation des œuvres artistiques.

Il s'applique également, sous réserve de la réciprocité, à l'artiste et au professionnel de la culture de nationalité étrangère dont le siège principal ou l'essentiel des activités est basé en République Démocratique du Congo.

### Article 3 : Des définitions

Au sens du présent Décret, on entend par :

– **Artiste** : toute personne qui crée ou participe, par son interprétation, à la création ou à la recréation d'œuvre d'art dont le travail artistique constitue un élément essentiel de sa vie et qui contribue au développement de l'art et de la culture.

– **Artiste salarié** : toute personne physique qui accomplit une prestation à caractère artistique et/ou littéraire, de manière ponctuelle ou permanente, pour le compte d'un employeur moyennant rémunération.

– **Arts** : ensemble d'œuvres humaines destinées à toucher l'esprit, les sens et les émotions du public. Ils comprennent les :

– **Arts de la scène** : champ de pratique regroupant le théâtre, la danse, le cirque, l'humour, la musique, le son, la poésie et les spectacles de rues ;

– **Arts visuels** : arts qui produisent des objets perçus essentiellement par l'œil. Ils englobent les arts graphiques, les arts plastiques, les arts numériques dont la photographie, le cinéma, l'art vidéo, l'art décoratif (art textile, marqueterie et maroquinerie), et les arts appliqués à l'industrie (design des objets comme mobilier ; design de communication comme publicité, graphisme, multimédia, prêt à porter) ; dessin, peinture, sculpture, céramique, gravure et haute couture.

– **Création artistique** : toute œuvre artistique réalisée par une personne physique notamment dans le domaine de l'audiovisuel, de l'art visuel ou de la scène, de la photographie, des arts plastiques et graphiques, de la musique, du théâtre, de la littérature artistique écrite ou orale ou de la chorégraphie.

– **Diffusion** : mise en contact, avec le public, d'œuvres (vente, prêt, location, échange, dépôt, exportation, édition, représentation en public, exposition, publication ou toute autre utilisation de l'œuvre).

– **Entrepreneur culturel** : acteur légalement constitué du développement économique de la culture ; il combine connaissance des arts, maîtrise des processus créatifs, capacité à

30 juillet 2025          Journal Officiel de la République Démocratique du Congo          *Première partie* – n° spécial

découvrir des talents, compréhension du public et compétences en développement commercial.

– **Entreprise culturelle** : entreprise dont le produit peut se définir comme de l'art ou du divertissement. Il peut s'agir entre autres de troupes de théâtre, de compagnies de danse, d'ensembles de musique, de musées, de centres d'interprétation, de spectacles de variétés. Une entreprise culturelle peut également être une association fédérant des projets culturels.

– **Industrie culturelle** : ensemble des entreprises produisant, selon des méthodes industrielles, des biens dont l'essentiel de la valeur tient dans leur contenu symbolique, comme livre, musique, cinéma, télévision, radio, jeux vidéo, tourisme de masse. Ce terme est essentiellement employé dans le domaine de la philosophie de l'art et dans celui de l'économie de la culture.

– **Littérature** : ensemble des œuvres écrites auxquelles on reconnaît une finalité esthétique.

– **Œuvre d'art** : toute réalisation matérielle ou immatérielle, écrite, visuelle ou sonore d'un artiste, exprimant sa pensée, ses sentiments, en vue d'un partage avec le spectateur, l'auditeur ou le lecteur doté de réceptivité.

– **Producteur** : toute personne physique ou morale qui finance ou contribue par son investissement matériel, à la réalisation d'une œuvre ou d'un produit artistique ou culturel pour sa commercialisation.

– **Professionnel de la culture** : toute personne physique ou morale qui fait de son activité principale la création, la production, la promotion, la diffusion ou l'archivage des œuvres littéraires et artistiques.

### Chapitre 2 : Des droits de l'artiste et du professionnel de la culture

### Article 4 : Des droits

Sans préjudice d'autres droits leur reconnus par la Constitution, les lois et d'autres règlements en vigueur, l'artiste et le professionnel de la culture bénéficient des droits suivants :

– Droit à la liberté de travail et d'entreprise ;

– Droit à la liberté d'association et d'opinion ;

– Droit à la protection sociale ;

– Droit à la rémunération équitable ;

– Droit au respect de sa personne ;

– Droit à l'accès aux médias audio-visuels et écrits publics et privés.

### Article 5 : Du droit à la liberté de travail et d'entreprise

L'artiste et le professionnel de la culture ont droit au libre exercice de leur activité, sans discrimination, fondée notamment sur les convictions morales, politiques ou religieuses.

Ils ne peuvent être astreints d'accomplir un acte professionnel contraire à leurs convictions morales, artistiques ou religieuses.

### Article 6 : Du droit à la liberté d'association et d'opinion

L'artiste et le professionnel de la culture ont droit de se constituer librement en associations de nature syndicale ou autre, d'y adhérer et de participer à leurs activités.

Les organisations professionnelles et les associations d'artistes et professionnels de la culture légalement établies par le Ministre ayant la Culture et les Arts dans ses attributions, participent à la détermination des normes conventionnelles régissant les relations de travail dans leurs domaines d'activités sans discrimination d'aucune sorte. Elles prennent une part active à tous les aspects du dialogue social.

L'artiste et le professionnel de la culture ont le droit de prendre part librement à la vie culturelle de la communauté et bénéficient de la protection de leurs œuvres de l'esprit.

### Article 7 : Du droit à la protection sociale

L'artiste et le professionnel de la culture ont droit à une protection sociale de la part des pouvoirs publics.

L'artiste et le professionnel de la culture salariés ont droit à la rémunération et à la sécurité sociale conformément à la législation sociale en vigueur.

## Article 8 : Du droit à la rémunération équitable

L'artiste et le professionnel de la culture salariés, liés par un contrat de travail, ont droit à une rémunération conformément à la législation sociale en vigueur.

Le bénéficiaire des prestations d'un artiste et d'un professionnel de la culture, en dehors de tout contrat de travail, assure en contrepartie à ces derniers, une rémunération proportionnelle conformément au barème fixé par arrêté du Ministre ayant la culture et les arts dans ses attributions, sur proposition des corporations des artistes et professionnels de la culture.

## Article 9 : Du droit à la protection de sa personne

Tout harcèlement ou violence sous toutes ses formes en milieu du travail à l'égard de l'artiste ou du professionnel de la culture est interdit.

## Article 10 : Du droit d'accès aux médias audio-visuels et écrits publics et privés

L'artiste et le professionnel de la culture ont droit d'accès aux médias audio-visuels et écrits, publics et privés conformément à la législation en vigueur.

## Chapitre 3 : De la protection spéciale de certaines catégories d'artistes et de professionnels de la culture

## Article 11 : De la protection de l'artiste et du professionnel de la culture, mineurs d'âge

Toute personne qui recourt aux prestations d'un artiste ou professionnel de la culture, mineur d'âge, dans les productions culturelles, le protège contre toute forme de violences physiques ou morales, d'atteintes à son intégrité physique ou morale, d'abandon ou de négligence, de mauvais traitements ou exploitation, y compris les abus sexuels.

Tout emploi éventuel d'un artiste ou professionnel de la culture, mineur d'âge participe au souci de l'épanouissement de ses talents artistiques ou culturels. L'employeur est tenu de se conformer aux dispositions de l'article 6 du Code du travail congolais ainsi que des articles 50 et suivants de la Loi n° 09/001 du 10 janvier 2009 portant protection de l'enfant.

## Article 12 : De la protection de la femme artiste et professionnelle de la culture

Toute discrimination à l'égard de la femme artiste et professionnelle de la culture est interdite.

La représentativité de la femme est garantie dans l'organisation des activités culturelles et artistiques.

## Article 13 : Du droit de participation des personnes avec handicap

Les personnes avec handicap participent, sans discrimination aucune notamment fondée sur leur état physique, à la création, à la production, à la conservation et à la diffusion des œuvres artistiques. Les partenaires professionnels de la culture s'abstiennent de tout acte et de toute pratique incompatible avec la situation des personnes avec handicap et promeuvent le respect de leurs droits et dignité.

La construction et l'aménagement des infrastructures culturelles tiennent compte de leur mobilité et accessibilité dans les lieux de représentation.

## Chapitre 4 : Des obligations de l'artiste et du professionnel de la culture

## Article 14 : Du respect de la loi, de l'ordre public et de bonnes mœurs

L'artiste et le professionnel de la culture sont tenus dans l'exercice de leurs activités de respecter la loi, l'ordre public et les bonnes mœurs.

## Article 15 : Des obligations fiscales

L'artiste et le professionnel de la culture sont soumis aux obligations fiscales conformément à la législation en vigueur.

Toutefois, compte tenu de la variabilité et de l'intermittence de leurs revenus, leur imposition peut déroger aux règles fiscales de droit commun.

Un arrêté interministériel des Ministres ayant respectivement les finances et la culture et arts dans leurs attributions détermine ce régime dérogatoire dans les limites de leurs compétences.

30 juillet 2025    Journal Officiel de la République Démocratique du Congo    *Première partie* – n° spécial

## Chapitre 5 : De l'accès et de l'exercice de métiers des arts et activités artistiques et culturelles connexes

### Article 16 : Des conditions d'accès et d'exercice

Les conditions d'accès et d'exercice de métiers des arts ainsi que des activités artistiques et culturelles connexes sont fixées par arrêté du Ministre ayant la culture et les arts dans ses attributions.

### Article 17 : Des critères de reconnaissance de l'artiste professionnel

L'artiste professionnel est celui qui satisfait aux conditions suivantes :

1. La création permanente et régulière d'œuvres pour son propre compte en vue de les diffuser, publier, exposer et les mettre sur le marché ;

2. L'enregistrement au répertoire des artistes du Ministère ayant la culture et les arts dans ses attributions ;

3. L'enregistrement ou l'adhésion à une association ou à un bureau des droits d'auteur ;

4. La participation régulière à des événements ou activités d'accès au public.

### Article 18 : De la délivrance de la carte professionnelle

L'exercice à titre professionnel d'une activité artistique et/ou technique appliquée à l'industrie des arts et de la culture requiert l'obtention d'une carte professionnelle.

Les modalités de la délivrance de cette dernière sont fixées par arrêté du Ministre ayant la culture et les arts dans ses attributions.

### Article 19 : De l'exigence de l'écrit dans le contrat de production des phonogrammes

La cession des droits de l'artiste-interprète est soumise aux conditions ci-après :

– Chacun des droits cédés fait l'objet d'une mention distincte dans le contrat conclu avec le producteur ou le tiers, personne physique ou morale ;

– Le domaine d'exploitation des droits visés au tiret précédent est délimité quant à son étendue,

sa destination, son lieu d'exploitation et sa durée.

### Article 20 : Des interdictions frappant les producteurs

Il est interdit aux producteurs, soit de refuser d'engager un artiste ou de respecter son contrat individuel, soit de faire à son égard, des discriminations en matière d'engagement, de rémunérations ou de conditions de travail, soit de le menacer ou de poser tout autre acte de nature à porter atteinte à ses droits, en raison de son appartenance à une association ou à un syndicat d'artistes.

## Chapitre 6 : Des relations entre l'artiste et le professionnel de la culture et leurs partenaires professionnels

### Article 21 : De la présomption de contrat de travail

Tout contrat en vertu duquel une personne physique ou morale s'assure, moyennant rémunération, du concours d'un artiste ou d'un professionnel de la culture en vue de la production, de la diffusion, de la représentation ou d'exposition de son œuvre artistique ou culturelle, est présumé être un contrat de travail, dès lors que cette personne détermine notamment le lieu et les horaires de la prestation de l'intéressé.

### Article 22 : Du contrat collectif

Les artistes ou les professionnels de la culture peuvent signer, par le biais de l'un d'eux, dûment mandaté, un contrat collectif les concernant. Dans ce cas, chacun d'eux a droit à un exemplaire dudit contrat.

## Chapitre 7 : Du répertoire des métiers des arts et de la culture

### Article 23 : De la création

Il est créé un répertoire des métiers des arts et de la culture dont les modalités de tenue sont fixées par arrêté du Ministre ayant la culture et les arts dans ses attributions.

Un Arrêté intermínistériel des Ministres ayant respectivement la culture et les arts ainsi que la formation professionnelle dans leurs attributions, pris

en concertation avec les corporations d'artistes et professionnels de la culture agréés par le Ministre ayant la culture et les arts dans ses attributions, détermine les filières de métiers en tenant compte des défis liés au développement du numérique, aux nouvelles technologies, à l'intelligence artificielle et aux transformations énergétiques et écologiques.

### Chapitre 8 : Des fonds publics et formation artistique et technique des artistes ainsi que des professionnels de la culture

### Article 24 : Des mesures incitatives

Les pouvoirs publics mettent en place des mesures visant à faciliter et à encourager notamment l'accès aux subventions à travers des Fonds d'appui aux arts et à la culture, l'octroi des bourses, le renforcement des capacités.

Ils encouragent les entreprises et autres partenaires à accompagner et soutenir matériellement et/ou financièrement les initiatives artistiques et culturelles par des mesures incitatives et facilités diverses.

### Article 25 : De l'accès à la formation

Les pouvoirs publics, les institutions d'enseignement des arts et métiers, les associations et syndicats d'artistes et professionnels de la culture concourent à la formation continue de ces derniers notamment par la dotation en bourses d'études ou de recherches, par l'organisation de sessions ou ateliers de formation en renforcement de capacités.

### Chapitre 9 : Des dispositions finales

### Article 26

Le Ministre ayant la culture et les arts dans ses attributions est chargé de l'exécution du présent Décret qui entre en vigueur à la date de sa signature.

Fait à Kinshasa, le 09 juin 2025

**Judith Suminwa Tuluka**

———————

# CERTIFIED TRANSLATION



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Special Edition of the Journal Officiel de la République Démocratique du Congo of 30 July 2025 Including the Ordonnance n° 25/238 du 19 Juillet 2025 (CADECO Nomination Presidential Decree**" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Jacqueline Yorke

Sworn to before me this
May 26, 2026

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

Part One

66th year

special issue

[emblem:] DEMOCRATIC REPUBLIC OF THE CONGO
JUSTICE
PEACE
WORK
PRESIDENCY OF THE REPUBLIC

# OFFICIAL JOURNAL

## of the
## Democratic Republic of the Congo

Cabinet of the President of the Republic

Kinshasa – July 30, 2025

# CONTENTS

### PRESIDENCY OF THE REPUBLIC

July 19, 2025 - Ordinance No. 25/230 appointing the members of the Board of Directors and the Executive Management of a public institution known as the National Agency for Spatial Planning, abbreviated as "ANAT", col. 3.

July 19, 2025 - Ordinance No. 25/231 appointing the members of the Board of Directors and the Executive Management of a public institution known as the National Land Use Planning Fund, abbreviated as "FONAT," col. 5.

July 19, 2025 - Ordinance No. 25/232 appointing the members of the Board of Directors and the Executive Management of a state-owned enterprise named Congo Ressources, abbreviated as "CORES SA", col. 7.

July 19, 2025 - Ordinance No. 25/233 appointing the members of the Board of Directors and the Executive Management of a public institution known as the Environmental Intervention Fund, abbreviated as "FIPE," col. 8.

July 19, 2025 - Ordinance No. 25/234 appointing the members of the Board of Directors and the Executive Management of a public institution known as the Carbon Market Regulatory Authority in the Democratic Republic of the Congo, abbreviated as "ARMCA", col. 10.

July 19, 2025 - Ordinance No. 25/235 appointing the members of the Board of Directors and the Executive Management of a public institution known as the Fund for the Promotion of Industry, abbreviated as "FPI", col. 12.

July 19, 2025 - Ordinance No. 25/236 appointing the members of the Board of Directors and the Executive Management of a public institution known as the Universal Service Development Fund, abbreviated as "FDSU", col. 14.

July 19, 2025 - Ordinance No. 25/237 appointing the members of the Board of Directors and the Executive Management of a public institution known as the Institute of National Museums of the Congo, abbreviated as "IMNC," col. 16.

