**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| PayServices Bank, | Case No. 1:26-cv-00009-REP |
| Plaintiff, | **DECLARATION OF LIONEL DANENBERG** |
| v. | |
| The Democratic Republic of the Congo, et al., | *(In Opposition to Defendants' Motions to Dismiss)* |
| Defendants. | |

I, Lionel Danenberg, declare under penalty of perjury under the laws of the United States of America as follows:

1. I am the founder and Principal of Plaintiff PayServices Bank ("PayServices"). I submit this declaration in opposition to the defendants' motions to dismiss.

2. I make this declaration based on my own personal knowledge and on PayServices' business records, which are kept in the ordinary course of business and which I am authorized to access and to authenticate. If called as a witness, I could and would testify competently to the matters stated here.

3. I am personally familiar with PayServices' formation and corporate status, its dealings with the Democratic Republic of the Congo (the "DRC") and its officials and instrumentalities, the negotiation and execution of the agreements at issue, the work PayServices performed, and the payment that was due and was never made.

**PayServices' Idaho identity**

4. PayServices Bank is a corporation organized under the laws of the State of Idaho, with its principal place of business at 950 W. Bannock Street, Suite 1100, Boise, Idaho.

PayServices' status as an Idaho corporation appears on the face of the Subscription Agreement the Ministry signed, which describes PayServices as "a corporation organized under the laws of Idaho." [Dkt. 43-3 at 2.]

5.  The conduct described below was directed at PayServices, an Idaho corporation, and the resulting harm was sustained by PayServices in Idaho.

**The agreements and the $20 million New York payment**

6.  On March 13, 2024, the Ministry of State in Charge of the Portfolio (the "Ministry"), as "Purchaser," executed a Subscription Agreement under which it agreed to subscribe for 36,700 shares of PayServices common stock—a 3.67% equity interest—for US$20,000,000. Dkt. 43-3.

7.  That same day, I executed a related Memorandum of Understanding with the Ministry of Portfolio on PayServices' behalf as Principal. Attached as Exhibit A.

8.  The Subscription Agreement provided that the US$20,000,000 "will be paid by electronic bank transfer within 14 days from the signature of this subscription agreement," and designated the receiving account: PayServices' account at Chase Bank, 270 Park Avenue, New York, New York, SWIFT CHASUS33. Dkt. 43-3 at 2–3. The payment was therefore due into a bank account in the United States.

9.  No portion of the US$20,000,000 was ever paid into that account or otherwise received by PayServices into any bank account in the United States.

10. The Subscription Agreement is governed by Idaho law (§ 14), contains an exclusive Idaho-forum clause (§ 13), and provides that notices to the Ministry are effective if sent by

registered or certified mail, return receipt requested, to the Ministry at 707, Avenue Wagenia, Kinshasa/Gombe (§ 17 and first page). Dkt. 43-3.

## PayServices' performance and investment

11. In reliance on the parties' agreements, including statements made by the parties, PayServices began performance and invested more than US$72,000,000 of its own capital in technology and services to deploy its proprietary core banking platform for the DRC's venture, including for the DRC's state-owned bank, CADECO.

12. The benefit of that work was conferred on and retained by the DRC and the Ministry, including through CADECO.

13. In reliance on the parties' agreements, PayServices designed, deployed, and placed into operation its proprietary core banking platform for the DRC's venture, including for the DRC's state-owned bank, CADECO, investing more than US$72,000,000 of its own capital. By April 2025 the deployment was substantially complete and operational. In a letter dated April 9, 2025 to the Banque Centrale du Congo, the General Manager of CADECO acknowledged that PayServices had performed and that its work was approximately 93% complete against specifications, that PayServices had invested approximately US$72,000,000, that the DRC was in breach, and that the breach would cause a substantial revenue loss to the venture.