July 19, 2025 - Ordinance No. 25/238 appointing the members of the Board of Directors and the Executive Management of a state-owned enterprise known as the Caisse générale D'épargne du Congo, abbreviated as "CADECO SA", col. 18.

July 19, 2025 - Ordinance No. 25/239 appointing a Governor of the Central Bank of Congo (BCC), col. 20.

July 19, 2025 - Ordinance No. 25/240 appointing a member of the Board of Directors of a public institution known as the National Social Security Fund (CNSS), col. 22.

July 19, 2025 - Ordinance No. 25/241 appointing two members to the personal staff of the Head of State, Col. 23.

July 19, 2025 - Ordinance No. 25/242 appointing a Deputy Chief of Staff to the President of the Republic, Col. 25.

### GOVERNMENT

### Prime Minister's Office

June 9, 2025 - Decree No. 25/24 on the Status of Artists and Cultural Professionals in the Democratic Republic of the Congo, col. 26.

————————————

**Decree No. 25/238 of July 19, 2025, appointing the members of the Board of Directors and the Executive Management of a state-owned enterprise known as the Caisse générale d'épargne du Congo, abbreviated as "CADECO SA"**

The President of the Republic,

Pursuant to the Constitution, as amended by Law No. 11/002 of January 20, 2011, revising certain articles of the Constitution of the Democratic Republic of the Congo of February 18, 2006, specifically Articles 69, 79, and 81;

Pursuant to Law No. 08/007 of July 7, 2008, containing general provisions regarding the restructuring of public enterprises, particularly Articles 2 and 4 thereof;

Pursuant to Law No. 08/010 of July 7, 2008, establishing rules governing the organization and management of the State's portfolio, specifically Articles 3, 9, 10, 11, and 13 thereof;

Pursuant to Ordinance No. 22/003 of January 7, 2022, establishing the responsibilities of the ministries;

Pursuant to Ordinance No. 24/022 of April 1, 2024, appointing a Prime Minister;

Pursuant to Ordinance No. 24/039 of May 28, 2024, appointing Deputy Prime Ministers, Ministers of State, Ministers, Deputy Ministers, and Assistant Ministers;

Pursuant to Ordinance No. 24/88 of October 11, 2024, concerning the organization and functioning of the Government, and the procedures for cooperation between the President of the Republic and the Government, as well as among members of the Government;

Having reviewed Ordinance No. 22/226 of November 11, 2022, appointing the members of the Board of Directors and the Executive Management of a state-owned enterprise known as the Caisse Générale d'Epargne du Congo, abbreviated as "CADECO SA";

Pursuant to Decree No. 13/055 of December 13, 2013, on the status of public officials in state-owned enterprises, specifically Articles 3, 4, and 5 thereof;

Pursuant to the Articles of Association of the "Caisse Générale d'Epargne du Congo," abbreviated as "CADECO SA";

Having regard to the personal files of the persons concerned;

Given the necessity and urgency;

On the proposal of the Government;

## ORDERS

### Article 1

The following individuals are hereby appointed as members of the Board of Directors of the Caisse Générale d'Epargne du Congo, abbreviated as "CADECO SA":

1.  Ms. **Malangu Kabedi-Mbuyi;**
2.  Mr. **Mukeba Muntuabu Célestin;**
3.  Mr. **Nyanguila Mukendi Moise;**
4.  Mr. **Kabwa Yaleyi Henry;**
5.  Mr. **Belo Pindi Jacqueline;**
6.  Mr. **Mwenze Wakadilo Rosen;**
7.  Mr. **Eholo Eoni Norbert;**
8.  Mr. **Litangi Madika Jean-Bedel;**
9.  Ms. **Maboya Damanzo Annie.**

### Article 2

The following individuals are hereby appointed to the positions indicated next to their names:

**1.** Ms. **Malangu Kabedi-Mbuyi**: Chair of the Board of Directors;

**2.** Mr. **Mukeba Muntuabu Célestin:** Director General;

**3.** Mr. **Luvuezo Tela Boyoma Christian**: Deputy Director General.

### Article 3

All prior provisions that conflict with this Ordinance are hereby repealed.

### Article 4

The Minister of the Portfolio is charged with the execution of this Ordinance, which takes effect on the date of its signature.

Executed at Kinshasa, on July 19, 2025

**Félix-Antoine TSHISEKEDI TSHILOMBO**

Judith Suminwa Tuluka
Prime Minister
_____

# EXHIBIT C

## SUBSCRIPTION AGREEMENT

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE OR ANY OTHER JURISDICTION. THERE ARE FURTHER RESTRICTIONS ON THE TRANSFERABILITY OF THE SECURITIES DESCRIBED HEREIN.

THE PURCHASE OF THE SECURITIES INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.

**The Company:**

Name:       PayServices Bank

Address:    950 Bannock Street, Suite 1100
            Boise ID 83702
            United States

Attention:  Lionel Danenberg
            +1(561)306-3861
            lionel@payservices.com

Hereafter the "**Company**";

**The Purchaser:**

Name:       Ministry of State in charge of the Portfolio

Address:    707, Av. Wagenia,
            Kinshasa/Gombe
            Democratic Republic of the Congo

Contact:    Clément Mushengezi
            +243 815 091 315 / +243 997 349 732 / +243 813 507 445
            clement_mus@yahoo.fr / minetatpf2021@gmail.com

Hereafter the "**Purchaser**" and/or the "**Undersigned**".

The undersigned understands that the Company, a corporation organized under the laws of Idaho, is offering an aggregate of **36,700** (thirty six thousand seven hundred) shares of its common stock (the "**Securities**"), which currently represent 3.67% of the total capital stocks, at the price of: $20,000,000 USD (twenty million USD).

In the event where a new shareholder investor is added to the stockholders of the Company, and the number of Company Stock is not increased beyond 1,000,000 at the time of the addition of a new stockholder, because the entire shares of the Restricted Stock of the Company are of the same type, should the Company Stock allocated for the Purchaser not have yet been issued, the Company may amend

1 of 10

 

proportionally the amount of shares that it has reserved for the Purchaser to reflect the new percentage after dilution.

It has been agreed that $20,000,000 (20 million USD) will be paid by electronic bank transfer within 14 days from the signature of this subscription agreement.

The Company Bank Details for the purposes of the stock purchase:

Bank:       Chase Bank
Address:    270 Park Ave.
            New York NY 10017
SWIFT:      CHASUS33

Beneficiary: PAYSERVICES, INC.
Routing #:  021000021
Account #:  702335610

**"Purchaser Payment"**.

The undersigned understands that the offering is being made without registration of the Securities under the Securities Act of 1933, as amended (the "**Securities Act**"), or any securities law of any state of the United States or of any other jurisdiction.

1.  Subscription. Subject to the terms and conditions hereof, and the Purchaser signing a Joinder Agreement (as defined below), the undersigned hereby irrevocably subscribes for the Securities set forth in Schedule 1 hereto for the aggregate purchase price set forth in Schedule 1, which is payable as described in **Section 4** hereof. The undersigned acknowledges that the Securities will be subject to restrictions on transfer as set forth in this subscription agreement (the "**Subscription Agreement**"); and the stockholder agreement between the Company and its shareholders, and any proper amendments and/or replacements (as applicable) thereof from time to time (the "**Stockholder Agreement**"), it being understood that the Purchaser shall in addition to signing this Agreement, sign the Joinder Agreement attached hereto in Schedule 2 (the "**Joinder Agreement**").

2.  Acceptance of Subscription and Issuance of Securities. It is understood and agreed that the Company shall have the sole right, at its complete discretion, to accept or reject this subscription, in whole or in part, for any reason and that the same shall be deemed to be accepted by the Company only when it is signed by a duly authorized officer of the Company and delivered to the undersigned at the Closing referred to in **Section 3** hereof. Subscriptions need not be accepted in the order received, and the Securities may be allocated among subscribers. Notwithstanding anything in this Subscription Agreement to the contrary, the Company shall have no obligation to issue any of the Securities to any person who is a resident of a jurisdiction in which the issuance of Securities to such person would constitute a violation of the securities, "blue sky" or other similar laws of such jurisdiction (collectively referred to as the "**State Securities Laws**").



3. <u>The Closing</u>. The closing of the purchase and sale of the Securities (the "**Closing**") shall take place at such time and place as the Company may designate by notice to the undersigned.

4. <u>Payment for Securities</u>. Payment for the Securities that have been paid to the Company. The Company shall deliver certificates representing the Securities to the undersigned at the Closing, subject to the Scrip Procedure (as defined in 4(a) below), bearing an appropriate legend referring to the fact that the Securities were sold in reliance upon an exemption from registration under the Securities Act.

   (a) The company shall issue scrip ("**Scrip**") to replace any fractional shares that are part of the Securities purchased by the undersigned hereunder, and herewith entitles the Purchaser to exchange any Scrip for title to the Company's stock once the Purchaser aggregates enough Scrip to equal one full share of the Company. It is agreed that any and all Scrip held by the Purchaser does not grant the Purchaser any voting, dividend or liquidation rights. The Company's board of directors reserves the right to grant such rights, and to fix other terms of the Scrip, such as making the Scrip void if it is not exchanged by a certain date.

5. <u>Representation and Warranties of the Company</u>. As of the Closing, the Company represents and warrants that: the Company is duly formed and validly existing under the laws of Idaho, with full power authority to conduct its business as it is currently being conducted.

6. <u>Representations and Warranties of the Undersigned</u>. The undersigned hereby represents and warrants to and covenants with the Company that:

   **A. General**

   I. The undersigned has all requisite authority (and in the case of an individual, the capacity) to purchase the Securities, enter into this Subscription Agreement and to perform all the obligations required to be performed by the undersigned hereunder, and such purchase will not contravene any law, rule or regulation binding on the undersigned or any investment guideline or restriction applicable to the undersigned.

   II. The undersigned is a resident of the state set forth on the signature page hereto and is not acquiring Securities as a nominee or agent or otherwise for any other person.

   III. The undersigned will comply with all applicable laws and regulations in effect in any jurisdiction in which the undersigned purchases or sells Securities and obtain any consent, approval or permission required for such purchases or sales under the laws and regulations of any jurisdiction to which the undersigned is subject or in which the undersigned makes such purchases or sales, and the Company shall have no responsibility therefore.



## B. Information Concerning the Company

I. The undersigned has received a copy of the Company's brochure which provides a general overview of the Company's business.

II. The undersigned understands and accepts that the purchase of the Securities involves various risks, including the risk of change in the substance of the business plan as and where in such is in the interests of the Company. The undersigned represents that it is able to bear any loss associated with an investment in the Securities.

III. The undersigned confirms that it is not relying on any communication (written or oral) of the Company or any of its affiliates, as investment advice or as a recommendation to purchase the Securities. It is understood that information and explanations provided in the Brochure or otherwise by the Company or any of its affiliates shall not be considered investment advice or a recommendation to purchase the Securities, and that neither the Company nor any of its affiliates is acting or has acted as an advisor to the undersigned in deciding to invest in the Securities. The undersigned acknowledges that neither the Company nor any of its affiliates has made any representation regarding the proper characterisation of the Securities for purposes of determining the undersigned's authority to invest in the Securities.

IV. The undersigned is familiar with the business and financial condition and operations of the Company. The undersigned has had access to such information concerning the Company and the Securities as it deems necessary to enable it to make an informed investment decision concerning the purchase of the Securities.

V. The undersigned understands that, unless the undersigned notifies the Company in writing to the contrary at or before the Closing, each of the undersigned's representations and warranties contained in this Subscription Agreement will be deemed to have been reaffirmed and confirmed as of the Closing, taking into account all information received by the undersigned.

VI. The undersigned acknowledges that the Company has the right in its sole and absolute discretion to abandon this private placement at any time prior to the completion of the offering. This Subscription Agreement shall thereafter have no force or effect and the Company shall return the previously paid subscription price of the Securities, without interest thereon, to the undersigned.

VII. The undersigned understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

4 of 10

## C. Non-reliance.

I. The undersigned represents that it is not relying on (and will not at any time rely on) any communication (written or oral) of the Company, as investment advice or as recommendation to purchase the Securities, it being understood that information in the Brochure shall not be considered investment advice or a recommendation to purchase the Securities.

II. The undersigned confirms that the Company has not (A) given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Securities or (B) made any representation to the undersigned regarding the legality of an investment in the Securities under applicable legal investment or similar laws or regulations. In deciding to purchase the Securities, the undersigned is not relying on the advice or recommendations of the Company and the undersigned has made its own independent decision that the investment in the Securities is suitable and appropriate for the undersigned.

## D. Status of undersigned

I. The undersigned has such knowledge, skill and experience in business, financial and investment matters that the undersigned is capable of evaluating the merits and risks of an investment in the Securities. With the assistance of the undersigned's own professional advisors, to the extent that the undersigned has deemed appropriate, the undersigned has made its own legal, tax, accounting and financial evaluation of the merits and risks of an investment in the Securities and the consequences of this Subscription Agreement. The undersigned has considered the suitability of the Securities as an investment in light of its own circumstances and financial condition and the undersigned is able to bear the risks associated with an investment in the Securities and its authority to invest in the Securities.

## E. Restrictions on Transfer or Sale of Securities.
As applies to the Purchaser:

I. The undersigned is acquiring the Securities solely for the undersigned's own beneficial account, and not with a view to, or for resale in connection with, any distribution of the Securities. The undersigned understands that the Securities have not been registered under the Securities Act of any State Securities Laws by reason of specific exemptions and/or safe harbours (as applicable) under the provisions thereof which depend in part upon the investment intent of the undersigned and of the other representations made by the

undersigned in this Subscription Agreement. The undersigned understands that the Company is relying upon the representations and agreements contained in this Subscription Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions and/or safe harbours (as applicable).

II. The undersigned understands that the Securities are "restricted securities" under applicable federal securities laws and the Securities Act and the rules of the U.S. Securities and Exchange Commission (the "**Commission**") provide in substance that the undersigned may dispose of the Securities only pursuant to an effective registration statement under the Securities Act or an exemption or safe harbour therefrom (as applicable), and the undersigned understands that the Company has no obligation or intention to register any of the Securities, or to take action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder). Accordingly, the undersigned understands that under the Commission's rules, the undersigned may dispose of the Securities principally in compliance with Regulation S of the Securities Act 1933, and "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations as in the hands of the undersigned. Consequently, the undersigned understands that the undersigned must bear the economic risks of the investment in the Securities for an indefinite period of time.

III. The undersigned agrees: (A) that the undersigned will not sell, assign, pledge, give, transfer or otherwise dispose of the Securities or any interest therein, or make any offer or attempt to do any of the foregoing, except pursuant to a registration of the Securities under the Securities Act and all applicable State Securities Laws, or in a transaction which is exempt from the registration provisions of the Securities Act and all applicable State Securities Laws; (B) that the certificates representing the Securities will bear a legend making reference to the foregoing restrictions; and (C) that the Company and its affiliates shall not be required to give effect to any purported transfer of such Securities except upon compliance with the foregoing restrictions.

IV. The undersigned acknowledges that neither the Company nor any other person offered to sell the Securities to it by means of any form of general solicitation or advertising, including but not limited to: (A) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or (B) any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

V. The undersigned agrees not to hedge the Securities except in compliance with the Securities Act 1933.



7. <u>Conditions of Obligations of the Undersigned and the Company</u>. The obligations of the undersigned to purchase and pay for the Securities specified in Schedule 1 and of the Company to sell the Securities are subject to the satisfaction at or prior to the Closing of the following conditions precedent: the representations and warranties of the Company contained in **Section 5** hereof and of the undersigned contained in **Section 6** hereof shall be true and correct as of the Closing in all respects with the same effect as though such representations and warranties had been made as of the Closing.

8. <u>Obligations Irrevocable</u>. The obligations of the undersigned shall be irrevocable.