## Exclusivity and proprietary technology

14. The parties' agreement included a covenant of exclusivity and obligations of confidentiality protecting PayServices' proprietary technology during the venture. Exhibit A §§ 6.1, 6.3–6.5. The Memorandum of Understanding, whose controlling language is

French (Art. 9.1), provides at Article 5.2 that any delay in the payment due under the concomitantly-signed Subscription Agreement automatically extends the Memorandum's initial twelve-month term in successive twelve-month tranches, each taking effect from the date payment is actually made; Article 6.1 ties the exclusivity period to the term and any extension. The US$20,000,000 was never transferred. I have reviewed the English translation of the Memorandum submitted by the State Defendants. Dkt. 43-2. That translation omits the second sentence of Article 5.2 — the provision extending the term upon any delay in payment — which appears in the controlling French original. Dkt. 43-2, at 3. The included French version of the Memorandum submitted by the State Defendants has also had the second sentence of Article 5.2 removed and there is a large blank space where the second sentence in the true and correct copy of the Memorandum is located. Dkt. 43-2, at 17. Having personal knowledge of the true and correct copy of the Memorandum, I can testify that the Memorandum submitted by the State Defendants has been altered to remove a key sentence that is beneficial to PayServices.

15. The platform PayServices deployed embodies proprietary know-how and intellectual property that PayServices developed over many years and at substantial expense.

**The Visa announcement of November 2025**

16. On or about November 24, 2025, I accessed a publicly available post on the LinkedIn page of the Banque Centrale du Congo (the DRC's central bank), dated November 20, 2025. The post reported that the Governor of the Central Bank, André Wameso, had received a Visa delegation led by Visa's Senior Vice-President for Central and West Africa, and that the Central Bank and Visa had agreed to a strategic partnership comprising, among other things, the creation of a "Financial Innovation Center" (Centre d'Innovation Financière de

la BCC) to position the DRC as a hub for digital payments and financial-technology innovation, together with financial-inclusion and digital-payment initiatives. A true and correct copy of the post as I accessed it, together with a certified English translation, is attached as Exhibit B.

17. The digital-payments and financial-inclusion initiative described in that post falls within the field that, under the parties' agreements, PayServices held the exclusive right to develop for the DRC: the deployment of digital-payment infrastructure and a universal payment card intended to bring the DRC's unbanked population—a projected customer base of up to 38 million over a five-year period—into the formal banking system. Mr. Wameso acquired his familiarity with PayServices' project and approach through his official role in addressing the blocked payment, including at least one meeting between PayServices and the DRC President in which he participated, as described below.

**The DRC's approval of the venture**

18. The ITAM Congo-Kinshasa venture was personally approved and directed by the President of the DRC, Félix Antoine Tshisekedi Tshilombo. The financial keystone of the venture was the Idaho-governed Subscription Agreement for the US$20,000,000 investment in PayServices.

19. In May 2025, I secured a direct meeting with President Tshisekedi. At that meeting, the President expressed his support for the project, reaffirmed the DRC's commitment to unblock the funds and revive the joint venture, and issued a direct order to André Wameso—then Deputy Chief of Staff—to resolve the transfer within two weeks.

**The individual defendants' conduct**

20. The individual defendants knew they were dealing with an Idaho company: the Subscription Agreement and related memoranda identify PayServices as an Idaho corporation.

21. Although the US$20,000,000 had been funded and was ready for transfer, DRC officials including Julie Mbuyi Shiku blocked the transfer after the 14-day deadline. Ms. Shiku, individually and through others, made clear to me that a 10% bribe (US$2,000,000) was required as a condition for permitting the transfer. Ms. Shiku and others she worked with knew that PayServices was an Idaho-based United States entity, which is subject to the U.S. Foreign Corrupt Practices Act, and was prohibited by law from paying a bribe. I met in person and communicated directly with Ms. Shiku. She conducted our discussions in fluent English and stated that she had previously worked for a New York based investment bank. She described herself as Deputy Chief of Staff to the Minister of Finance and we discussed the Subscription Agreement, and its payment terms, along with the ITAM and CADECO components of the project, at length. In those discussions she demonstrated detailed familiarity with United States and international banking, including the distinction between retail, corporate, and wholesale banking and the nature of the transaction as a subscription for shares in a United States bank.