9. <u>Legend</u>. The certificates representing the Securities sold pursuant to this Subscription Agreement will be imprinted with a legend in substantially the following form:

"THE SECURITIES EVIDENCES BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO A SAFE HARBOUR FROM REGISTRATION UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION TO WHICH A SAFE HARBOR APPLIES OR WHICH IS EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE LAWS."

10. <u>Waiver, Amendment</u>. Neither this Subscription Agreement nor any provisions hereof shall be modified, changed, discharged or terminated except by an instrument in writing, signed by the party against whom any waiver, change, discharge or termination is sought.

11. <u>Assignability</u>. Neither this Subscription Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by either the Company or the undersigned without the prior written consent of the other party.

12. <u>Waiver of Jury Trial</u>. THE UNDERSIGNED IRREVOCABLE WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT.

13. <u>Submission to Jurisdiction</u>. With respect to any suit, action or proceeding relating to any offers, purchases or sales of the Securities by the undersigned ("**Proceedings**"), the undersigned irrevocably submits to the jurisdiction of the federal or state courts located in the State of Idaho, which submission shall be exclusive unless none of such courts has lawful jurisdiction over such Proceedings.

14. Governing Law. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Idaho.

15. Section and Other Headings. The section and other headings contained in this Subscription Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Subscription Agreement.

16. Counterparts. This Subscription Agreement may be executed in any number of counterpart, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

17. Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the addresses on the first page of this Subscription Agreement (or such other address as either party shall have specified by notice in writing to the other).

18. Binding Effect. The provision of this Subscription Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

19. Survival. All representations, warranties and covenants contained in this Subscription Agreement shall survive (i) the acceptance of the subscription by the Company, (ii) changes in the Business Plan and (iii) the death or disability of the undersigned.

20. Notification of Changes. The undersigned hereby covenants and agrees to notify the Company upon the occurence of any event prior to the closing of the purchase of the Securities pursuant to this Subscription Agreement which would cause any representation, warrant, or covenant of the undersigned contained in this Subscription Agreement to be false or incorrect.

21. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or un-enforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement this __13__ day of __MARCH__ 2024.

| | |
|---|---|
| **PURCHASER** _(sign & date)_ | **COMPANY** _(sign & date)_ |

The offer to purchase Securities as set forth above is confirmed and accepted by the Company.

## SCHEDULE 1

### CONSIDERATION TO BE DELIVERED

Securities to be Acquired:

**36,700** shares of common stock = 3.67 %.

Aggregate Purchase Price:

Payments of agreed amounts as outlined in "**Purchaser Payment**" description.

Authorized Capital Stock at the time of this Agreement**:**

**1,000,000** shares of common stock.



## SCHEDULE 2

## JOINDER AGREEMENT

Reference is hereby made to the Stockholders Agreement (as amended from time to time, the "**Stockholders Agreement**"), by an between the then existing stockholders of PayServices Bank, a company organized under the laws of Idaho (the "**Company**"). Pursuant to and in accordance with the Stockholders Agreement, the undersigned hereby agrees that upon the execution of this Joinder Agreement, it shall become a party to the Stockholders Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as though an original party thereto and shall be deemed to be a Stockholder of the Company for all purposes thereof.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Stockholders Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of this ___13___ day of ___MARCH___ 2024.

**PURCHASER**      (sign & date)
Name:

**COMPANY**      (sign & date)
Name:

TRADUCTION POUR RÉFÉRENCE, SEULE LA VERSION EN ANGLAIS PRÉVAUT

## CONTRAT DE SOUSCRIPTION

LES TITRES N'ONT PAS ÉTÉ ENREGISTRÉS EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES DE 1933 OU DES LOIS SUR LES VALEURS MOBILIÈRES D'AUCUN ÉTAT OU DE TOUTE AUTRE JURIDICTION. IL EXISTE D'AUTRES RESTRICTIONS SUR LA TRANSFÉRABILITÉ DES TITRES DÉCRITS DANS LES PRÉSENTES.

L'ACHAT DES TITRES IMPLIQUE UN DEGRÉ DE RISQUE ÉLEVÉ ET NE DOIT ÊTRE CONSIDÉRÉ QUE PAR DES PERSONNES POUVANT SUPPORTER LE RISQUE DE PERTE DE LA TOTALITÉ DE LEUR INVESTISSEMENT.

**L'entreprise:**

Nom:        PayServices Bank

Adresse:    950 Bannock Street, Suite 1100
            Boise ID 83702
            United States

Attention:  Lionel Danenberg
            +1(561)306-3861
            lionel@payservices.com

Ci-après la « Société » ;

**L'acheteur:**

Nom:        Ministère d'État en charge du Portefeuille

Adresse:    707, Av. Wagenia,
            Kinshasa/Gombe
            République Démocratique du Congo

Contact:    Clément Mushengezi
            +243 815 091 315 / +243 997 349 732 / +243 813 507 445
            clement_mus@yahoo.fr / minetatpf2021@gmail.com

Ci-après l'« **Acheteur** » et/ou le « **Soussigné** ».

Le soussigné comprend que la Société, une société constituée selon les lois de l'Idaho, offre un total de **36 700** (trente six mille sept cents) actions ordinaires (les « **Titres** »), qui représentent actuellement 3,67 % du capital total d'actions, au prix de : 20 000 000 USD (vingt millions USD).

Dans le cas où un nouvel investisseur actionnaire est ajouté aux actionnaires de la Société et que le nombre d'actions de la Société n'augmente pas au-delà de 1 000 000 au moment de l'ajout d'un nouvel actionnaire, car la totalité des actions des actions restreintes de la Société sont de même nature, si les actions de la Société attribuées à l'Acheteur n'ont pas encore été émises, la Société pourra modifier

1 of 10



TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

proportionnellement le nombre d'actions qu'elle a réservées à l'Acheteur pour refléter le nouveau pourcentage après dilution.

Il a été convenu que 20 000 000 $ (20 millions USD) seront payés par virement bancaire électronique dans les 14 jours suivant la signature du présent contrat de souscription.

Les coordonnées bancaires de la société pour les besoins de l'achat d'actions :

Bank:       Chase Bank
Address:    270 Park Ave.
            New York NY 10017
SWIFT:      CHASUS33

Beneficiary: PAYSERVICES, INC.
Routing #: 021000021
Account #: 702335610

« **Paiement de l'acheteur** ».

Le soussigné comprend que l'offre est effectuée sans enregistrement des titres en vertu du Securities Act de 1933, tel que modifié (le « **Securities Act** »), ou de toute loi sur les valeurs mobilières d'un État des États-Unis ou de toute autre juridiction.

1. Souscription. Sous réserve des termes et conditions des présentes et de la signature par l'acheteur d'un accord de jonction (tel que défini ci-dessous), le soussigné souscrit par les présentes de manière irrévocable aux titres indiqués à l'annexe 1 des présentes pour le prix d'achat global indiqué à l'annexe 1, qui est payable comme décrit à la **section 4** des présentes. Le soussigné reconnaît que les titres seront soumis à des restrictions de transfert telles qu'énoncées dans le présent contrat de souscription (le « **Contrat de souscription** ») ; et le contrat d'actionnaires entre la Société et ses actionnaires, ainsi que toute modification et/ou remplacement approprié (le cas échéant) de celui-ci de temps à autre (le « **Contrat d'actionnaires** »), étant entendu que l'Acheteur doit, en plus de signer le présent Contrat, signer l'accord de jonction ci-joint à l'annexe 2 (l'« **accord de jonction** »).

2. Acceptation de souscription et émission de titres. Il est entendu et convenu que la Société aura le droit exclusif, à son entière discrétion, d'accepter ou de refuser cette souscription, en tout ou en partie, pour quelque raison que ce soit et que celle-ci sera réputée acceptée par la Société uniquement lorsqu'il est signé par un dirigeant dûment autorisé de la Société et remis au soussigné à la clôture mentionnée à **l'article 3** des présentes. Les souscriptions ne doivent pas être acceptées dans l'ordre de réception et les Titres peuvent être répartis entre les souscripteurs. Nonobstant toute disposition contraire du présent Contrat de Souscription, la Société n'aura aucune obligation d'émettre des Titres à toute personne qui est un résident d'une juridiction dans laquelle l'émission de Titres à une telle personne constituerait une violation des titres, " blue sky » ou d'autres lois similaires de cette juridiction (collectivement appelées les « **lois sur les valeurs mobilières de l'État** »).



TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

3. La fermeture. La clôture de l'achat et de la vente des titres (la « **clôture** ») aura lieu à l'heure et au lieu que la Société pourra désigner par notification au soussigné.

4. Paiement des titres. Paiement des Titres qui ont été payés à la Société. La Société délivrera des certificats représentant les Titres au soussigné à la Clôture, sous réserve de la Procédure de Script (telle que définie au point 4(a) ci-dessous), portant une légende appropriée faisant référence au fait que les Titres ont été vendus en vertu d'une dispense d'enregistrement en vertu de la Loi sur les valeurs mobilières.

   (a) La société émettra des scripts (« **Scrip** ») pour remplacer toutes les fractions d'actions qui font partie des titres achetés par le soussigné en vertu des présentes, et autorise par les présentes l'acheteur à échanger tout script contre le titre des actions de la société une fois que l'acheteur aura rassemblé suffisamment de scripts pour égaler une action entière de la Société. Il est convenu que tous les Scripts détenus par l'Acheteur ne confèrent à l'Acheteur aucun droit de vote, de dividende ou de liquidation. Le conseil d'administration de la Société se réserve le droit d'accorder de tels droits et de fixer d'autres conditions du Scrip, comme par exemple rendre le Scrip nul s'il n'est pas échangé à une certaine date.

5. Représentation et garanties de la société. À la clôture, la Société déclare et garantit que : la Société est dûment constituée et existe valablement en vertu des lois de l'Idaho, avec les pleins pouvoirs pour mener ses activités telles qu'elles sont actuellement menées.

6. Représentations et garanties du soussigné. Le soussigné par les présentes déclare, garantit et s'engage avec la Société que:

   **A. Général**

   I. Le soussigné a toute l'autorité requise (et dans le cas d'une personne physique, la capacité) pour acheter les titres, conclure le présent contrat de souscription et exécuter toutes les obligations qui doivent être exécutées par le soussigné en vertu des présentes, et un tel achat ne contreviendra à aucune loi, règle ou règlement liant le soussigné ou toute directive ou restriction d'investissement applicable au soussigné.

   II. Le soussigné est un résident de l'État indiqué sur la page de signature des présentes et n'acquiert pas de titres en tant que prête-nom, agent ou autrement pour toute autre personne.

   III. Le soussigné se conformera à toutes les lois et réglementations applicables en vigueur dans toute juridiction dans laquelle il achète ou vend des titres et obtiendra tout consentement, approbation ou autorisation requis pour de tels achats ou ventes en vertu des lois et réglementations de toute juridiction à laquelle le soussigné est rattaché ou sujet ou dans lequel le soussigné effectue de tels achats ou ventes, et la Société n'en assumera aucune responsabilité.

TRADUCTION POUR RÉFÉRENCE, SEULE LA VERSION EN ANGLAIS PRÉVAUT

## B. Informations concernant la société

I. Le soussigné a reçu un exemplaire de la brochure de la Société qui donne un aperçu général des activités de la Société.

II. Le soussigné comprend et accepte que l'achat des titres comporte divers risques, y compris le risque de changement dans la substance du plan d'affaires dans la mesure où cela est dans l'intérêt de la Société. Le soussigné déclare qu'il est en mesure de supporter toute perte associée à un investissement dans les titres.

III. Le soussigné confirme qu'il ne s'appuie sur aucune communication (écrite ou orale) de la Société ou de l'une de ses sociétés affiliées, comme conseil en investissement ou comme recommandation d'achat des Titres. Il est entendu que les informations et explications fournies dans la Brochure ou autrement par la Société ou l'une de ses sociétés affiliées ne doivent pas être considérées comme un conseil en investissement ou une recommandation d'achat de Titres, et que ni la Société ni aucune de ses sociétés affiliées n'agit ou n'a agi à titre de conseiller du soussigné dans sa décision d'investir dans les titres. Le soussigné reconnaît que ni la Société ni aucun des membres de son groupe n'a fait de déclaration concernant la qualification appropriée des titres aux fins de déterminer l'autorité du soussigné à investir dans les titres.

IV. Le soussigné connaît bien la situation commerciale et financière ainsi que les opérations de la Société. Le soussigné a eu accès aux informations concernant la Société et les Titres qu'il juge nécessaires pour lui permettre de prendre une décision d'investissement éclairée concernant l'achat des Titres.

V. Le soussigné comprend que, sauf notification écrite contraire du soussigné à la Société au plus tard à la clôture, chacune des déclarations et garanties du soussigné contenues dans le présent contrat de souscription sera réputée avoir été réaffirmée et confirmée à la clôture, compte tenu compte de toutes les informations reçues par le soussigné.

VI. Le soussigné reconnaît que la Société a le droit, à sa seule et absolue discrétion, d'abandonner ce placement privé à tout moment avant la réalisation de l'offre. Le présent Contrat de Souscription n'aura par la suite aucune force ni effet et la Société restituera le prix de souscription des Titres précédemment payé, sans intérêts y afférents, au soussigné.



TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

VII. Le soussigné comprend qu'aucune agence fédérale ou étatique n'a évoqué les mérites ou les risques d'un investissement dans les titres ni n'a formulé de conclusion ou de détermination concernant l'équité ou l'opportunité de cet investissement.

## C. Non-dépendance.

I. Le soussigné déclare qu'il ne s'appuie pas (et ne s'appuiera à aucun moment sur) aucune communication (écrite ou orale) de la Société, en tant que conseil en investissement ou recommandation d'achat des Titres, étant entendu que les informations contenues dans la Brochure doivent ne doit pas être considérées comme un conseil en investissement ou une recommandation d'achat des Titres.

II. Le soussigné confirme que la Société n'a (A) donné aucune garantie ou déclaration quant au succès, au rendement, à l'effet ou au bénéfice potentiel (juridique, réglementaire, fiscal, financier, comptable ou autre) d'un investissement dans les Titres ou (B) a fait toute déclaration au soussigné concernant la légalité d'un investissement dans les titres en vertu des lois ou réglementations légales applicables en matière d'investissement ou de lois ou réglementations similaires. En décidant d'acheter les titres, le soussigné ne s'appuie pas sur les conseils ou les recommandations de la Société et a pris sa propre décision indépendante selon laquelle l'investissement dans les titres est approprié et approprié pour le soussigné.

## D. Statut du soussigné

I. Le soussigné possède de telles connaissances, compétences et expérience en matière commerciale, financière et d'investissement qu'il est capable d'évaluer les mérites et les risques d'un investissement dans les titres. Avec l'aide de ses propres conseillers professionnels, dans la mesure que le soussigné l'a jugé approprié, le soussigné a procédé à sa propre évaluation juridique, fiscale, comptable et financière des mérites et des risques d'un investissement dans les Titres et des conséquences de ce Contrat de Souscription. Le soussigné a examiné la pertinence des titres en tant qu'investissement à la lumière de sa propre situation et de sa situation financière et il est en mesure d'assumer les risques associés à un investissement dans les titres et à son pouvoir d'investir dans les titres.

## E. Restrictions sur le transfert ou la vente de titres.
S'applique à l'Acheteur :

I. Le soussigné acquiert les titres uniquement pour son propre compte bénéficiaire, et non en vue ou pour la revente dans le cadre d'une distribution des titres. Le soussigné comprend que les titres n'ont pas été enregistrés en vertu de la loi sur les valeurs mobilières d'une loi nationale sur les valeurs mobilières en raison d'exemptions spécifiques et/ou de règles d'exonération (le cas échéant) en vertu des dispositions de celles-ci qui dépendent en partie de l'intention d'investissement du soussigné et des autres déclarations faites par le

TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

soussigné dans le présent contrat de souscription. Le soussigné comprend que la Société s'appuie sur les déclarations et accords contenus dans le présent Contrat de Souscription (et toute information supplémentaire) dans le but de déterminer si cette transaction répond aux exigences de ces exemptions et/ou règles d'exonération (le cas échéant).