22. After acknowledging the President's two-week directive to resolve the transfer, Mr. Wameso did not resolve it. After becoming Governor of the Central Bank, in or about October 2025 he publicly took credit before the DRC Parliament and national media for financial reforms; it is clear to me, based on his participation in the matters described above and all other interactions with him and the relevant parties, that those reforms drew on

PayServices' proprietary know-how. His November 2025 dealings with Visa are described in paragraphs 16–17.

23. On May 20, 2025, I met with Mr. Wameso in person, for approximately three hours, at his personal residence in Kinshasa, to discuss the ITAM project and the status of the payment owed to PayServices. A member of his household whom he identified as his niece was present at the residence when I arrived. The meeting took place after President Tshisekedi had directed Mr. Wameso to evaluate the project and to resolve the situation.

24. In the course of that meeting, Mr. Wameso proposed to invest at least $100,000 of his own personal funds to acquire a personal equity interest in PayServices Bank. He sought to acquire that interest at a reduced valuation, explaining that, because the DRC was to contribute the committed $20 million to the project, the value of PayServices would rise once that transaction closed, so that any shares he acquired beforehand at a lower valuation would appreciate. The interest Mr. Wameso sought was for his own account; he did not propose any investment by or on behalf of the DRC.

25. I declined Mr. Wameso's proposal. I told him that I considered his acquisition of a personal stake in PayServices incompatible with his official responsibilities over the same transaction. I could and would testify to these matters if called as a witness.

26. In September 2024, at a meeting in New York City, Doudou Roussel Fwamba Likunde personally solicited a bribe from PayServices. Additionally, an assistant and advisor to Mr. Fwamba participated and, when PayServices' representatives rebuffed the demand, warned him that "he's not in Congo and there are witnesses." Mr. Fwamba then directed PayServices to create a pretextual paper trail, asking PayServices to "[s]end me a letter

saying you want to come to invest" so that he would "then invite you to come so you can convince me in my office behind closed doors." PayServices refused.

27. I also know that Anthony Nkinzo Kamole, the President's Chief of Staff, prevented PayServices from attending a scheduled meeting in New York during this same month, September 2024.

28. On or about July 8, 2024, I came into possession of, and reviewed, an official mission order issued by the Cabinet of the President of the Democratic Republic of the Congo, bearing reference N/Réf. 575/2024 and dated 8 July 2024 (the "Mission Order"). The Mission Order is signed by Anthony Nkinzo Kamole in his capacity as *Directeur de Cabinet* (Chief of Staff) to the President of the Republic. The controlling French text designates a delegation of DRC officials — including Aphy Badaga Mubagwa, Jean-Luc Mugogwa Katshelewa, and Norbert Eholo Eoni, each of whom is a defendant in this action, together with the Director General of CADECO — to carry out an official mission whose stated object was to "examine the financial and technical capacity of the company PayServices in Florida and in Idaho, in the United States." The Mission Order states the destination as "Florida and Idaho (United States)," an itinerary of "Kinshasa – Florida – Idaho – Kinshasa," a departure date of 6 July 2024, and a return date of 15 July 2024. The Mission Order identifies PayServices by name and identifies Idaho as a destination of the delegation. A true and correct copy of the Mission Order, together with a certified English translation that I prepared, is attached as Exhibit D.

29. On March 8, 2024, I attended the execution of a Protocole d'accord (memorandum of understanding) between PayServices and the Société Congolaise des Postes et Télécommunications ("SCPT"), the Democratic Republic of the Congo's national postal

enterprise, concerning the post-office component of the ITAM venture. Sandra Tshibonge Mbiye signed that instrument as Director General of the SCPT. Attached as Exhibit C.

30. Exhibit C. The Protocole d'accord was signed before the Ministry of State in Charge of the Portfolio executed the Subscription Agreement. On its face, the Protocole d'accord identifies PayServices as a company whose seat is established in the State of Idaho, at 950 Bannock Street, Suite 1100, Boise, Idaho, and it repeats that Idaho address in its notice provisions.

31. The Protocole d'accord contemplated that the parties would reconvene within twelve months to convert it into a definitive agreement. Approximately two months before that period was to expire, PayServices representatives met with Ms. Tshibonge concerning the venture. Ms. Tshibonge stated in that meeting that she intended to divert the project to associates who, she said, had paid her a €5,000,000 bribe.