II. Le soussigné comprend que les titres sont des « titres soumis à des restrictions » en vertu des lois fédérales sur les valeurs mobilières applicables et du Securities Act et que les règles de la Securities and Exchange Commission des États-Unis (la « **Commission** ») prévoient en substance que le soussigné ne peut disposer des titres que conformément à une déclaration d'enregistrement effective en vertu de la Securities Act ou d'une exemption ou d'une sphère de sécurité (le cas échéant), et le soussigné comprend que la Société n'a aucune obligation ni intention d'enregistrer l'un des titres, ou de prendre des mesures de manière à permettre les ventes conformément à la Securities Act (y compris la règle 144 ci-dessous). En conséquence, le soussigné comprend qu'en vertu des règles de la Commission, le soussigné peut disposer des titres principalement conformément au règlement S du Securities Act 1933, et aux « placements privés » qui sont dispensés d'enregistrement en vertu du Securities Act, auquel cas le cessionnaire acquerra des « titres restreints » soumis aux mêmes limitations que celles entre les mains du soussigné. En conséquence, le soussigné comprend qu'il doit supporter les risques économiques liés à l'investissement dans les Titres pour une durée indéterminée.

III. Le soussigné s'engage : (A) à ne pas vendre, céder, mettre en gage, donner, transférer ou autrement aliéner les titres ou tout intérêt dans ceux-ci, ni faire aucune offre ou tenter de faire ce qui précède, sauf en vertu d'un enregistrement des titres en vertu de la loi sur les valeurs mobilières et de toutes les lois sur les valeurs mobilières de l'État applicables, ou dans le cadre d'une transaction qui est exemptée des dispositions d'enregistrement de la loi sur les valeurs mobilières et de toutes les lois sur les valeurs mobilières de l'État applicables ; (B) que les certificats représentant les Titres porteront une légende faisant référence aux restrictions qui précèdent ; et (C) que la Société et ses sociétés affiliées ne seront pas tenues de donner effet à tout prétendu transfert de ces Titres, sauf en cas de respect des restrictions ci-dessus.

IV. Le soussigné reconnaît que ni la Société ni aucune autre personne n'a proposé de lui vendre les titres au moyen de toute forme de sollicitation générale ou de publicité, y compris, mais sans s'y limiter : (A) toute publicité, article, avis ou autre communication publié dans tout journal, magazine ou média similaire ou diffusé à la télévision ou à la radio ou (B) tout séminaire ou réunion dont les participants ont été invités par une sollicitation générale ou une publicité générale.

V. Le soussigné s'engage à ne pas couvrir les titres sauf en conformité avec le Securities Act 1933.



TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

7. Conditions d'Obligations du Soussigné et de la Société. Les obligations du soussigné d'acheter et de payer les Titres spécifiés à l'Annexe 1 et de la Société de vendre les Titres sont soumises à la satisfaction au plus tard à la Clôture des conditions suspensives suivantes : les déclarations et garanties de la Société contenues dans la **section 5** des présentes et le soussigné contenu dans la **section 6** des présentes seront véridiques et exactes à la clôture à tous égards avec le même effet que si de telles représentations et garanties avaient été faites à la clôture.

8. Obligations irrévocables. Les obligations du soussigné sont irrévocables.

9. Légende. Les certificats représentant les Titres vendus aux termes du présent Contrat de Souscription porteront une légende sensiblement sous la forme suivante :

« LES PREUVES DE TITRES CONTENUES PAR CE CERTIFICAT N'ONT PAS ÉTÉ ENREGISTRÉES EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES DE 1933, TELLE QUE MODIFIÉE (LA « LOI SUR LES VALEURS MOBILIÈRES »), OU DES LOIS SUR LES VALEURS MOBILIÈRES D'AUCUN ÉTAT OU AUTRE JURIDICTION. LES TITRES NE PEUVENT PAS ÊTRE OFFERTS, VENDUS, NONGÉS OU AUTRE TRANSFÉRÉS SAUF (1) EN VERTU D'UNE EXEMPTION D'ENREGISTREMENT EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES OU (2) EN VERTU D'UNE DÉCLARATION D'ENREGISTREMENT EFFICACE EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES OU EN VERTU D'UNE EXEMPLAIRE SÛR D'ENREGISTREMENT EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES LA LOI SUR LES VALEURS MOBILIÈRES, DANS CHAQUE CAS CONFORMÉMENT À TOUTES LES LOIS APPLICABLES SUR LES VALEURS MOBILIÈRES DES ÉTATS ET AUX LOIS SUR LES VALEURS MOBILIÈRES D'AUTRES JURIDICTIONS, ET DANS LE CAS D'UNE TRANSACTION À LAQUELLE UN SÛR S'APPLIQUE OU QUI EST EXEMPTÉE D'ENREGISTREMENT, À MOINS QUE LA SOCIÉTÉ A REÇU UN AVIS DE CONSEIL RAISONNABLEMENT SATISFAISANT QUE UNE TELLE TRANSACTION N'EXIGE PAS D'ENREGISTREMENT EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES ET DE TELLES AUTRES LOIS APPLICABLES.

10. Renonciation, Amendement. Ni le présent Contrat de souscription ni aucune disposition des présentes ne doivent être modifiés, changés, libérés ou résiliés sauf par un instrument écrit, signé par la partie contre laquelle toute renonciation, changement, libération ou résiliation est demandée.

11. Cessibilité. Ni le présent Contrat de Souscription ni aucun droit, recours, obligation ou responsabilité découlant des présentes ou en raison des présentes ne seront cessibles par la Société ou le soussigné sans le consentement écrit préalable de l'autre partie.

12. Renonciation au procès devant jury. LE SOUSSIGNÉ RENONCE IRRÉVOCABLE À TOUT DROIT DE PROCÈS PAR JURY CONCERNANT TOUTE PROCÉDURE JUDICIAIRE DÉCOULANT DES TRANSACTIONS ENVISAGÉES PAR LE PRÉSENT CONTRAT DE SOUSCRIPTION.

13. Soumission à la juridiction. En ce qui concerne toute poursuite, action ou procédure relative à toute offre, achat ou vente de titres par le soussigné («

TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

Procédures »), le soussigné se soumet irrévocablement à la compétence des tribunaux fédéraux ou étatiques situés dans l'État de l'Idaho, où la soumission sera exclusive à moins qu'aucun de ces tribunaux n'ait la compétence légale sur une telle procédure.

14. Loi applicable. Le présent contrat de souscription sera régi et interprété conformément aux lois de l'État de l'Idaho.

15. Section et autres titres. La section et les autres titres contenus dans le présent Contrat de Souscription sont fournis à titre de référence uniquement et n'affecteront pas la signification ou l'interprétation du présent Contrat de Souscription.

16. Exemplaires. Le présent Contrat de Souscription peut être signé en n'importe quel nombre d'exemplaires, dont chacun, une fois ainsi signé et livré, sera considéré comme un original et qui, ensemble, seront considérés comme un seul et même contrat.

17. Avis. Tous les avis et autres communications prévus aux présentes doivent être faits par écrit et seront réputés avoir été dûment donnés s'ils sont livrés en personne ou envoyés par courrier recommandé ou certifié, avec accusé de réception demandé, port payé aux adresses indiquées sur la première page du présent Contrat d'abonnement ( ou toute autre adresse que l'une ou l'autre des parties aura spécifiée par notification écrite à l'autre).

18. Effet contraignant. La disposition du présent Contrat de Souscription liera et profitera aux parties aux présentes et à leurs héritiers, représentants légaux, successeurs et ayants droit respectifs.

19. Survie. Toutes les déclarations, garanties et engagements contenus dans le présent Contrat de Souscription survivront (i) à l'acceptation de la souscription par la Société, (ii) aux modifications apportées au Plan d'Affaires et (iii) au décès ou à l'invalidité du soussigné.

20. Notification des modifications. Le soussigné s'engage par les présentes et convient d'informer la Société de la survenance de tout événement avant la clôture de l'achat des titres conformément au présent contrat de souscription qui entraînerait toute déclaration, mandat ou engagement du soussigné contenu dans le présent contrat de souscription à être faux ou incorrect.

21. Divisibilité. Si une condition ou une disposition du présent accord est invalide, illégale ou inapplicable dans une juridiction, cette invalidité, illégalité ou inapplicabilité n'affectera aucune autre condition ou disposition du présent accord ni n'invalidera ou ne rendra inapplicable cette condition ou cette disposition dans toute autre juridiction. .

EN FOI DE QUOI, le soussigné a signé le présent Contrat de Souscription ce ___13___ jour de ___MARS___ 2024.

_____    _____  13/03/2024
ACHETEUR (signature et date)        ENTREPRISE (signature et date)

8 of 10

TRADUCTION POUR RÉFÉRENCE, SEULE LA VERSION EN ANGLAIS PRÉVAUT

L'offre d'achat de Titres telle que présentée ci-dessus est confirmée et acceptée par la Société.

## ANNEXE 1

## CONTREPARTIE À LIVRER

Titres à acquérir :

**36 700** actions ordinaires = 3,67 %.

Prix d'achat global :

Paiements des montants convenus comme indiqué dans la description « **Paiement de l'acheteur** ».

Capital-actions autorisé au moment de la conclusion du présent accord :

**1 000 000** d'actions ordinaires.



TRADUCTION POUR RÉFÉRENCE. SEULE LA VERSION EN ANGLAIS PRÉVAUT

## ANNEXE 2

## ACCORD DE JONCTION

Il est fait référence par les présentes au Contrat d'actionnaires (tel que modifié de temps à autre, le « **Contrat d'actionnaires** »), conclu entre les actionnaires alors existants de PayServices Bank, une société organisée selon les lois de l'Idaho (la « **Société** »). En vertu et conformément au pacte d'actionnaires, le soussigné convient par les présentes qu'à la signature du présent accord de jonction, il deviendra partie au pacte d'actionnaires et sera pleinement lié par et soumis à tous les engagements, termes et conditions du Contrat d'Actionnaires comme s'il était une partie originale de celui-ci et sera considéré comme un actionnaire de la Société à toutes fins utiles.

Les termes en majuscules utilisés ici sans définition auront la signification qui leur est attribuée dans le pacte d'actionnaires.

**EN FOI DE QUOI**, les parties aux présentes ont signé le présent Accord à compter de ce ___13___ jour de ___MARS___ 2024.

**ACHETEUR** (signature et date)
Nom:

**ENTREPRISE** (signature et date)
Nom:

# EXHIBIT D



# ITAM

### CONGO-KINSHASA

**PROPULSÉ PAR**

 **CADECO** | PayServices

## DIGITALISATION DE L'ÉCONOMIE DE LA RDC

Case 1:26-cv-00009-REP  Document 46-4  Filed 05/26/26  Page 55 of 114

# PROLOGUE

Dans un tournant décisif pour l'avenir économique de la République Démocratique du Congo, une nouvelle entité émerge sous le nom d'ITAM. Alimentée par deux forces majeures, PayServices, une institution financière basée aux États-Unis forte de son savoir faire dans les technologies financières de pointe, et CADECO, une institution financière congolaise, ITAM se dresse comme le pilier central de la digitalisation de l'économie congolaise.

CADECO, une banque d'État autrefois au bord de la faillite, est en pleine métamorphose. Grâce à cette alliance stratégique, elle se prépare à une renaissance spectaculaire, visant à accumuler des dépôts dépassant les 2 milliards de dollars américains sur une période de cinq ans. Cette transformation permettra à CADECO de servir une vaste majorité de la population congolaise, jusqu'alors non bancarisée.

L'ambition d'ITAM ne s'arrête pas là. La nouvelle entité projette de multiplier la valorisation de CADECO, d'élargir son réseau avec au moins quatre agences par province, totalisant 114 agences à travers le pays, et d'accroître sa force de travail de quelques centaines à plus de 3 000 employés.

Ensemble, PayServices et CADECO, à travers ITAM, sont résolus à transformer la RDC en un hub financier pour toute la région de l'Afrique centrale, propulsant le pays vers une ère de prospérité et d'innovation financière.



# GLOSSAIRE

| | |
|---|---|
| Avantages de ITAM pour la RDC | 1-2 |
| Objectif Général | 3 |
| L'institution financière congolaise CADECO | 4-6 |
| L'institution financière américaine PayServices | 7-8 |
| Le projet « ITAM » | 9 |
| Le projet de « SWITCH Universel » | 10 |
| Carte universelle dont les transactions sont traitées localement pour l'Afrique | 11-12 |
| Cible | 13 |
| Accords signés | 14-16 |
| Fonctionnalités de la plateforme du réseau PayServices | 17-18 |
| Infrastructure de serveurs sécurisée en RDC | 19 |
| Digitalisation de l'économie et de l'administration congolaise | 20 |
| Projections financières et statistiques relatives à la CADECO | 21-26 |

# AVANTAGES DE ITAM POUR LA RDC

**ITAM**
CONGO-KINSHASA

• Création d'un réseau interbancaire africain dont les transactions sont gérées localement en RDC ; positionnant la RDC comme un acteur économique incontournable sur le continent africain.

• Sécurisation nationale : stockage et traitement des transactions financières directement sur le sol congolais.

• Savoir-faire : Installation d'un centre de données sécurisé selon les standards américains en la matière (cyber-sécurité) pour la sécurisation des données financières qui seront traitées localement selon la législation congolaise.

• Paiements en temps réel entre les contreparties puisque PayServices, l'institution américaine qui fait le partenariat avec l'État Congolais et la CADECO possède un agrément américain qui va servir à faciliter les transactions financières (résolution du problème des comptes de banque correspondants).

• Participation minoritaire dans le capital d'un établissement bancaire américain, donnant à la RDC et la positionnant comme le seul pays d'Afrique Centrale avec un accès direct aux marchés financiers américains.

• Accession aux marchés financiers américains qui permettra à la RDC de se financer directement auprès d'investisseurs américains et autres.

• Connexion au monde pour permettre aux entreprises étrangères d'investir plus facilement leur argent en RDC à travers l'infrastructure de PayServices.

• Mise en place d'une infrastructure numérique et bancaire permettant à la diaspora congolaise de prendre part à la vie économique congolaise en investissant par exemple dans des obligations d'état.

• Accession à plus de liquidités en devises sur le marché financier de ITAM RDC.

• Bourse des devises permettant le « trading » des devises via ITAM RDC, et facilitant à la monnaie de « flotter » et d'être accessible à tous.

• Inclusion financière : Accès global à tous les citoyens.

• Diminution des barrières d'entrée dans l'économie pour les populations.

• Formalisation de l'économie informelle.

• Numérisation de l'économie et administration congolaise et au-delà.

1



# AVANTAGES DE ITAM POUR LA RDC

• Augmentation du PIB congolais.

• Augmentation du niveau de qualité de vie pour les congolais.

• Visibilité, traçabilité des informations et données financières.

• Numérisation de l'administration congolaise via un système centralisé stockant et traitant tous les documents administratifs avec un suivi et une transparence permettant à tout personne autorisée de prendre connaissance à tout moment de l'historique.

• Installation en RDC de serveurs de messagerie permettant une sécurité accrue, une rapidité de connexion et un traitement des données localement et sans paiement de licence.

• Production à moindre coût en RDC de cartes biométriques de paiement et d'identification permettant dans un délai réduit l'émission de la carte et une sécurité renforcée des données qui sont traitées exclusivement en RDC.



2

# OBJECTIF GÉNÉRAL

L'objectif est la mise en place d'une co-entreprise entre la République du Congo et PayServices Bank (PayServices.com), nommée « ITAM Congo-Kinshasa » ; ITAM est un acronyme pour « International Trade Association Market », en français « Marché de l'Association du Commerce International». Cette plateforme financière vise à faciliter tous les investissements en Afrique Centrale en offrant un cadre simple et rapide aux investisseurs et aux entrepreneurs pour établir leur activité dans les zones ECCAS. ITAM ambitionne de devenir un choix privilégié pour faciliter les échanges commerciaux avec les investisseurs étrangers en RDC comme porte d'entrée pour l'Afrique Centrale, à l'instar de Dubaï au Moyen-Orient ou de Singapour en Asie.