**The DRC's failure to transfer the US$20,000,000**

32. The US$20,000,000 was payable to PayServices in the United States, and its receipt there carried regulatory significance for PayServices as an Idaho institution. At the relevant time, PayServices held a preliminary approval from the Idaho Department of Finance to establish and operate as a bank. Though a banking charter was not required for PayServices to perform under its agreements with the DRC, the lack of a banking charter would hinder PayServices other endeavors.

33. One condition of converting that preliminary Idaho approval into a final bank charter was completing PayServices' initial capital raise through the sale of company shares. The DRC's Ministry's subscription for US$20,000,000 in PayServices shares was part of that

capital raise. Receipt of those funds in the United States would both satisfy that Idaho condition and capitalize PayServices' venture with the DRC — including the representative office PayServices intended to open in the DRC to work alongside CADECO.

34. The object of the transfer was that the funds come in to PayServices, not that PayServices remit funds to the DRC. Because the US$20,000,000 were never transferred to the United States, PayServices was unable to complete that capital raise on the timeline its Idaho regulator expected.

35. In or about October 16, 2024, the Idaho Department of Finance issued a cease-and-desist order that, among other things, restricted PayServices' use of the term "bank". PayServices appealed and successfully challenged that action before an administrative law judge.

36. The regulatory difficulty the defendants invoke was thus a consequence of the DRC's own failure to remit the funds to the designated account in the United States, not an independent fault of PayServices.

**Service**

37. Julie Mbuyi Shiku is currently the Minister of State in Charge of the Portfolio. The official seat of that Ministry is 707, Avenue Wagenia, Kinshasa/Gombe, Democratic Republic of the Congo.

38. Andre Wameso Nkualoloki, whom I know to be the Governor of the Central Bank of the Congo (Banque Centrale du Congo), and has an office at the Central Bank's headquarters, 563 Boulevard Colonel Tshatshi, Gombe, Kinshasa, BP 2697, Democratic Republic of the Congo.

39. Anthony Nkinzo Kamole, the President's Chief of Staff, has his office at the Office of the President (Cabinet du Président), Palais de la Nation, Avenue Roi Baudoin, Kinshasa/Gombe, Democratic Republic of the Congo.

40. Doudou Roussel Fwamba Likunde, the Minister of Finance, has his office at the Centre Financier de Kinshasa, 1 Zongotolo, Kinshasa/Gombe, Democratic Republic of the Congo.

41. Sandra Tshibonge Mbiye, the Chief Executive Officer of the DRC's National Post, maintains her office at the Hôtel des Postes, 1009, Boulevard du 30 Juin, Kinshasa/Gombe, Democratic Republic of the Congo.

42. Célestin Mukeba Muntuabu, Norbert Eholo Eoni, and Jean-Pierre Dikoma Kitengie, each an official of CADECO, the DRC's state-owned bank, both maintain offices at CADECO's offices, 38, Avenue CADECO, Kinshasa/Gombe, Democratic Republic of the Congo.

43. Aphy Badaga Mubagwa, has an office at the Palais de la Nation, Collège Économie et Finances, Avenue Roi Baudoin, Kinshasa/Gombe, Democratic Republic of the Congo.

44. Each of the foregoing offices is the place where the named defendant works. The addresses PayServices provided for service were based on PayServices' direct dealings with these defendants and their offices during the venture and on official DRC government sources.

**Exhibits**

45. Attached as true and correct copies of records I am authorized to authenticate are: Exhibit B (the November 20, 2025 Banque Centrale du Congo LinkedIn post described in paragraph 16); Exhibit C (the memorandum of understanding signed by Ms. Mbiye); and Exhibit D (the Mission Order described in paragraph 28). The Subscription Agreement and

the subsequently edited version of the Memorandum of Understanding are already in the

record as the defendants' Exhibits DRC/MX2 and DRC/MX1, respectively.

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on June 13, 2026.

_____

Lionel Danenberg