En outre, PayServices prévoit d'apporter son expertise dans les centres de données sécurisés de niveau bancaire en RDC. Ces centres stockeront et traiteront localement toutes les transactions et données du pays, ainsi que celles des autres pays d'Afrique Centrale qui souhaiteront bénéficier de cette infrastructure interbancaire. Cette initiative revêt une importance cruciale pour la sécurité nationale, car en 2024, un pays qui ne gère pas ses propres données risque de perdre sa souveraineté et de devenir vulnérable aux acteurs étrangers. En outre, de part cette initiative, PayServices prévoit de stocker et traiter les transactions financières de la RDC et de toute la sous-région via ces centres de données sécurisé sur le sol congolais.

La co-entreprise avec PayServices permettra d'établir un « SWITCH Universel ». Ce système permettra à toutes les banques opérant en Afrique Centrale de se connecter à la plateforme ITAM et de bénéficier de l'ensemble des services offerts par PayServices. En travaillant en partenariat avec l'État, PayServices ne se contente pas de vendre une application, mais offre un service public accessible à tous les acteurs privés, publics et commerciaux. Ce service va permettre aux acteurs économiques congolais d'avoir accès au marché américain (grâce à l'agrément américain de PayServices) sans les contraintes rencontrées avec une banque traditionnelle (Citibank, Bank of America, etc.)

Le SWITCH Universel permettra également aux services de l'État d'auditer en temps réel les transactions diverses et les livres comptables, améliorant ainsi la transparence et la conformité aux différentes lois en vigueur.



3

# L'INSTITUTION FINANCIÈRE CONGOLAISE CADECO

**Création**

CADECO, la Caisse Générale d'Épargne du Congo, a été créée le 10 juin 1950 par un décret royal, désigné sous le nom de "Caisse d'Épargne Belge-Rwanda-Burundi, C.E.C.B.R." en sigle modifié et complété par l'ordonnance n°78/182 du 5 mai 1978.

**Historique**

La révolution industrielle a eu comme conséquence sur le plan social la naissance d'une importante classe ouvrière composée des travailleurs qui bénéficiaient des salaires qui ne leur permettant pas de solliciter les services de banques.

Ainsi, l'administration coloniale, ayant senti la nécessité, mena une certaine étude visant à créer des institutions de micro finances qui s'occuperaient de ce problème de sécurité et de prévoyance. C'est ainsi que fut créer une caisse d'épargne pour les indigènes de la colonie. Cependant, comme cette caisse n'intervenait que d'une façon modique, ceci poussa les ouvriers à se constituer des économies personnelles, raison pour laquelle à l'époque de l'État Indépendant du Congo, une caisse d'épargne fut créée par décret royal; placée sous la garantie de l'État et état réservée exclusivement aux européens.

En 1947, l'Administration coloniale demanda à la Caisse Générale d'Épargne et de Retraite de la Belgique "C.G.E.R." d'étudier les possibilités d'installer une nouvelle caisse d'épargne au Congo. Ainsi, une caisse d'épargne à dimension plus élargie adaptée aux besoins de la masse ouvrière fut créée par le décret royal du 10 juin 1950 avec comme appellation: "Caisse Générale d'Épargne Congo belge et Rwanda-Burundi" en sigle (C.E.C.B.R.U.) - organisme chargé de recevoir les petites économies des travailleurs et les mettre en sécurité en les protégeant contre les risques fortuits contre la tentation de la dissipation sans nécessité absolue et les faire fructifier.

**Développement**

A l'accession du pays à la souveraineté international le 30 juin 1960, le Congo devenu un état Indépendant, décida de se retirer de la C.E.C.B.R.U. en se dotant d'une caisse d'épargne nationale autonome en nom de la CADEZA (Caisse Générale d'Épargne du Zaïre).

L'ordonnance-loi n°78-182 du 5 mai 1978 à fait accéder la CADEZA à la plaine capacité bancaire et l'avait placée sous l'entreprise de la loi bancaire. De ce fait, la CADEZA avait un caractère hybride: elle est à la fois une caisse d'épargne et une banque et par conséquent, elle est au centre de gravité avec une vocation économique et social.

# L'INSTITUTION FINANCIÈRE CONGOLAISE CADECO

En date du 17 mai 1997, la CADEZA redevient alors CADECO, la Caisse Générale d'Épargne du Congo et est placée sous tutelle du ministère du Portefeuille et des Finances pour sons caractère technique dont elle jouit de la garantie de l'État congolais sur les dépôts des épargnants.

La CADECO est membre effectif de l'institut international des caisses d'épargne depuis le 1er septembre 1975. Elle est représentée sur tout le territoire national avec plus d'une centaine de sièges.

## Mission

La mission est l'expression de but de l'existence d'une entreprise. La mission, jusqu'à très récemment, s'énonçait comme suit: "Orienter la population à savoir utiliser judicieusement des revenus tout en renforçant la liberté et la responsabilité individuelle et permettre au travailleur qui épargne ou tout autre individu à pouvoir relever harmonieusement le niveau de sa vie" car l'épargne est le centre de la croissance économique.

## Objet Social de la CADECO

La CADECO est une entreprise publique qui était créée par l'ordonnance loi n°72-205 du 19 mai 1972, avec une délégation générale.

Elle fonctionne sous la tutelle du ministère du portefeuille et le ministère des finances. Elle est identifiée au numéro national (1124M). Il est a noté qu'à partir de l'article 4 de cette loi, que la CADECO accède à la pleine capacité bancaire. La CADECO a à cet effet un caractère hybride, à savoir:
- Une caisse d'épargne unique de l'état, et
- Une banque populaire (banque de famille).

En vertu de ses statuts, la CADECO est à la fois au centre de gravité avec une triple mission notamment (a) l'économie, (b) le social, et (c) l'éducation pour ainsi dire:

- Collecter l'épargne des personnes physiques et morales et d'encourager l'épargne au sein de la population;
- Assurer la promotion de l'épargne sur toute l'étendue du territoire national;
- Drainer les fonds collectés vers le financement du développementsocial et économique par l'octroi du prêt et crédit aux différents secteurs notamment pour le financement de l'habitat et l'octroi du crédit aux petites et moyennes entreprises;
- Effectuer toutes les opérations bancaires généralement reconnues aux banques commerciales;
- Assister les régies financières dans la mobilisation des recettes; et
- Collaborer avec des organismes pour la domiciliation des salaires de leurs agents.

# L'INSTITUTION FINANCIÈRE CONGOLAISE CADECO

**CADECO**

**Situation Géographique**

Étant donné que la CADECO reste une caisse d'épargne et qu'elle est la plus ancienne du pays, il est normal que sa direction générale soit installée à la capital précisément sur l'Avenue CADECO n°38, Kinshasa/Gombe, République Démocratique du Congo.

La CADECO est le deuxième plus grand détenteur de bureaux de représentation (112) à travers le pays après La Poste Congolaise (386).

**Nature Juridique**

La CADECO est une entreprise à caractère financier dotée d'une personnalité juridique. Elle est régie par les dispositions de l'ordonnance loi n°78-002 de janvier 1978 portant les dispositions générales applicables aux entreprises. Le patrimoine de la CADECO est constitué de tous les biens et obligations qui sont reconnus par l'ordonnance précitée. La CADECO est soumise aux lois et usages applicables aux banque et institutions financières. Il est a noté que la CADECO est la seule banque Congolaise encore en existence dans le pays et qu'elle est également la seule banque détenue à 100% par l'état et la seule banque qui possède le statut hybrid de Caisse d'Épargne et de Crédit.

Il est à noter que la CADECO est la seule banque Congolaise encore en existence dans le pays et qu'elle est également la seule banque détenue à 100% par l'état et la seule banque qui possède le statut hybrid de Caisse d'Épargne et de Crédit. Il est également à noter que la CADECO possède plus d'agences à travers le pays que toutes les autres banques combinées et que dans certains territoires seul la CADECO possède une présence.



6

# L'INSTITUTION FINANCIÈRE AMÉRICAINE PAYSERVICES

Pour faire une analogie, PayServices est au monde de la finance ce que Tesla est au monde de l'automobile. En effet, l'entreprise Tesla construit des véhicules mais n'est en fait pas un constructeur automobile mais une entreprise de haute technologie dans le domaine de l'intelligence artificielle et l'automatisation qui construit des voitures avec cette technologie que ce soit pour la conduite automatique mais encore pour la myriade de capteurs informatiques qui sont intégrés dans leurs véhicules. Au même titre, PayServices est avant tout une entreprise de développement informatique de haut niveau dans les systèmes financiers sécurisés de pointe, qui possède un agrément bancaire lui permettant d'offrir ses technologies au grand public.

PayServices, contrairement aux établissements bancaires classiques, a vocation à déployer ses technologies et son savoir-faire en partenariat stratégique avec un ou plusieurs États de par le monde (en fonction des zones géographiques et économiques). Dans ce modèle d'affaires, PayServices devient un service de l'état et non une application vendue à des tiers.

L'entreprise PayServices est une institution financière basée aux États-Unis d'Amérique qui est légalement enregistrée dans l'État de l'Idaho en tant que banque et dans l'État de Floride en tant qu'entreprise de services financiers. Dans les deux États, l'entreprise est soit « active », soit « en règle », suivant les exigences d'exploitation de chaque État.

PayServices possède la particularité de par ses agréments d'être le seul établissement américain qui possède les permis et l'infrastructure avec la capacité d'ouvrir des comptes américains à toute personne de par le monde via ses applications en ligne et mobile. En effet, PayServices a développé un processus et une technologie de conformité qui créer un « passeport de conformité » qui peut être accéder par les différentes contreparties qui prennent part à une transaction.

En d'autres termes, avec PayServices, un client qui se trouve en RDC peut facilement faire des transactions avec une contrepartie qui se trouve par exemple aux États-Unis grâce à la technologie de chambre de compensation en temps réel (24/7/365) de PayServices mais également surtout grâce au passeport de conformité qui assure une collecte des données de bonne qualité dans un format commun. Ici réside la clé de la réussite de la chambre de compensation en temps réel, car bien que la technologie soit importante, la majorité des transactions n'aboutissent pas, ou avec beaucoup de difficulté, à cause des questions de conformité. Donc, en ayant allié dans une même architecture la conformité avec la technologie, via le réseau PayServices, une transaction soumise, est une transaction d'office acceptée puisque toutes les questions de conformité sont traitées en amont directement à la source avant que la transmission de fonds ne soit initiée.

# L'INSTITUTION FINANCIÈRE AMÉRICAINE PAYSERVICES

En tant qu'institution financière, PayServices se focalise essentiellement sur un seul domaine : la conformité et la transmission des devises. Tel un athlète de haut niveau qui est le meilleur en natation, PayServices ne prétend pas offrir d'autres services tels que les prêts. Ce modèle permet à PayServices de travailler avec tous les acteurs financiers existants sans pour autant être concurrent avec eux. Au contraire, PayServices est complémentaire et amène une solution dans un domaine qui touche tous les acteurs financiers : des échanges et flux financiers rapides et sans friction. En tant que société bancaire américaine qui possède l'autorisation de prendre des dépôts, PayServices offre, de par sa plateforme, une solution facile, efficace, et à moindre coût à tous les établissements congolais qui sont à la recherche de services de correspondance.



# LE PROJET « ITAM »



ITAM est un acronyme en anglais pour « International Trade Association Market », traduction : le Marché de l'Association du Commerce International.

Le but de ITAM est de créer un cadre unique et extrêmement facile à y adhérer offrant tous les services disponibles à n'importe quelle entreprise et investisseur désireux de s'établir en Afrique Centrale. L'idée de ITAM est de créer un environnement avantageux pour que quand une entreprise ou un investisseur cherche un lieu où s'établir en Afrique Centrale, que la RDC soit inévitable comme destination d'affaire au même titre que Dubaï l'est au Moyen Orient ou Singapour en Asie.

Avec ITAM, nous envisageons un avenir dans lequel chaque petite et moyenne entreprise (PME) intègre de manière transparente une technologie de pointe pour prospérer et être compétitive à l'échelle mondiale tout en responsabilisant les PME en leur fournissant les outils, les connaissances et le soutien nécessaires pour adopter et exploiter une technologie de pointe pour une croissance et un succès durable.

Avec ITAM, chaque investisseur pourra facilement créer son entreprise en quelques clics mais également obtenir :
- Un compte courant multidevise gratuit
- Une application bancaire mobile complète et multi-langue
- Un accès facile au marché du commerce international

- Des services de paie et de gestion des ressources humaines
- Une plateforme de facturation
- Des outils comptables
- Une gestion de l'inventaire pour les fournisseurs de marchandises
- Une plateforme de commerce électronique qui traite également des questions de douanes
- Des contrats numérisés, dits « intelligents »
- Un outil de paiement des factures pour émettre et recevoir des paiements de factures.

ITAM Congo-Kinshasa va devenir la porte d'entrée de tous les investissements en Afrique Centrale et va de ce fait, transformer la RDC en un hub financier et une destination d'affaire incontournable.

La création d'avantages fiscaux pour les investisseurs créant au minimum quatre (4) emplois qualifiés à plein temps sont également envisagés pour inciter les entreprises à bouger leur siège en RDC.

En offrant une infrastructure dans le climat des affaires qui n'est pas disponible dans les autres pays de la ECCAS, et cela combiné avec d'éventuels avantages fiscaux, la RDC crée un environnement propice pour doubler son Produit Intérieur Brute (PIB), tout en élevant le niveau de qualité de vie des Congolais de par la création d'emplois qualifiés et bien rémunérés.

9

# LE PROJET DE « SWITCH UNIVERSEL »

Le SWITCH Universel a pour but de faciliter une interconnexion plus rapide, plus fiable et plus conviviale pour les utilisateurs, favorisant ainsi l'inclusion financière dans un cadre sous régulation bancaire.

Dans la démarche de partenariat via la relation stratégique, PayServices amène son savoir-faire dans le domaine des technologies financières pour s'adosser à la BCC/CADECO et créer un réseau interbancaire africain qui opérera depuis la RDC dans l'Afrique de l'Ouest qui permettra à toutes les banques de la région de se connecter à une chambre de compensation en temps réel permettant des échanges commerciaux mais aussi des conversions de devises faciles et un accès aux liquidités en devises.

Derrière l'idée de SWITCH Universel, réside l'initiative de faciliter la venue dans l'économie formelle environ 95% de la population, qui aujourd'hui encore résident dans l'économie informelle. Cette démarche est accomplie en offrant une application mobile et une infrastructure intuitive, qui ne requiert pas aux personnes de se rendre dans une agence de banque physique pour l'ouverture d'un compte, mais au simple téléchargement d'une application mobile offerte par le réseau de PayServices et qui bénéficie du savoir-faire et du processus standardisé de collecte des informations client en conformité avec la législation bancaire internationale.

Chaque client, que ce soit un client d'une banque commerciale existante, ou un client qui aura un compte via la CADECO, crée en fait ce que PayServices appelle un « passeport de conformité » qui est compatible avec tous les établissements financiers. Donc, ce passeport permet l'ouverture et la fermeture de comptes de manière simple, que ce soit pour travailler avec des établissements financiers locaux ou étrangers.

La technologie du SWITCH Universel permet également une meilleure gestion dans les domaines de comptabilité de l'État, mais aussi pour les auditeurs de l'État qui auront maintenant accès à des meilleurs données dans un format standardisé en temps réel. Ici se trouve la clé dans ce domaine : l'accès à l'information car aujourd'hui beaucoup d'information existe mais le temps que cela prend pour y avoir accès est bien souvent long et fastidieux, alors qu'ici avec le SWITCH Universel, toutes les données seront disponibles en temps réel, aussi bien via un ordinateur ou une application mobile.

# CARTE UNIVERSELLE DONT LES TRANSACTIONS SONT TRAITÉES LOCALEMENT POUR L'AFRIQUE

Au cours des différentes réunions, une carte à usage universel a été présentée et produite. Le spécimen de la carte qui fut présentée détient plusieurs fonctions clés qui peuvent être combinées ou utilisées indépendamment, à savoir :

I. Une carte de paiement via un nouveau réseau de PayServices dont les transactions seront stockées et traitées en RDC.

II. Une carte pour la couverture universelle médicale.

III. Une carte qui peut servir de pièce d'identité.

IV. Une carte qui peut servir de permis de conduire.

V. Une carte qui peut servir pour offrir des produits et services aux personnes avec handicap.

Quand on parle de la carte comme carte de paiement, il est important de noter que la même carte peut être associée à plusieurs comptes en banque dans plusieurs banques en même temps afin de réduire la quantité de cartes que les gens doivent garder sur eux. Dans les terminaux de paiement de PayServices, quand on insère la carte, le terminal demande au client depuis quel compte il veut faire la transaction.

Les objectifs de la carte sont les suivants :

**I. Souveraineté nationale** :
Avoir un réseau de cartes qui soit traité localement de tel sorte que la RDC et tout pays de la ECCAS qui va se connecter sur le SWITCH Universel puisse bénéficier d'une souveraineté sur ses transactions financières mais également pour se protéger de toute intervention extérieure d'un pays qui voudrait nuire à la souveraineté de la RDC. Par exemple, pour punir la Russie, le réseau Visa a déconnecté toutes les banques russes de son réseau. Cela a paralysé l'économie russe dont la population s'est retrouvée avec des dizaines de millions de cartes inutilisables. Depuis lors, la Russie a lancé son propre réseau qui fonctionne dans son pays et est imperméable à toute politique extérieure.

**II. Inclusion financière :**
Aujourd'hui, une grande majorité de la population congolaise ne possède pas de compte en banque. Les services existants sont souvent perçus par ces populations comme étant des produits de luxe et non comme une nécessité. En offrant une carte locale à un coût abordable, cela permettra à toute la population, même aux plus démunis, de rejoindre l'économie formelle en ayant un compte courant dans une des banques de l'État via la plateforme et ce à moindre coût.

11

12

## CARTE UNIVERSELLE DONT LES TRANSACTIONS SONT TRAITÉES LOCALEMENT POUR L'AFRIQUE







**III. Carte biométrique :**

La carte produite par PayServices sera en fait produite localement en RDC par des employés de la co-entreprise ITAM qui possède une puce électronique mémoire de grande taille. Cette puce permet le stockage sécurisé de toutes les données relatives aux fonctionnalités de la carte ; mais également le stockage d'une miniature de la photo de profile de la personne. Cette capacité de stocker toutes ces données de manière sécurisée et encryptée dans la puce permet à tout agent qui possède un lecteur de carte fournit par PayServices de lire les données directement de la puce même si le réseau est indisponible. Cette capacité ouvre la porte à des applications de contrôle d'identité, de lecture d'un fichier médical, de vérification des avantages disponibles (par exemple à une personne avec handicap), etc. même dans les zones reculées ou en cas de panne du réseau.

## CIBLE



Le service qui sera offert par PayServices / ITAM s'adressera au grand public pour faciliter l'interopérabilité des opérations dans les différentes banques. Contrairement aux banques commerciales existantes, il ne vise pas à concurrencer ces dernières. Au contraire, ITAM a pour objectif d'être ouvert et de permettre aux banques commerciales d'utiliser le service dans les mêmes conditions que les banques d'État, qui seront les premières à en bénéficier.

A différencier avec les opérateurs mobiles qui ne sont pas des banques, mais qui aujourd'hui prennent des parts de marché aux banques. A faire attention de ne pas reproduire l'erreur du Zimbabwe qui a vu ses banques complètement délaissées au profit d'opérateurs téléphoniques, qui offrent des services de paiement en dehors du cadre de la législation bancaire et bien qu'ils ont comblé un besoin, détiennent aujourd'hui l'économie du Zimbabwe en otage puisque la majorité de la population détient son argent dans les opérateurs téléphoniques sans possibilité de sortir leur argent à moindre coût.

Dès lors qu'un établissement financier (qu'il s'agisse d'une banque, d'une compagnie d'assurance, d'une microfinance, de la bourse des valeurs, etc.) est connecté aux API de la plateforme, il devient disponible pour les investisseurs via l'ITAM qui est propulsé par la technologie de pointe de PayServices en tant que service public de l'État avec la CADECO.



L'objectif est de travailler de manière disciplinée et pragmatique pour avancer rapidement dans l'établissement du premier lancement du service, d'abord auprès d'un groupe d'utilisateurs restreint qui comprend le million de fonctionnaires de l'état, puis de l'étendre à tous. Cette approche permettra à tous les acteurs impliqués d'apprendre à collaborer de manière opérationnelle et de recueillir les retours des utilisateurs initiaux, ce qui nous permettra d'apporter des ajustements si nécessaires.

Sept accords ont été signé en 2024 sous l'égérie du Cabinet du Président :

**A. Accord de Souscription de Parts** :

Ce contrat fut signé suite à l'approbation du Directeur du Cabinet de Président de la République après étude par les équipes juridiques et techniques du cabinet du président. La République du Congo a souscrit des parts dans le capital de l'établissement bancaire américain de PayServices. Cette souscription permettra à la République d'avoir un droit d'accès aux marchés financiers américains (chose qu'aucun autre pays de la ECCAS possède). En retour, elle permettra à PayServices d'augmenter son capital, répondant ainsi aux exigences nécessaires pour ouvrir un bureau de représentation en RDC. Ce bureau travaillera directement sur le marché local en collaboration avec la CADECO, en respectant le cadre légal et l'agrément existant de la banque.

Cette prise de participation à son capital permettra à PayServices et la République Démocratique du Congo de travailler dans une relation stratégique de partenaires, décidant ensemble des intérêts communs pour la réussite du projet, puisqu'à partir de ce moment, elles offriront ensemble un service public et non un produit qui est vendu. Elles parleront bien d'une relation de partenaire intime et non d'une relation de fournisseur à acheteur. Cette dynamique assure également une sécurité pour la RDC du point de vue stratégique pour s'assurer que PayServices ne fasse pas par exemple le même accord avec un voisin directe de la RDC ; chose qui serait contre-productive pour tout le monde.

En devenant le seul pays d'Afrique Centrale qui aura une participation dans le capital d'un établissement bancaire américain, la RDC sera le seul pays de la sous-région qui aura un accès directe aux marchés financiers américains ; positionnant la RDC comme une destination d'affaire incontournable offrant une infrastructure aujourd'hui inexistante nulle part ailleurs dans toute l'Afrique Centrale. Une fois les fonds décaissés, PayServices émettra les parts en équivalence au nom de la CADECO, qui pourra les inclure dans son bilan comptable. En d'autres termes, ce décaissement ne constitue pas une dépense, mais un investissement qui restera inscrit dans les actifs du bilan comptable de la CADECO.

Case 1:26-cv-00009-REP     Document 46-4     Filed 05/26/26     Page 71 of 114

# ACCORDS SIGNÉS



Il fera donc d'une pierre deux coups puisque cet argent non seulement se retrouvera dans le bilan de la CADECO sous forme d'actions d'une banque américaine, mais aussi permettra de fructifier la relation stratégique afin de travailler conjointement au doublement du PIB de la RDC.

**B. Accord de Création de Co-entreprise ITAM avec Ministère d'État en Charge du Portefeuille** :

Cet accord fut signé suite à l'approbation du Directeur du Cabinet de Président de la République après étude par les équipes juridiques et techniques du cabinet du président.
Cet accord formalise la création de la co-entreprise « ITAM Congo-Kinshasa ». Il définit les modalités de collaboration en partenariat pour le déploiement de l'infrastructure bancaire sécurisée de PayServices et l'implémentation du SWITCH National. L'objectif est de numériser l'économie de la RDC et, dans une perspective plus large, celle de la ECCAS.

Cet accord vise à l'établissement d'un hub financier en RDC qui va créer l'environnement propice pour faire de la RDC la destination d'affaire par excellence dont les investisseurs ne pourront se passer, que ce soit grâce à son offre d'infrastructure en haute technologie financière, ou son environnement d'affaires tout en bénéficiant d'avantages fiscaux, chaque entreprise pourra y trouver son bonheur pour avoir une facilité qui n'existe pas dans les autres pays.

**C. Accord avec Ministère du Numérique** :

Cet accord porte sur le mise en œuvre d'une infrastructure du système de paiement électronique et de facilitation des opérations commerciales (ITAM).

**D. Accord avec Caisse Générale d'Épargne du Congo (CADECO)** :

Cet accord porte sur la création d'un espace de collaboration pour le mise en places des conditions favorables pour le développement et la mise en œuvre d'une infrastructure de paiement et finance numérique visant la croissance de revenus à travers la CADECO et l'augmentation de l'inclusion financière à travers le pays. Via cet accord on crée un cadre d'informatisation de la CADECO pour sa relance.

**E. Accord avec Ministère Délégué en charge des Personnes vivants avec Handicap et autres Personnes Vulnérables** :

Cet accord porte sur la conception d'une infrastructure du paiement électronique (en coopération avec la CADECO) et de facilitation des opérations commerciales en faveur des personnes vivants avec handicap et autres personnes vulnérables.

15

# ACCORDS SIGNÉS

**F. Accord avec Société Congolaise des Postes et Télécommunications** :

Cet accord porte sur :

a. La création d'un cadre de collaboration ainsi que les conditions favorables pour le développement et la mise en œuvre d'une infrastructure de logistique nationale de délivrance des cartes de santé, cartes bancaires, permis de conduire et de paiement, de génération et de croissance de revenus en RDC ;

b. La mise à contribution du réseau de l'infrastructure postale pour la vente de formulaires, la capture et la distribution des différentes cartes et le paiement ;

c. Le développement d'un système informatique de suivi et de localisation national des envois de la Poste.

**G. Accord avec Agence d'Ingénierie Clinique et du Numérique de la Santé (ANICNS)** :

Cet accord porte sur la mise à disposition d'une infrastructure sécurisée de centre de données basée sur les meilleurs standards en matière de cyber-sécurité dont PayServices, en tant qu'établissement financier américain, possède le savoir-faire.

L'objectif pour cette infrastructure étant de s'assurer que les données médicales des Congolais soient traitées et stockées via un centre de données se trouvant en République Démocratique du Congo.



16

# FONCTIONNALITÉS DE LA PLATEFORME DU RÉSEAU PAYSERVICES

La plateforme de PayServices est offerte en multi-langues et permet l'interconnexion de tous les services financiers offerts par les acteurs existants via un format unique et une chambre de compensation en temps réel offrant des transactions faciles et rapides.

Grâce aux agréments de PayServices, notamment aux États-Unis, nous permettrons également à la diaspora de prendre part à la vie économique congolaise par exemple en leur permettant l'achat de titres et obligations d'état directement depuis l'étranger.

La plateforme de PayServices a été conçue avec la sécurité et la bonne gouvernance en tête.

Le système comprend notamment :

I. Un core banking

II. Gestion des comptes courants, épargnes, séquestres, prêts

III. Achat et vente de titres, obligations, certificats de dépôts

IV. Achat et vente de devises (plateforme boursière des devises)

V. Gestion des comptes en banque

VI. Gestion des cartes de débit et de crédit

VIII. Système de paiement (chambre de compensation) en temps réel et interbancaire

IX. Comptes correspondants en dollars et autres devises

X. Gestion des abonnements

XI. Gestion des calendriers d'un point de vue régulatrice (dates importantes de soumissions de rapports, etc.)

XII. Gestion des autorisations internes pour une bonne gouvernance avec traçabilité et historique.

XIII. Gestion des contreparties et de leurs coordonnées.

XIV. Gestion des contrats pour les transactions et accords commerciaux.

XV. Gestion des documents (factures, bons de commande, document d'import/export, douanes, etc.)

XVI. Gestion des inventaires de marchandises.

XVII. Système d'achat et vente de prêts sous toute forme (ligne de crédit, prêt hypothécaire, etc.)

XVIII. Gestion complète des ressources humaines.

17

# FONCTIONNALITÉS DE LA PLATEFORME DU RÉSEAU PAYSERVICES

XIX. Gestion des accès et des modèles de signature (telle personne peut approuver une transaction jusqu'à tel montant, etc.)

XX. Système de paiement mobile de personne à personne, d'entreprise à entreprise, de personne à entreprise et d'entreprise à personne. Depuis et vers n'importe quel compte dans n'importe quelle banque qui se trouve sur le réseau ITAM et au-delà.



PayServices

18

# INFRASTRUCTURE DE SERVEURS SÉCURISÉE EN RDC

PayServices va apporter son savoir-faire en RDC pour l'installation d'un centre de données de serveurs sécurisés pour le stockage et le traitement des données localement en RDC et sous la législation congolaise. Bien que l'infrastructure soit principalement dédiée au traitement des données financières, la même infrastructure pourra être étendue facilement à d'autres besoins de l'État qui sont importants pour la souveraineté et la sécurité nationale.

A savoir :

- l'installation d'un serveur de gestion des noms de domaines (connexion plus rapide) ;
- l'installation d'un serveur de messagerie d'emails (pas de licence à payer et données stockées sur le sol congolaise et non à l'extérieur comme c'est le cas aujourd'hui).



ITAM

CONGO-KINSHASA

19

# DIGITALISATION DE L'ÉCONOMIE ET DE L'ADMINISTRATION CONGOLAISE

Via la plateforme sécurisée de PayServices qui propulsera ITAM, tous les services de l'État seront en mesure d'utiliser le même logiciel numérique qui sera centralisé dont les données seront stockées et traitées localement. Le logiciel permet de créer, signer, envoyer, garder le suivi de tous types de documents que ce soit des courriers, des ordres de mission, des bons de commande, des factures, des redevances, etc. Tous ces documents peuvent être stockés dans l'infrastructure centralisée qui va se trouver en RDC.

Tous les documents traités par le logiciel de PayServices / ITAM sont marqués d'un identifiant unique qui permet à l'État de retrouver l'original en quelques clics via le tableau de contrôle du système et d'avoir une transparence sur les métadonnées du document.

A savoir par exemple :

1. qui a créé le document,
2. qui a approuvé le document,
3. qui a signé et envoyé le document, et
4. qui a reçu le document.

Quand on parle d'une administration performante et numérisée cela commence avec les processus de bonne gouvernance interne de l'administration qui permettent une traçabilité aux administrations et aux auditeurs de l'État.

Au même titre que le logiciel permet de centraliser tous les documents et contrats de manière numérique, le logiciel permet également d'assurer une visibilité totale sur la trésorerie des administrations que ce soit les administrations de l'État, des régions, des départements, des villes, des communes et des régies financières.

Cette capacité va permettre au gouvernement congolais de prendre des meilleures décisions quand il faut faire passer un budget grâce à un accès à des données de meilleures qualités qui seront disponibles en temps réel.

Par exemple, la capacité à pouvoir identifier avec le logiciel les rentrées financières attendues dans les 2 prochaines semaines, les 3 prochains mois, les 6 prochains mois, etc. permettant au Trésor Public congolais de mieux gérer ses liquidités et les investissements dans les programmes sociaux-économiques pour stimuler l'économie et les investissements dans les infrastructures du pays.

20

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

CADECO a le potentiel d'augmenter sa clientèle jusqu'à 38 millions sur la période projetée de 5 ans complété par l'infrastructure de soutien requise de 114 succursales bancaires et 342 guichets automatiques.



Remarque : ratio médian ATM/agence des banques africaines : 4x

Source : Données S&P Capital IQ pour 100 banques cotées en bourse en Afrique

L'expansion à 114 succursales serait capable de soutenir l'expansion des activités bancaires pour traiter des dépôts d'un montant de 2,28 milliards de dollars.

21

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

Les dépôts cibles de la CADECO devraient atteindre 2,28 milliards de dollars sur la base d'un capital initial de 30 millions de dollars avec une marge d'intérêt nette favorable de 3 %.



Intérêts payés aux clients sur les dépôts **2%**

Intérêts facturés aux emprunteurs sur les prêts et avances **5%**

Marge nette d'intérêts: 3%

Remarque : les fonds de dépôt restants seront placés dans des titres d'État.

22

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

CADECO devrait fonctionner de manière durable avec une marge d'exploitation saine



Économie des unités commerciales
(Revenu total indexé à 100)

81.3 | 18.7 | 100 | -43.2 | -18.2 | -10 | -0.4 | 28.2

Marge opérationnelle de 28,2%

Revenus d'intérêts | Revenus autres que d'intérêts | Revenu total | Intérêts sur les dépôts | Salaires du personnel | Frais généraux | Provisions ANP | Résultat opérationnel

ANP - Actifs Non Performants

Remarque : indicateurs financiers clés basés sur les projections de la sixième année après l'achèvement de la phase d'expansion.

23

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

Les principales projections financières de CADECO indiquent un revenu total cible de 106 millions de dollars (année 6) après la phase d'expansion de 5 ans



24

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

Profil de rendement attractif pour l'investissement d'un capital initial de 30 millions de dollars avec un TRI supérieur à 20 %

| Année | Année 1 | Année 2 | Année 3 | Année 4 | Année 5 | Année 6 | Année 7 | Année 8 | Année 9 | Année 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Capital initial | (30,000) | | | | | | | | | |
| Dividendes | | - | - | - | - | - | 557 | 1,250 | 1,942 | 2,634 |
| Valorisation | | | | | | | | | | 165,471 |
| Flux de trésorerie net | (30,000) | - | - | - | - | - | 557 | 1,250 | 1,942 | 168,105 |
| TRI | 22% | | | | | | | | | |
| Multiplicateur Équité | 5.7x | | | | | | | | | |
| VAN (au seuil de rendement de 12 %) | 62,252 | | | | | | | | | |

| | |
|---|---|
| Valorisation par rapport au cours/bénéfice moyen | 162,153 |
| Valorisation par rapport au ratio cours/valeur comptable | 168,789 |
| Évaluation terminale médiane | 165,471 |

TRI - Taux de Rendement Interne

VAN - Valeur Actuelle Nette

Remarque : les banques africaines commercent à un multiple cours/bénéfice médian de 5,9x et à un multiple cours/valeur comptable de 0,9x.

Source : Données S&P Capital IQ pour 100 banques cotées en bourse en Afrique

# PROJECTIONS FINANCIÈRES ET STATISTIQUES RELATIVES À LA CADECO

Création d'emplois pour plus de 3 000 membres du personnel pour soutenir l'expansion de CADECO à 114 succursales



Remarque : ratio effectifs de la banque/nombre d'agences bancaires : 30x

**CERTIFIED TRANSLATION**



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**ITAM Congo-Kinshasa**" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Jacqueline Yorke

Sworn to before me this
May 26, 2026

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public





# PROLOGUE

In a decisive turning point for the economic future of the Democratic Republic of the Congo, a new entity is emerging under the name ITAM. Driven by two major forces, PayServices, a U.S.-based financial institution with extensive expertise in cutting-edge financial technology, and CADECO, a Congolese financial institution, ITAM stands as the cornerstone of the Congolese economy's digital transformation.

CADECO, a state-owned bank that was once on the brink of bankruptcy, is undergoing a major transformation. Thanks to this strategic alliance, the company is poised for a spectacular resurgence, with the goal of accumulating deposits exceeding $2 billion over a five-year period. This transformation will enable CADECO to serve the vast majority of the Congolese population, who until now have had no access to banking services.

ITAM's ambition does not stop there. The new entity plans to significantly boost CADECO's value, expand its network to include at least four branches per province, totaling 114 branches nationwide, and grow its workforce from a few hundred to more than 3,000 employees.

Together, PayServices and CADECO, through ITAM, are

committed to transforming the DRC into a financial hub for the entire Central African region, propelling the country into an era of prosperity and financial innovation.



# GLOSSARY

Benefits of ITAM for the DRC                                                      1-2

General Objective                                                                   3

The Congolese financial institution CADECO                                        4-6

The American financial institution PayServices                                    7-8

The "ITAM" project                                                                 9

The "Universal SWITCH" project                                                    10

Universal card whose transactions are processed locally for Africa              11-12

Target                                                                            13

Signed agreements                                                               14-16

Features of the PayServices network platform                                    17-18

Secure server infrastructure in the DRC                                           19

Digitalization of the Congolese Economy and Administration                        20

Financial projections and statistics related to CADECO                          21-26

# BENEFITS OF ITAM FOR THE DRC

• Establishment of an African interbank network whose transactions are managed locally in the DRC, positioning the DRC as a key economic player on the African continent.

• National security: storage and processing of financial transactions directly on Congolese soil.

• Know-how: Establishment of a secure data center in accordance with the U.S. cybersecurity standards to safeguard financial data, which will be processed locally in accordance with Congolese law.

• Real-time payments between counterparties, as PayServices, the U.S. institution partnering with the Congolese government and CADECO, holds a U.S. license that will facilitate financial transactions (resolving the issue of correspondent bank accounts).

• A minority stake in a U.S. bank, giving the DRC the distinction of being the only country in Central Africa with direct access to U.S. financial markets.

• Access to U.S. financial markets, which will enable the DRC to raise funds directly from U.S. and other investors.

• Connecting to the world to make it easier for foreign companies to invest their money in the DRC through PayServices'

infrastructure.

• Establishment of a digital and banking infrastructure that enables the Congolese diaspora to participate in the Congolese economy, for example by investing in government bonds.

• Access to more foreign currency liquidity on the ITAM DRC financial market.

• Currency exchange allowing currency "trading" via ITAM DRC, and facilitating the currency to "float" and be accessible to all.

• Financial inclusion: Global access for all citizens.

• Reduction of barriers to entry into the economy for populations.

• Formalization of the informal economy.

• Digitization of the Congolese economy and administration, and beyond.
• Increase in Congolese GDP.

• Increase in the quality of life for the Congolese.

• Visibility and traceability of information and financial data.

1



# BENEFITS OF ITAM FOR THE DRC

• Digitization of the Congolese government through a centralized system that stores and processes all administrative documents, with tracking and transparency that allow any authorized person to view the history at any time.

• On-premises deployment of email servers, providing enhanced security, faster connection speeds, and local data processing, all without license fees.

• Low-cost production in the DRC of biometric payment and identification cards, enabling faster card issuance and enhanced data security, with all data processed exclusively within the DRC.



2

# GENERAL OBJECTIVE



The goal is to establish a joint venture between the Republic of the Congo and PayServices Bank (PayServices.com), to be named "ITAM Congo-Kinshasa"; ITAM is an acronym for "International Trade Association Market." This financial platform aims to facilitate all investments in Central Africa by providing a simple and efficient framework for investors and entrepreneurs to establish their businesses in ECCAS regions. ITAM aims to become the preferred choice for facilitating trade with foreign investors in the DRC as a gateway to Central Africa, much like Dubai in the Middle East or Singapore in Asia.

In addition, PayServices plans to bring its expertise to secure, bank-grade data centers in the DRC. These centers will store and process all transactions and data from the country locally, as well as those from other Central African countries that wish to benefit from this interbank infrastructure. This initiative is of critical importance to national security, because by 2024, a country that does not manage its own data risks losing its sovereignty and becoming vulnerable to foreign actors. In addition, as part of this initiative, PayServices plans to store and process financial transactions from the DRC and the entire subregion through these secure data centers located in the DRC.

The joint venture with PayServices will enable the creation of a "Universal SWITCH." This system will enable all banks operating in Central Africa to connect to the ITAM platform and take advantage of all the services offered by PayServices. By partnering with the government, PayServices does more than just sell an app; it provides a public service accessible to all private, public, and commercial entities. This service will enable Congolese businesses to access the U.S. market (thanks to PayServices' U.S. license) without the constraints typically associated with traditional banks (such as Citibank, Bank of America, etc.)

The Universal SWITCH will also enable government agencies to audit various transactions and accounting records in real time, thereby improving transparency and ensuring compliance with applicable laws.



3

Case 1:26-cv-00009-REP    Document 46-4    Filed 05/26/26    Page 92 of 114

# THE CONGOLESE FINANCIAL INSTITUTION CADECO



## Creation

CADECO, the General Savings Bank of the Congo, was established on June 10, 1950, by a royal decree, under the name "Belgian-Rwanda-Burundi Savings Bank, C.E.C.B.R.", an acronym modified and supplemented by Ordinance No. 78/182 of May 5, 1978.

## History

One of the social consequences of the Industrial Revolution was the emergence of a large working class made up of workers whose wages were too low to allow them to use banking services.

Consequently, recognizing the need, the colonial administration conducted a study aimed at establishing microfinance institutions that would address these issues of security and financial planning. And so, a savings bank was established for the indigenous people of the colony. However, since this fund provided only modest assistance, this prompted the workers to build up their own personal savings; for this reason, during the era of the Independent State of the Congo, a savings bank was established by royal decree; it was backed by the state and reserved exclusively for Europeans.

In 1947, the colonial administration asked the Caisse Générale d'Épargne et de Retraite de la Belgique "C.G.E.R." to explore the possibility of establishing a new savings bank in the Congo. Thus, a savings bank with a broader scope, tailored to the needs of the working class, was established by royal decree on June 10, 1950, under the name: "Caisse Générale d'Épargne Congo belge et Rwanda-Burundi" (C.E.C.B.R.U.) - an organization responsible for collecting workers' small savings, safeguarding them against unforeseen risks and the temptation to spend them unnecessarily, and helping them grow.

## Development

When the country achieved international sovereignty on June 30, 1960, the Congo, now an independent state, decided to withdraw from the C.E.C.B.R.U. and established its own autonomous national savings bank known as CADEZA (Caisse Générale d'Épargne du Zaïre).

Decree-Law No. 78-182 of May 5, 1978, granted CADEZA full banking status and brought it under the jurisdiction of the Banking Act. As a result, CADEZA had a hybrid nature: it is both a savings bank and a commercial bank, and as such, it plays a central role with both economic and social objectives.

On May 17, 1997, CADEZA was renamed CADECO (Caisse Générale d'Épargne du Congo) and placed under the supervision

4

Case 1:26-cv-00009-REP   Document 46-4   Filed 05/26/26   Page 93 of 114

of the Ministry of the Treasury and Finance due to its technical nature; as such, it is backed by the Congolese government's guarantee on savers' deposits.

CADECO has been a full member of the International Institute of Savings Banks since September 1, 1975. It has a presence throughout the country, with more than 100 offices.

## Mission

A mission statement is an expression of a company's purpose. The mission, until very recently, was stated as follows: "To guide the public in making wise use of their income while strengthening individual freedom and responsibility, and to enable workers who save, or any other individual, to improve their standard of living in a balanced way," because saving is the cornerstone of economic growth.

## Corporate Purpose of CADECO

CADECO is a public enterprise established by Ordinance No. 72-205 of May 19, 1972, with general authority.

It operates under the supervision of the relevant ministry and the Ministry of Finance. It is identified by the national number (1124M). It should be noted that, as of Article 4 of this law, CADECO gains full banking capacity. CADECO therefore has a

hybrid nature, namely:
- A single state savings bank, and
- A people's bank (family bank).

Under its bylaws, CADECO serves as a central hub with a threefold mission, namely (a) the economy, (b) social issues, and (c) education, so to speak:

- To collect savings from individuals and corporations and to encourage saving among the general public;
- Promote savings throughout the country;
- Channel the funds raised toward financing social and economic development by providing loans and credit to various sectors, particularly for housing finance and credit to small and medium-sized enterprises;
- Perform all banking operations typically offered by commercial banks;
- Assist financial authorities in mobilizing revenue; and
- Collaborate with organizations for the domiciliation of their employees' salaries.

## Geographical Location

Since CADECO remains a savings bank and is the oldest in the country, it is only natural that its headquarters are located in the capital, specifically at 38 Avenue CADECO, Kinshasa/Gombe, Democratic Republic of the Congo.

5



Case 1:26-cv-00009-REP   Document 46-4   Filed 05/26/26   Page 94 of 114

CADECO is the second-largest operator of branch offices (112) nationwide, after La Poste Congolaise (386).

**Legal Status**

CADECO is a financial enterprise with legal personality. It is governed by the provisions of Ordinance No. 78-002 of January 1978 establishing general provisions applicable to businesses. CADECO's assets consist of all property and obligations recognized by the aforementioned ordinance. CADECO is subject to the laws and practices applicable to banks and financial institutions.
It should be noted that CADECO is the only Congolese bank still operating in the country, and that it is also the only bank wholly owned by the state and the only bank with the hybrid status of a savings and credit bank.

It should be noted that CADECO is the only Congolese bank still operating in the country, and that it is also the only bank wholly owned by the government and the only bank with the hybrid status of a savings and credit bank. It is also worth noting that CADECO has more branches across the country than all other banks combined, and that in some regions, CADECO is the only bank with a presence.



6

# THE AMERICAN FINANCIAL INSTITUTION PAYSERVICES

To draw an analogy, PayServices is to the world of finance what Tesla is to the automotive industry. In fact, while Tesla builds vehicles, it is not actually an automaker but rather a high-tech company specializing in artificial intelligence and automation that uses this technology to build cars, not only for autonomous driving but also for the myriad of computer sensors integrated into its vehicles. Similarly, PayServices is first and foremost a leading IT development company specializing in cutting-edge secure financial systems, and it holds a banking license that allows it to offer its technologies to the general public.

Unlike traditional banks, PayServices aims to deploy its technologies and expertise through strategic partnerships with one or more countries around the world (depending on geographic and economic regions). Under this business model, PayServices becomes a government service rather than an application sold to third parties.

PayServices is a financial institution based in the United States that is legally registered in the state of Idaho as a bank and in the state of Florida as a financial services company. In both states, the company is either "active" or "in good standing," depending on each state's operating requirements.
PayServices is unique in that, thanks to its regulatory approvals, it is the only U.S. institution with the necessary licenses and infrastructure to open U.S. bank accounts for anyone worldwide through its online and mobile applications. In fact, PayServices

has developed a compliance process and technology that creates a "compliance passport" which can be accessed by the various counterparties involved in a transaction.

In other words, with PayServices, a customer located in the DRC can easily conduct transactions with a counterparty located, for example, in the United States, thanks to PayServices' real-time clearing technology (24/7/365) and, above all, thanks to the compliance passport, which ensures the collection of high-quality data in a common format. This is the key to the success of real-time clearing, because while technology is important, the majority of transactions fail to go through, or do so only with great difficulty, due to compliance issues. Therefore, by integrating compliance with technology within a single architecture, via the PayServices network, a submitted transaction is automatically accepted, since all compliance issues are addressed upstream directly at the source before the transfer of funds is initiated.

7

## THE U.S. FINANCIAL INSTITUTION PAYSERVICES

As a financial institution, PayServices focuses primarily on a single area: compliance and currency transfers. Just like a top-level athlete who excels at swimming, PayServices does not claim to offer other services, such as loans. This model allows PayServices to work with all existing financial institutions without competing with them. On the contrary, PayServices is complementary and provides a solution in an area that affects all financial players: fast, frictionless financial transactions and flows. As a U.S. banking company authorized to accept deposits, PayServices offers, through its platform, an easy, efficient, and cost-effective solution to all Congolese financial institutions seeking correspondent banking services.



8

Case 1:26-cv-00009-REP   Document 46-4   Filed 05/26/26   Page 97 of 114

# THE "ITAM" PROJECT

ITAM is an acronym for "International Trade Association Market."

ITAM's goal is to create a unique and highly accessible framework that provides all available services to any company or investor looking to establish a presence in Central Africa. ITAM's goal is to create an attractive environment so that when a company or investor is looking for a place to set up operations in Central Africa, the DRC becomes an obvious choice as a business destination, just as Dubai is in the Middle East or Singapore is in Asia.

With ITAM, we envision a future in which every small and medium-sized enterprise (SME) seamlessly integrates cutting-edge technology to thrive and compete on a global scale, while empowering SMEs by providing them with the tools, knowledge, and support needed to adopt and leverage cutting-edge technology for sustainable growth and success.

With ITAM, every investor will be able to easily start their business in a few clicks, and also obtain:
- A free multi-currency checking account
- A comprehensive and multilingual mobile banking application
- Easy access to the international trade market
- Payroll and human resources management services
- A billing platform
- Accounting tools

- Inventory management for merchandise suppliers
- An e-commerce platform that also handles customs matters
- Digitized contracts, known as "smart contracts"
- A bill payment tool for sending and receiving bill payments.

ITAM Congo-Kinshasa will become the gateway for all investments in Central Africa and will, as a result, transform the DRC into a financial hub and a leading business destination.

Tax incentives for investors who create at least four (4) full-time skilled jobs are also being considered to encourage companies to relocate their headquarters to the DRC.

By providing a business infrastructure not available in other ECCAS countries, combined with potential tax incentives, the DRC is creating an environment conducive to doubling its Gross Domestic Product (GDP), while raising the standard of living for Congolese citizens through the creation of skilled, well-paying jobs.

9

# THE "UNIVERSAL SWITCH" PROJECT

The Universal Switch is designed to facilitate faster, more reliable, and more user-friendly interconnection, thereby promoting financial inclusion within a banking regulatory framework.

As part of its partnership initiative through a strategic relationship, PayServices brings its expertise in financial technology to partner with BCC/CADECO and create an African interbank network operating from the DRC to West Africa, enabling all banks in the region to connect to a real-time clearinghouse that facilitates trade, easy currency conversions, and access to foreign currency liquidity.

The idea behind SWITCH Universel is to help bring the approximately 95% of the population who are still part of the informal economy into the formal economy. This is achieved by offering a mobile app and an intuitive platform that allows customers to open an account without having to visit a physical bank branch; instead, they simply download the mobile app provided by the PayServices network, which leverages the company's expertise and standardized process for collecting customer information in compliance with international banking regulations.

Every customer, whether they are an existing commercial bank customer or a customer who will open an account through

CADECO, creates what PayServices calls a "compliance passport," which is compatible with all financial institutions. This passport makes it easy to open and close accounts, whether you're working with local or foreign financial institutions.

The Universal SWITCH technology also enables more effective management in the area of government accounting, as well as for government auditors, who will now have access to better data in a standardized format in real time. This is the key to this field: access to information. Today, while a great deal of information is available, the process of accessing it is often time-consuming and tedious. With the Universal SWITCH, however, all data will be available in real time, whether via a computer or a mobile app.

10

# UNIVERSAL CARD WHOSE TRANSACTIONS ARE PROCESSED LOCALLY FOR AFRICA

During the various meetings, a universal-use card was presented and produced. The card specimen that was presented has several key functions that can be combined or used independently, namely:

I.  A payment card via a new PayServices network whose transactions will be stored and processed in the DRC.

II. A card for universal medical coverage.

III. A card that can be used as an identity document.

IV. A card that can be used as a driver's license.

V. A card that can be used to offer products and services to people with disabilities.

When referring to a card as a payment card, it is important to note that the same card can be linked to multiple bank accounts at different banks at the same time, thereby reducing the number of cards people need to carry with them. On PayServices payment terminals, when a card is inserted, the terminal asks the customer which account they want to use for the transaction.

The objectives of the card are as follows:

**I. National sovereignty:**
To establish a card network that is managed locally, so that the DRC and any ECCAS country connecting to the Universal SWITCH can maintain sovereignty over its financial transactions and protect itself from any external interference by a country seeking to undermine the DRC's sovereignty. For example, to punish Russia, Visa disconnected all Russian banks from its network. This brought the Russian economy to a standstill, leaving tens of millions of people with unusable cards. Since then, Russia has launched its own network, which operates within its borders and is impervious to any foreign influence.

**II. Financial inclusion:**
Today, the vast majority of the Congolese population does not have a bank account. These groups often view existing services as luxuries rather than necessities. By offering a local card at an affordable price, this will enable the entire population, even the most disadvantaged, to join the formal economy by opening a checking account at one of the state-owned banks through the platform, at a low cost.

**III. Biometric card:**
The card produced by PayServices will actually be manufactured locally in the DRC by employees of the ITAM joint venture, which

11

# A UNIVERSAL CARD WITH LOCALLY PROCESSED TRANSACTIONS FOR AFRICA

uses a high-capacity memory chip. This chip enables the secure storage of all data related to the card's features, as well as a thumbnail of the person's profile photo. This ability to store all this data securely and in encrypted form on the chip allows any agent with a card reader provided by PayServices to read the data directly from the chip, even if the network is down. This capability opens the door to applications such as identity verification, accessing medical records, and checking available benefits (for example, for people with disabilities), even in remote areas or in the event of a network outage.





12

## TARGET



The service to be offered by PayServices / ITAM will be aimed at the general public to facilitate interoperability across different banks. Unlike existing commercial banks, it does not aim to compete with them. On the contrary, ITAM aims to be open and to allow commercial banks to use the service under the same terms as state-owned banks, which will be the first to benefit from it.

This is different from mobile operators, which are not banks but are currently taking market share away from banks. We must be careful not to repeat the mistake made in Zimbabwe, where banks were completely sidelined in favor of mobile phone operators, which offer payment services outside the framework of banking regulations. Although they have filled a need, they now hold Zimbabwe's economy hostage, since the majority of the population keeps its money with these operators with no way to withdraw it at a low cost.

Once a financial institution (whether a bank, insurance company, microfinance organization, stock exchange, etc.) is connected to the platform's APIs, it becomes available to investors through ITAM, which is powered by PayServices' cutting-edge technology as a public service of the State in partnership with CADECO.

13

# SIGNED AGREEMENTS

The goal is to work in a disciplined and pragmatic manner to make rapid progress toward the initial launch of the service, first to a limited group of users, including the one million state employees, and then to expand it to everyone. This approach will enable all stakeholders to learn how to collaborate effectively and gather feedback from early users, allowing us to make adjustments as needed.

Seven agreements were signed in 2024 under the auspices of the Office of the President:

**A. Share Subscription Agreement:**

This contract was signed following approval by the Chief of Staff to the President of the Republic, after review by the legal and technical teams of the President's office. The Republic of the Congo has acquired shares in the capital of the U.S. banking firm PayServices. This subscription will give the Republic access to U.S. financial markets (a privilege that no other ECCAS country currently has). In return, this will enable PayServices to increase its capital, thereby meeting the requirements necessary to open a representative office in the DRC. This office will work directly in the local market in collaboration with CADECO, in accordance with the legal framework and the bank's existing license.

This equity investment will enable PayServices and the Democratic Republic of the Congo to work together as strategic partners, jointly determining their shared interests to ensure the project's success, since from that point on, they will jointly provide a public service rather than a product for sale. They will certainly be referring to an intimate partnership, not a supplier-customer relationship. This approach also provides strategic security for the DRC by ensuring that PayServices does not, for example, enter into the same agreement with a direct neighbor of the DRC, a move that would be counterproductive for everyone.

By becoming the only country in Central Africa to hold a stake in an American bank, the DRC will be the only country in the subregion with direct access to U.S. financial markets; this positions the DRC as an essential business destination offering infrastructure that is currently unavailable anywhere else in Central Africa. Once the funds have been disbursed, PayServices will issue the equity shares in the name of CADECO, which may then include them in its balance sheet. In other words, this disbursement is not an expense, but an investment that will remain listed as an asset on CADECO's balance sheet.

This will therefore kill two birds with one stone, as this money will not only appear on CADECO's balance sheet in the form of shares in an American bank, but will also help strengthen the strategic partnership so that the two parties can work together to double the DRC's GDP.

14

Case 1:26-cv-00009-REP    Document 46-4    Filed 05/26/26    Page 103 of 114

**B. Agreement to Establish an ITAM Joint Venture with the Ministry of State for the Portfolio:**

This agreement was signed following approval by the Chief of Staff to the President of the Republic, after review by the legal and technical teams of the President's office.
This agreement formalizes the establishment of the "ITAM Congo-Kinshasa" joint venture. It sets out the terms of the partnership for the deployment of PayServices' secure banking infrastructure and the implementation of SWITCH National. The goal is to digitize the economy of the DRC and, more broadly, that of ECCAS.

This agreement aims to establish a financial hub in the DRC that will create the ideal environment to make the DRC the premier business destination that investors cannot do without. Whether through its state-of-the-art financial infrastructure or its business environment, all while offering tax incentives, every company will find what it needs there, benefiting from advantages not available in other countries.

**C. Agreement with the Ministry of Digital Affairs:**

This agreement concerns the implementation of an infrastructure for an electronic payment system and trade facilitation (ITAM).

**D. Agreement with the General Savings Bank of the Congo**

**(CADECO):**

This agreement focuses on creating a collaborative framework to establish conditions conducive to the development and implementation of a digital payment and financial infrastructure aimed at boosting revenue through CADECO and increasing financial inclusion across the country. This agreement establishes a framework for the digital transformation of CADECO to support its revitalization.

**E. Agreement with the Office of the Deputy Minister for Persons with Disabilities and Other Vulnerable Individuals:**

This agreement covers the development of an electronic payment infrastructure (in cooperation with CADECO) and measures to facilitate commercial transactions for people with disabilities and other vulnerable individuals.

**F. Agreement with the Congolese Postal and Telecommunications Company:**

This agreement covers:

a. The creation of a framework for collaboration and the establishment of favorable conditions for the development and implementation of a national logistics infrastructure for the

15



issuance of health cards, bank cards, driver's licenses, and payment cards, as well as for revenue generation and growth in the DRC;

b. Utilizing the postal infrastructure network for the sale of forms, the capture and distribution of various cards, and payment;

c. The development of a national computer system for tracking and locating postal shipments.

**G.Agreement with the Agency for Clinical Engineering and Digital Health (ANICNS):**

This agreement covers the provision of a secure data center infrastructure based on the highest cybersecurity standards, an area in which PayServices, as a U.S. financial institution, possesses the necessary expertise.

The goal of this infrastructure is to ensure that the medical data of Congolese citizens is processed and stored through a data center located in the Democratic Republic of the Congo.

# FEATURES OF THE PAYSERVICES NETWORK PLATFORM

The PayServices platform is available in multiple languages and enables the integration of all financial services offered by existing providers through a single format and a real-time clearinghouse, facilitating fast and easy transactions.

Thanks to PayServices' licenses, particularly in the United States, we will also enable the Congolese diaspora to participate in the Congolese economy, for example by allowing them to purchase government securities and bonds directly from abroad.

The PayServices platform was designed with security and good governance in mind.

The system includes, in particular:

I.   A core banking system

II.  Management of checking accounts, savings, escrow accounts, loans

III. Purchase and sale of securities, bonds, and certificates of deposit

IV. Currency trading (foreign exchange trading platform)

V.  Bank account management

VI. Debit and credit card management

VIII. Real-time and interbank payment system (clearinghouse)

IX.  Correspondent accounts in dollars and other currencies

X.   Subscription management

XI.  Managing schedules from a regulatory perspective (key report submission deadlines, etc.)

XII. Internal authorization management for effective governance with traceability and audit trails.

XIII. Management of counterparties and their contact details.

XIV. Contract management for transactions and commercial agreements.

XV.  Document management (invoices, purchase orders, import/export documents, customs, etc.)

XVI. Merchandise inventory management.

XVII. System for buying and selling loans of all types (lines of credit, mortgages, etc.)

XVIII. Comprehensive human resources management.

17

## FEATURES OF THE PAYSERVICES NETWORK PLATFORM

XIX.  Access management and signature policies (e.g., a specific person can approve a transaction up to a certain amount, etc.)

XX.  A mobile payment system for person-to-person, business-to-business, person-to-business, and business-to-person transactions. From and to any account at any bank on the ITAM network and beyond.



18

# SECURE SERVER INFRASTRUCTURE IN THE DRC

PayServices will bring its expertise to the DRC to set up a secure server data center for the local storage and processing of data in the DRC, in accordance with Congolese law. Although the infrastructure is primarily designed for processing financial data, it can easily be expanded to meet other government needs that are critical to national sovereignty and security.

Namely:

- the installation of a domain name server (faster connection);
- the installation of an email server (no license fees and data stored within the country rather than abroad, as is currently the case).



19

# DIGITALIZATION OF THE CONGOLESE ECONOMY AND ADMINISTRATION

Through the secure PayServices platform that will power ITAM, all government agencies will be able to use the same centralized digital software, with data stored and processed locally. The software allows you to create, sign, send, and track all types of documents, including letters, travel orders, purchase orders, invoices, fees, and more. All of these documents can be stored in the centralized infrastructure located in the DRC.

All documents processed by the PayServices/ITAM software are assigned a unique identifier that allows the government to locate the original with just a few clicks via the system's dashboard and to view the document's metadata transparently.

Namely, for example:

1. who created the document,
2. who approved the document,
3. who signed and sent the document, and
4. who received the document.

When we talk about an efficient, digitized government, it starts with sound internal governance processes that ensure transparency for government agencies and state auditors.

Just as the software enables the digital centralization of all documents and contracts, it also provides complete visibility into the cash flow of government agencies, including federal, regional, departmental, city, and municipal governments, as well as financial agencies.

This capability will enable the Congolese government to make better decisions when passing a budget, thanks to access to higher-quality data that will be available in real time.

For example, the ability to use the software to identify expected revenue over the next two weeks, three months, six months, and so on, enabling the Congolese Treasury to better manage its cash flow and investments in socioeconomic programs to stimulate the economy and investments in the country's infrastructure.

20

# FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

CADECO has the potential to expand its customer base to 38 million over the projected five-year period, supported by the necessary infrastructure of 114 bank branches and 342 ATMs.



Note: Median ATM/branch ratio for African banks: 4x

Source: S&P Capital IQ data for 100 publicly traded banks in Africa

Expanding to 114 branches would be sufficient to support the growth of banking operations to handle deposits totaling $2.28 billion.

21

# FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

CADECO's target deposits are expected to reach $2.28 billion, based on an initial capital of $30 million and a favorable net interest margin of 3%.



Case 1:26-cv-00009-REP    Document 46-4    Filed 05/26/26    Page 110 of 114

22

## FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

CADECO is expected to operate sustainably with a healthy operating margin



Business Unit Economics (Total revenue indexed to 100)

Operating margin of 28.2%

- Interest income: 81.3
- Non-interest income: 18.7
- Total revenue: 100
- Interest on deposits: -43.2
- Staff salaries: -18.2
- Overhead: -10
- NPA provisions: -0.4
- Operating income: 28.2

NPA - Non-Performing Assets

Note: Key financial indicators based on projections for the sixth year following the completion of the expansion phase.

23

# FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

CADECO's key financial projections indicate a target total revenue of $106 million (Year 6) following the 5-year expansion phase



24

## FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

Attractive return profile for an initial investment of $30 million, with an IRR exceeding 20%

| Year | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial capital | (30,000) | | | | | | | | | |
| Dividends | | - | - | - | - | - | 557 | 1,250 | 1,942 | 2,634 |
| Valuation | | | | | | | | | | 165,471 |
| Net cash flow | (30,000) | - | - | - | - | - | 557 | 1,250 | 1,942 | 168,105 |
| IRR | 22% | | | | | | | | | |
| Equity Multiplier | 5.7x | | | | | | | | | |
| NPV (at the 12% return threshold) | 62,252 | | | | | | | | | |

| | |
|---|---|
| Valuation relative to average P/E ratio | 162,153 |
| Valuation based on the price-to-book ratio | 168,789 |
| Median terminal valuation | 165,471 |

IRR - Internal Rate of Return
NPV - Net Present Value

Note: African banks are trading at a median price-to-earnings ratio of 5.9x and a price-to-book ratio of 0.9x.

Source: S&P Capital IQ data for 100 publicly traded banks in Africa

25

# FINANCIAL PROJECTIONS AND STATISTICS RELATED TO CADECO

Creation of jobs for more than 3,000 employees to support CADECO's expansion to 114 branches



Note: Ratio of bank employees to number of bank branches: 30:1