MEMORANDUM IN SUPPORT OF MOTION OF THE DEMOCRATIC REPUBLIC OF THE CONGO AND MINISTRY OF STATE IN CHARGE OF THE PORTFOLIO OF THE DEMOCRATIC REPUBLIC OF THE CONGO AND DEFENDANTS DOUDOU ROUSSEL FWAMBA LIKUNDE AND ANTHONY NKINZO KAMOLE TO DISMISS THE COMPLAINT ON *FORUM NON CONVENIENS* GROUNDS

# MOVANT'S EXHIBIT MX1-123

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION

IN RE:

PAYSERVICES.COM, INC. d/b/a
PAYSERVICES.COM and LIONEL
DANENBERG

Respondents.

Administrative Proceeding Docket
Number: 89320

## AMENDED ADMINISTRATIVE COMPLAINT

The State of Florida, Office of Financial Regulation, ("Office") files this Amended

Administrative Complaint against **PAYSERVICES.COM, INC. d/b/a PAYSERVICES.COM**

and **LIONEL DANENBERG** (together as "Respondents"), alleging:

## GENERAL ALLEGATIONS

1. Pursuant to sections 560.105 and 560.109, Florida Statutes, the Office is charged

with administering and enforcing the provisions of chapter 560, Florida Statutes, and conducting

examinations and investigations to determine whether any provision of chapter 560, Florida

Statutes, has been violated.

2. Pursuant to section 560.114(1)(a), Florida Statutes, failure to comply with any

provision of chapter 560, Florida Statutes, or related rule constitutes grounds for disciplinary

action.

3. At all times material, Respondents are or have been a Part II licensee pursuant to

chapter 560, Florida Statutes, and specifically a "money services business," as defined in section

560.103(22), Florida Statutes, having been issued license number FT230000158.

4. Payservices.com, Inc.'s business is in located in Delray Beach, Florida, and Lionel

Danenberg is Payservices.com, Inc.'s CEO/President/Compliance Officer and an owner.

5. The Office conducted a limited examination (#88578) of Respondents' compliance

1

MX1-001

with the money services business filing requirements.

6.    Pursuant to Rule 69V-560.1000(150), Florida Administrative Code, the range for an "A" level fine is between $1,000 and $3,500.

7.    Pursuant to Rule 69V-560.1000(150), Florida Administrative Code, the range for a "B" level fine is between $3,500 and $7,500; and, pursuant to Rule 69V-560.1000(151), Florida Administrative Code, the range for a "B" level suspension is 10 to 20 days.

## COUNT I

8.    The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

9.    Pursuant to section 560.209(2), Florida Statutes, and Rule 69V-560.606, Florida Administrative Code, a licensee must annually submit a financial audit report to the Office within 120 days after the end of the licensee's fiscal year.

10.    Respondents' fiscal year ends on December 31st.

11.    Thereby, Respondents' 2016 financial audit report was due on May 1, 2017. The Office did not receive Respondents' submission until December 20, 2017.

12.    Respondents failed to submit their annual financial audit report within 120 days after the end of their fiscal year, in violation of section 560.209(2), Florida Statutes.

13.    Pursuant to Rule 69V-560.1000(64), Florida Administrative Code, a licensee cited for a violation of 560.209(2), Florida Statutes, is subject to a "B" fine, and a "B" suspension or revocation.

14.    Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

## COUNT II

15.    The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

2

MX1-002

16. Pursuant to section 560.209(2), Florida Statutes, and Rule 69V-560.606, Florida Administrative Code, a licensee must annually submit a financial audit report to the Office within 120 days after the end of the licensee's fiscal year.

17. Pursuant to section 560.103(15), Florida Statutes, a "financial audit report" is defined, among other things, must be conducted by a certified public accountant licensed to do business in the United States, and must include the expression of an opinion.

18. Pursuant to sections 473.302(8)(a), 473.3101, 473.3141, and 473.322(1)(c), Florida Statutes, an expression of an opinion regarding financial statements is lawful only if made by a person who holds an active license in Florida or another state and is either 1) a licensed firm or 2) provides such services through a licensed firm.

19. On March 28, 2018, the office timely received a financial audit report for fiscal year 2017, which was prepared by a Georgia certified public accountant who was not affiliated with a licensed firm.

20. Respondents failed to submit a lawful financial audit report within 120 days after the end of their fiscal year, in violation of section 560.209(2), Florida Statutes. .

21. Pursuant to Rule 69V-560.1000(64), Florida Administrative Code, a licensee cited for a violation of 560.209(2), Florida Statutes, is subject to a "B" fine, and a "B" suspension or revocation.

22. Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

### COUNT III

23. The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

24. Pursuant to section 560.209(5), Florida Statutes, a licensee must maintain a surety bond or collateral deposit in the required amount.

3

25.    Form OFR-560-07, incorporated by reference in Rule 69V-560.1012, Florida Administrative Code Pursuant to Rule 69V-560.402, Florida Administrative Code ("Form 560-07") (Security Device Calculation Form) is the form used by money services business licensees to calculate the required amount of their surety bond, collateral deposit, combination thereof. A money services business licensee must file Form OFR-560-07, annually, no later than January 31.

26.    On February 10, 2018, Respondents filed their Form OFR-560-07 which was due January 31, 2018.

27.    Respondents failed to file the Security Device Calculation Form within the time required by Form 560-07, as adopted by rule.

28.    Pursuant to Rule 69V-560.1000(12), Florida Administrative Code, a licensee cited for failing to comply with a provision of chapter 560, Florida Statutes, or related rule is subject to a "B" fine and a "B" suspension.

29.    Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

## COUNT IV

30.    The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

31.    Pursuant to section 560.126(2), Florida Statutes, and Rules 69V-560.1012, and 69V-560.102(5), Florida Administrative Code, licensees are required to notify the Office of any change in information within 30 days of its occurrence.

32.    In their initial license application dated December 6, 2015, Respondents were required to list the name and address of their registered agent for service of process. Respondents listed Corporate Access Inc. as their registered agent, and identified the address for service of process as 236 East 6th Avenue, Tallahassee, FL 32303.

4

33.    After reviewing the Florida Division of Corporations ("Sunbiz") records, the Office discovered that Respondents appointed Lionel Danenberg as their registered agent on January 10, 2017 and listed their registered agent address as 300 W Palmetto Park Road, A210, Boca Raton, FL 33432. Respondents amended their registered agent information on Sunbiz again on February 26, 2018, by listing the address of their registered agent as 14061 Pacific Point Place, #204, Delray Beach, FL 33484.

34.    Respondents have not amended their application information to reflect their updated registered agent name and address information.

35.    Respondents failed to timely report the change in the name and address of their registered agent, in violation of section 560.126(2), Florida Statutes, and Rule 69V-560.102(5), Florida Administrative Code.

36.    Pursuant to Rule 69V-560.1000(52), Florida Administrative Code, a licensee cited for the first time for failing to report any change in application information of the licensee is subject to an "A" fine.

37.    Therefore, the Office is seeking an administrative fine of $2,000

WHEREFORE, Respondents, **PAYSERVICES.COM, INC. d/b/a PAYSERVICES.COM and LIONEL DANENBERG** are hereby notified that the Office intends to enter an Order imposing an administrative fine of $12,500 and a 30-day license suspension.

5

## NOTICE OF RIGHTS

The licensee is entitled to be represented by counsel or other qualified representative. The licensee also has the right to request a hearing pursuant to sections 120.569 and 120.57, Florida Statutes. Such request must comply with Rules 28-106.2015 and 28-106.104, Florida Administrative Code. An Election of Proceeding form is attached for your convenience.

Any such request must be filed as follows:

| **By Mail or Fax** | **OR** | **By Hand Delivery** |
|---|---|---|
| Office of Financial Regulation | | Office of Financial Regulation |
| P.O. Box 8050 | | General Counsel's Office |
| Tallahassee, FL 32314-8050 | | The Fletcher Building, Suite 118 |
| Phone: (850) 410-9987 | | 101 East Gaines Street |
| Fax: (850) 410-9914 | | Tallahassee, FL 32399-0379 |
| | | Phone: (850) 410-9987 |

**TO PRESERVE THE RIGHT TO A HEARING, A WRITTEN RESPONSE MUST BE FILED WITH THE OFFICE OF FINANCIAL REGULATION WITHIN TWENTY-ONE (21) DAYS AFTER THE RECEIPT OF THE AMENDED ADMINISTRATIVE COMPLAINT. SAID RESPONSE MUST BE RECEIVED BY THE OFFICE NO LATER THAN 5:00 P.M. ON THE TWENTY-FIRST DAY AFTER THE RECEIPT OF THE AMENDED ADMINISTRATIVE COMPLAINT. A FAILURE TO TIMELY RESPOND IN WRITING WILL CONSTITUTE A WAIVER OF THE LICENSEE'S RIGHT TO REQUEST A HEARING AND A FINAL ORDER MAY BE ENTERED WITHOUT FURTHER NOTICE.**

You may not make an oral request for an administrative hearing. With regard to a written request, if you fail to follow the outlined procedure, your request may be dismissed. Any request for an administrative proceeding received prior to the date of this notice is deemed abandoned and to be considered, must be timely renewed in compliance with the procedure set forth above.

Mediation of this matter pursuant to section 120.573, Florida Statutes, is not available.

6

MX1-006

## NOTICE TO RESPONDENTS

In accordance with the Americans with Disabilities Act, persons with disabilities needing special accommodation to participate in this proceeding should contact the Agency Clerk no later than seven (7) days prior to the filing deadline or proceeding, at the Office of Financial Regulation, The Fletcher Building, Suite 118, 101 East Gaines Street, Tallahassee, Florida 32399-0379, Phone: (850) 410-9889, or by Email: agencyclerk@flofr.com.

DATED and SIGNED this 22ᴺᴰ day of April, 2019.

RONALD L. RUBIN, Commissioner
Office of Financial Regulation

By: _____
Joaquin Álvarez
Assistant General Counsel
Office of Financial Regulation
Fla. Bar No. 113647
101 E. Gaines Street
Tallahassee, FL 32399-0379
(850) 410-9554
Joaquin.alvarez@flofr.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Administrative Complaint has been sent for service by U.S. certified mail to Lionel Danenberg at 14061 Pacific Point Place #204 Delray Beach, Florida 33484 on this 22ʳᵈ day of April, 2019

_____
Joaquín Álvarez

91 7199 9991 7039 5682 4255

7

MX1-007

STATEMENT OF THE ISSUES

Whether Respondents violated the statutes and rules alleged in the Second Amended Administrative Complaint; and, if so, what is the appropriate penalty to be imposed against Respondents.

PRELIMINARY STATEMENT

On April 22, 2019, Petitioner, Office of Financial Regulation, Division of Consumer Finance ("OFR"), issued a four-count Amended Administrative Complaint against Respondents Payservices.com, Inc., d/b/a Payservices.com and Lionel Danenberg.[1/] Subsequently, Respondents filed a "Response by Respondents" and "Notice to Cease and Desist." On May 31, 2019, OFR referred the matter to DOAH to assign an Administrative Law Judge to conduct the final hearing.

On June 11, 2019, the undersigned set the final hearing for August 20, 2019. On June 11, 2019, Respondents filed a motion to dismiss the Amended Administrative Complaint and motion for summary judgment. On June 17, 2019, OFR filed a response in opposition to Respondents' motions. On June 18, 2019, the undersigned entered an Order granting Mr. Danenberg's motion to dismiss without prejudice and with leave to amend. On June 19, 2019, the undersigned entered an Order denying Payservices' motions.

On July 8, 2019, OFR filed a motion for leave to file its Second Amended Administrative Complaint. On July 11, 2019,

2

Respondents filed a response in opposition to the motion. On July 15, 2019, the undersigned entered an Order granting the motion.

The Second Amended Administrative Complaint contains three counts against Respondents. In Count I, OFR alleges that Respondents failed to submit their annual financial audit report within 120 days after the end of their fiscal year, in violation of section 560.202(2), Florida Statutes. In Count II, OFR alleges that Respondents failed to timely submit their Security Device Calculation Form by January 31, 2018, as required by OFR Form 560-07, incorporated by reference in Florida Administrative Code Rule 69V-560.1012 pursuant to rule 69V-560.402. In Count III, OFR alleges that Respondents failed to notify OFR of a change in Payservices' registered agent name and address within 30 days, in violation of section 560.126(2) and rules 69V-560.1012 and 69V-560.102(5).

As to Count I, OFR seeks an administrative fine of $3,500 and a ten-day license suspension. As to Count II, OFR seeks an administrative fine of $3,500 and a ten-day license suspension. As to Count III, OFR seeks an administrative fine of $2,000. Thus, OFR seeks a total administrative fine of $9,000 and a 20-day license suspension.

On July 30, 2019, OFR filed a motion to compel Mr. Danenberg's deposition and to continue the final hearing

3

scheduled for August 20, 2019, based on Mr. Danenberg's failure to cooperate in the setting of his deposition. On July 31, 2019, Payservices filed a response in opposition to the motion. On August 1, 2019, the undersigned entered an Order granting OFR's motion to compel and ordered Mr. Danenberg to appear for his deposition on August 20, 2019, the date Mr. Danenberg had represented he was available for the final hearing. The Order also granted the motion for continuance, and the final hearing was rescheduled for October 16, 2019.

The next day, August 2, 2019, Respondents filed a motion for protective order, seeking to prevent OFR from requiring Mr. Danenberg to travel from outside the United States to West Palm Beach, Florida for his deposition on August 20, 2019. In the motion, Mr. Danenberg stated that he "is not a U.S. Citizen and neither a permanent resident of the United States of America." He further stated that he "has an E-2 Treaty Investor Visa which allows him to come and go the United States for certain periods of time, up to 2 years at once within the limits of his visa." Mr. Danenberg further stated that to require him to appear in south Florida for his deposition on August 20, 2019, would cause a financial burden. On August 5, 2019, OFR filed a response in opposition to the motion.

On August 5, 2019, the undersigned entered an Order granting the motion for protective order, concluding that

4

Mr. Danenberg is not required to appear in south Florida on August 20, 2019, for his deposition. Nevertheless, because the final hearing was continued to October 16, 2019, the undersigned ordered that the parties confer within the next seven business days and discuss, in detail, future arrangements for the taking of Mr. Danenberg's deposition because of OFR's right to depose Mr. Danenberg prior to the final hearing. In this regard, the undersigned ordered that:

> [T]he parties should determine whether there is a mutually convenient date prior to the October [16], 2019, final hearing, in which Mr. Danenberg will be in the south Florida area and, therefore, available to be deposed in south Florida prior to the final hearing. If not, the parties should determine alternative arrangements for taking Mr. Danenberg's deposition prior to the final hearing, such as by video teleconference or telephone. In any event, by no later than August 15, 2019, the parties shall file a joint status report advising the undersigned of the results of their conferral.

On August 15, 2019, the parties filed unilateral status reports, which show they were unable to reach an agreement regarding the rescheduling of Mr. Danenberg's deposition.

In his continuous efforts to reschedule Mr. Danenberg's deposition, OFR's counsel emailed Mr. Danenberg on Thursday, August 22, 2019, at 12:33 p.m., requesting that by noon on Monday, August 26, 2019, Mr. Danenberg provide answers to various questions, including:

5

MX1-011

1.    When will you be in south Florida?

2.    Where are you currently?

3.    When are you available for a telephonic or video teleconference deposition?

Having not received a response by noon on Monday, August 26, 2019, at 12:48 p.m., that same day, OFR's counsel emailed Mr. Danenberg, indicating his intent to file a motion to compel or in the alternative a motion for an order to show cause.  OFR's counsel inquired of Mr. Danenberg whether he agreed or objected.  In response, on August 26, 2019, Mr. Danenberg emailed OFR's counsel.  In his response, Mr. Danenberg refused to even acknowledge or address any of the aforementioned questions previously asked of him that prior Thursday.  Nevertheless, on August 27, 2019, at 4:45 p.m., OFR's counsel emailed Mr. Danenberg again requesting whether he would object to a motion to compel regarding the requested deposition information.

On August 29, 2019, OFR filed a Motion to Compel Production of Documents and to Compel Deposition Information.  On September 3, 2019, Payservices filed a response in opposition to the motions.  In the motion to compel deposition information, OFR asked for nothing more than for Mr. Danenberg to provide basic information necessary for the scheduling of his deposition

6

MX1-012

and to specify all dates, that are at least three weeks prior to the final hearing, on which he is available for deposition.

On September 6, 2019, the undersigned entered an Order denying OFR's motion to compel production of documents and granting the motion to compel deposition information.  In granting the motion to compel deposition information, the undersigned ordered that by no later than Friday, September 13, 2019, Mr. Danenberg must provide to OFR's counsel, in writing, information which will permit OFR to schedule his deposition, including, but not limited to, answering the three questions above, and specifying all dates, that are at least three weeks prior to the hearing, on which he is available for deposition. The Order specifically stated:  "Failure to provide this information will result in the imposition of sanctions, including the preclusion of Mr. Danenberg testifying as a witness or party at the final hearing in this matter."  On September 16, 2019, OFR filed a motion to preclude Mr. Danenberg from testifying at trial based on Mr. Danenberg's repeated refusal of OFR's efforts to depose him prior to the final hearing and failure to comply with the undersigned's September 6, 2019, Order.

On October 11, 2019, OFR filed its witness and exhibit lists.  Respondents did not file any witness or exhibit list.

7

MX1-013

The final hearing was held on October 16, 2019, with all parties present. At the outset of the hearing, which commenced at 9:00 a.m., the undersigned addressed OFR's motion to preclude Mr. Danenberg from testifying at trial. Even though Mr. Danenberg had failed to comply with the undersigned's September 6, 2019, Order, the undersigned indicated that he could order that a break be taken which would allow Mr. Danenberg to be deposed by video teleconference that morning. Mr. Danenberg stated he would not abide by such an order. Accordingly, the undersigned granted OFR's motion to preclude Mr. Danenberg from testifying at trial and Mr. Danenberg was precluded from testifying at hearing on his individual behalf and on behalf of Payservices.

At the hearing, OFR presented the testimony of William C. Morin, Jr., and Andrew Grosmaire. OFR's Exhibits 1, 2, and 4 through 8 were received into evidence. Respondents did not present any witness testimony and no exhibits were received into evidence.[2/] The undersigned granted OFR's ore tenus motion for official recognition of section 560.1401.

At the conclusion of the hearing, the undersigned informed the parties that "within ten days after the final hearing transcript is filed at the Division of Administrative Hearings," they will have the opportunity to file proposed recommended orders, which should consist of proposed findings of fact and

8

conclusions of law based on the evidence presented at the hearing.  Tr. p. 200.[3/]

The one-volume final hearing Transcript was filed on November 14, 2019.  The parties timely filed proposed recommended orders, which were considered in the preparation of this Recommended Order.

Unless otherwise indicated, citations to the Florida Statutes and Florida Administrative Code provisions are to those versions in effect at the time of the alleged violations.

FINDINGS OF FACT

1.  OFR is the state agency charged with administering and enforcing chapter 560, Florida Statutes, including part II related to money services businesses.

2.  At all times material hereto, Payservices has been a foreign corporation and part II licensee pursuant to chapter 560, specifically a "money services business," as defined in section 560.102(22), and "money transmitter," as defined in section 560.102(23).[4/]

3.  At all times material hereto, Mr. Danenberg has been the chief executive officer, compliance officer, and an owner of Payservices.  As such, Mr. Danenberg is an "affiliated party" and a "responsible person" as defined in sections 560.103(1) and 560.103(33).

9

Count I

4.  Licensees, such as Payservices, are required to annually file a financial audit report within 120 days after the end of the licensee's fiscal year.

5.  The financial audit report is prepared by a certified public accountant and is used to demonstrate to OFR that the licensee has the financial health to conduct its business and transmit funds within the State of Florida.

6.  Payservices' fiscal year ends December 31st.

7.  Respondents were required to provide Payservices' 2016 financial audit report to OFR by no later than May 1, 2017.

8.  On December 20, 2017, William C. Morin, Jr., OFR's Chief of the Bureau of Registration, contacted Payservices by email with regard to Payservices' failure to timely file a financial audit report within 120 days after the 2016 fiscal year ended.

9.  Mr. Danenberg responded by email that same day, telling Mr. Morin that Payservices' accountant had prepared a financial audit report "many months ago," and that it was his "impression" that it had been uploaded to the REAL system "at some point when we filed the quarterly reports." Mr. Danenberg attached to his December 20, 2017, email what OFR accepted as the financial audit report that same day. Notably, the document indicated it

10

was prepared by a certified public accountant on June 15, 2017, after the May 1, 2017, deadline.

10. In any event, Mr. Morin reviewed the REAL system regarding Payservices and determined there were no problems with the REAL system's ability to accept uploaded documents.

11. Mr. Morin testified that he could see on the REAL system that Payservices successfully uploaded a quarterly report and Security Device Calculation Form on January 26, 2017, which created a transaction number. Mr. Morin also observed that Payservices started to upload its financial audit report, which would create a transaction number, but no financial audit report was actually attached and uploaded to the REAL system on January 26, 2017, under that transaction number.

12. According to Mr. Morin, Payservices may have attempted to start to file a financial audit report on January 26, 2017, but it did not complete the transaction because no financial audit report was attached. At hearing, Mr. Morin acknowledged that: "When I looked at the Financial Audit Report transaction, nothing was attached. And I also know that the functionality of the REAL system will kind of allow for the transaction to be completed and nothing attached." Tr. p. 100.

13. Mr. Morin testified that Mr. Danenberg was cooperative when he was contacted on Decemeber 20, 2017, and submitted the financial audit report.

11

14.  The persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not submit their financial audit report to OFR until December 20, 2017, almost eight months after the May 1, 2017, deadline.

Count II

15.  Licensees, such as Payservices, are required to annually file Form OFR-560-07, Security Device Calculation Form, by January 31st of each calendar year for the preceding calendar year.

16.  The Security Device Calculation Form requires licensees to report to OFR the dollar amount of transactions with Florida consumers.  The dollar amount of transactions identified in the form is then utilized by OFR to determine if additional collateral is necessary to protect Florida consumers in the event a claim is made against the collateral for monies that were not properly transmitted by the licensee.

17.  Andrew Grosmaire, OFR's Chief of Enforcement in the Division of Consumer Finance, acknowledged at hearing that a licensee has 60 days to amend the face value of its surety bond, should an increase be required, and that at all times material hereto, the value of Payservices' surety bond has been correct for the minimum amount required.

12

18. Nevertheless, Mr. Morin testified that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

19. The persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

Count III

20. Licensees, such as Payservices, are required to update information contained in an initial application form, or any amendment to such application, within 30 days after the change is effective.

21. In Payservices' initial application dated September 25, 2015, Respondents identified Corporate Access, Inc., as its registered agent with an address for service of process at 236 East 6th Avenue, Tallahassee, Florida 32303.

22. According to the Department of State, Division of Corporation's records, on January 10, 2017, Mr. Danenberg was appointed as Payservices' registered agent with a new address for service of process at 300 West Palmetto Park Road, A210, Boca Raton, Florida 33432.

23. Respondents filed an amended license application with OFR on August 28, 2017, which still listed Corporate Access, Inc., as the registered agent for service of process.

13

MX1-019

24. On February 26, 2018, Respondents amended their registered agent information with the Department of State listing a new address for Mr. Danenberg at 14061 Pacific Pointe Place, No. 204, Delray Beach, Florida 33484.

25. Mr. Morin testified that at no time have Respondents updated their initial application with OFR to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.[5]

26. Mr. Morin and Mr. Grosmaire testified that the reason a licensee needs to update a change in the registered agent's name and address is so that OFR may effectuate service of process against the licensee. Yet, Mr. Grosmaire acknowledged that OFR has access to the Division of Corporation's records.

27. Nevertheless, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not update their initial application with OFR to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.

CONCLUSIONS OF LAW

28. DOAH has jurisdiction over the parties and subject matter of this proceeding pursuant to sections 120.569 and 120.57(1), Florida Statutes (2019).

14

29. Pursuant to section 560.105, OFR is charged with the responsibility of administering and enforcing the provisions of chapter 560.

30. OFR has the burden of proving its allegations by clear and convincing evidence. Ferris v. Turlington, 510 So. 2d 292 (Fla. 1987). The "clear and convincing evidence" standard requires that:

> [T]he evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.

In re Davey, 645 So. 2d 398, 404 (Fla. 1994)(quoting Slomowitz v. Walker, 429 So. 2d 797, 800 (Fla. 4th DCA 1983)).

31. Pursuant to section 560.114(1)(a), failure of a money services business or affiliated party to comply with any provision of chapter 560 or related rules constitutes grounds for disciplinary action.

32. The phrase "Affiliated party" is defined in section 560.103(1) as follows:

> (1) "Affiliated party" means a director, officer, responsible person, employee, or foreign affiliate of a money services business, or a person who has a controlling

15

> interest in a money services business as provided in s. 560.127.

§ 560.103(1), Fla. Stat. (2016).

33.   As to Count I, section 560.209(2) specifically provides, in pertinent part:

> (2)   A licensee must obtain an annual financial audit report, which must be submitted to the office within 120 days after the end of the licensee's fiscal year, as disclosed to the office.

§ 560.209(2), Fla. Stat. (2016).

34.   Rule 69V-560.606 further provides:

> (1)   Each licensed money transmitter and payment instrument seller shall annually submit financial audit reports to the Office in accordance with section 560.209(2), F.S., for the licensee's most recent fiscal year.
>
> (2)   Annual financial audit reports must be received by the Office within one hundred twenty (120) days after the licensee's fiscal year end.
>
> (3)   A report is "past due" if it is received by the Office one or more days beyond the period defined in subsection (2).

Fla. Admin. Code R. 65V-560.606.

35.   As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not submit their financial audit report to OFR until December 20, 2017, almost eight months after the May 1, 2017, deadline.

16

36. As to Count II, pursuant to rules 69V-560.402 and 69V-560.1012(g), licensees, such as Payservices, are required to annually file Form OFR-560-07, Security Device Calculation Form, by January 31st of each calendar year for the preceding calendar year. As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

37. As to Count III, pursuant to section 560.126(2), licensees, such as Payservices, are required to report, on a form adopted by rule, any change in the information contained in an initial license application form, or any amendment to such application within 30 days after the change is effective. Rule 69V-560.102(5) further provides that if the information contained in an application form for licensure as a money services business, or in any amendment thereto, becomes inaccurate for any reason, the applicant must file an amendment correcting such information within 30 days of the change on Form OFR-560-01, which is incorporated by reference in rule 69V-560.1012. As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not update their initial application to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.

17

<u>Penalty</u>

38.    Pursuant to sections 560.114(1)(a) and 560.1141, OFR imposes penalties upon licensees in accordance with disciplinary guidelines set forth in rule 69V-560.1000.

39.    As to Count I, the penalties are within a range of an administrative fine between $3,500 to $7,500, a ten-day to 20-day suspension, or revocation.    As to Count II, the penalties are within a range of an administrative fine between $3,500 to $7,500, a ten-day to 20-day suspension, or revocation.    As to Count III, the penalty is within a range of an administrative fine between $1,000 to $3,500.

40.    Rule 69V-560.1000(148) requires that OFR consider the following circumstances in determining an appropriate penalty within the range of penalties for each violation.    Rule 69V-560.1000(148) also requires that OFR consider these circumstances in determining a penalty that deviates from the range of penalties for each violation:

> (a)    Whether the violation rate is less than 5% when compared to the overall sample size reviewed;
>
> (b)    The degree of harm to the customers or the public;
>
> (c)    The disciplinary history of the licensee;
>
> (d)    Whether the licensee detected and voluntarily instituted corrective responses or measures to avoid the recurrence of a

18

violation prior to detection and intervention by the Office;

(e) Whether the licensee's violation was the result of willful misconduct or recklessness;

(f) Whether at the time of the violation, the licensee had developed and implemented reasonable supervisory, operational or technical procedures, or controls to avoid the violation;

(g) Where the violation is attributable to an individual officer, director, responsible person, or authorized vendor, whether the licensee removed or otherwise disciplined the individual prior to detection and intervention by the Office;

(h) Whether the licensee attempted to conceal the violation or mislead or deceive the Office;

(i) The length of time over which the licensee engaged in the violations;

(j) Whether the licensee engaged in numerous violations or a pattern of misconduct;

(k) The number, size and character of the transactions in question;

(l) Whether the licensee provided· substantial assistance to the Office in its examination or investigation of the underlying misconduct;

(m) Other relevant, case-specific circumstances.

41. Applying the relevant circumstances to the particular facts of the instant case, each of the violations entailed the failure to comply with various reporting requirements. As to

19

Count I, Mr. Danenberg was cooperative with Mr. Morin on December 20, 2017, the same day he was contacted by Mr. Morin. In fact, Mr. Danenberg filed a document that same day, which was accepted by OFR as Payservices' financial audit report.

42. As to Count II, Respondents' filing of Form OFR-560-07, Security Device Calculation Form, was only ten days late. Even then, Payservices' surety bond was correct for the minimum amount required. Had an increase been required, Payservices would have had a 60-day grace period to amend the face of its surety bond. Taking these mitigating factors into account, and pursuant to the second sentence of rule 69V-560.1000(148), a downward deviation of the penalty is appropriate for Count II.

43. As to Count III, the failure to update the registered agent name and address is only one question among many within the initial application. No evidence was presented at hearing that OFR was unable to serve Payservices because of the change of the registered agent name and address and OFR has had access to the Division of Corporation's records and actual knowledge of the changes.

44. There was no proven harm to the customers or the public resulting from any of the violations. There is no disciplinary history. Indeed, OFR concedes that the lack of any disciplinary history is a mitigating factor.

20

45. Based on the particular case-specific circumstances and facts of this case, the undersigned recommends an administrative fine of $3,500 for Count I, an administrative fine of $1,500 for Count II, and an administrative fine of $1,000 for Count III, for a total administrative fine of $6,000, with no suspension or revocation for any of the violations.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED that OFR impose an administrative fine against Respondents in the amount of $6,000.

DONE AND ENTERED this 16th day of December, 2019, in Tallahassee, Leon County, Florida.

DARREN A. SCHWARTZ
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 16th day of December, 2019.

## ENDNOTES

1/ Respondents shall be referred to herein collectively as "Respondents" or by their individual names ("Mr. Danenberg" and "Payservices").

21

MX1-027

2/ At hearing, Respondents requested to question Mr. Joaquin Alvarez, Ms. Melinda Butler, Assistant General Counsel for OFR, and Ms. Wilkinson, Chief Counsel of OFR. OFR objected at the hearing and made an ore tenus motion for protective order, which was granted.

3/ The undersigned further stated at the hearing:

> Now, if you want to order a copy of the transcript, then I believe you will need to get with the court reporter who's there today to make those arrangements. And you should monitor the docket to see when the transcript is filed. Sometimes the court reporter files it herself. Sometimes the agency files it.
>
> But you just need to realize that the deadline to file your Proposed Orders turn on--the clock starts ticking ten days from the date the transcript is filed at DOAH. So just keep an eye on the docket. Since you're both registered for electronic filing, you should be notified when that's done.

Tr. P. 200.

4/ Pursuant to section 560.103(22), Florida Statutes, a "money services business" includes a corporation, qualified to do business in Florida, which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, within this country, or to or from this country.

Pursuant to section 560.103(23), a "money transmitter" includes a corporation, qualified to do business in Florida, which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, within this country, or to or from this country.

5/ Notably, the Amended Adminitrative Complaint referred by OFR to DOAH indicated it was served on Mr. Danenberg at 14061 Pacific Point Place, No. 204, Delray Beach, Florida 33484.

22

COPIES FURNISHED:

Joaquin Alvarez, Esquire
Office of Financial Regulation
Fletcher Building
200 East Gaines Street
Tallahassee, Florida  32399-0370
(eServed)

Lionel Danenberg
Payservices.Com, Inc.,
d/b/a Payservices.com
14061 Pacific Point Place, Suite 204
Delray Beach, Florida  33484
(eServed)

Commissioner
Office of Financial Regulation
200 East Gaines Street
Tallahassee, Florida  32399-0350

Anthony Cammarata, General Counsel
Office of Financial Regulation
Fletcher Building, Suite 118
200 East Gaines Street
Tallahassee, Florida  32399-0370
(eServed)

## NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 15 days from the date of this Recommended Order.  Any exceptions to this Recommended Order should be filed with the agency that will issue the Final Order in this case.

23

MX1-029

Index: OFR 2019-457

### STATE OF FLORIDA
### OFFICE OF FINANCIAL REGULATION

DOCKETED
12/23/2019
LEGAL
RH

In Re:

PAYSERVICES.COM, INC. d/b/a
PAYSERVICES.COM and LIONEL
DANENBERG,

Respondents.

Administrative Proceeding Docket
No.: 89320

DOAH Case No.: 19-2943

## FINAL ORDER

This cause came on for consideration and final agency action. Upon review of the complete record in this case, including the attached Recommended Order, and being otherwise fully advised in the premises, the Commissioner or Designee hereby finds:

1.    The Office of Financial Regulation ("Office") has jurisdiction over the subject matter of this case and the parties hereto.

2.    The entry of this Final Order shall conclude the above-referenced administrative proceeding.

**IT IS ACCORDINGLY ORDERED:**

A. The attached Recommended Order is adopted by the Office and incorporated by reference as if fully stated herein.

B. Respondents shall pay an administrative fine in the amount of **Six Thousand Dollars ($6,000)** on or before the 31st day following the date of entry of this Final Order. The fine shall be submitted in the form of a money order or cashier's check made payable to: **Department of Financial Services,** and shall be sent to the attention of **Agency Clerk – c/o Joaquin Alvarez, Esq., Post Office Box 8050, Tallahassee, Florida 32314-8050.**

1

MX1-030

**DONE and ORDERED** this 23rd day of December 2019, in Tallahassee, Leon County, Florida.

_(signature)_

Commissioner or Designee
Office of Financial Regulation

## NOTICE OF RIGHTS

A PARTY WHO IS ADVERSELY AFFECTED BY THIS AMENDED FINAL ORDER IS ENTITLED TO JUDICIAL REVIEW PURSUANT TO SECTION 120.68, FLORIDA STATUTES. REVIEW PROCEEDINGS ARE GOVERNED BY THE FLORIDA RULES OF APPELLATE PROCEDURE. SUCH PROCEEDINGS ARE COMMENCED BY FILING THE ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AS FOLLOWS:

By Mail or Facsimile            **OR**            By Hand Delivery

Agency Clerk                                    Agency Clerk
Office of Financial Regulation                  Office of Financial Regulation
P.O. Box 8050                                   General Counsel's Office
Tallahassee, Florida 32314-8050                 The Fletcher Building, Suite 118
Phone: (850) 410-9889                           101 East Gaines Street
Fax: (850) 410-9663                             Tallahassee, Florida 32399-0379
                                                Phone: (850) 410-9889

A COPY OF THE NOTICE OF APPEAL, ACCOMPANIED BY THE FILING FEES AS REQUIRED BY LAW, MUST ALSO BE FILED WITH THE DISTRICT COURT OF APPEAL, FIRST DISTRICT, 2000 DRAYTON DRIVE, TALLAHASSEE, FLORIDA 32399-0950, OR WITH THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE PARTY RESIDES. **THE NOTICE OF APPEAL MUST BE FILED WITH BOTH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AND THE DISTRICT COURT OF APPEAL WITHIN 30 DAYS OF THE RENDITION OF THE ORDER TO BE REVIEWED.**

2

MX1-031

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Final Order and Notice of Rights has been furnished to Lionel Danenberg at lionel@payservices.com, this 23rd day of _December_ , 2019.

Agency Clerk
Florida Office of Financial Regulation
Tallahassee, FL 32314-8050
Email: Agency.Clerk@flofr.com


Cc:  Joaquin Alvarez
      Assistant General Counsel
      Division of Consumer Finance

3

MX1-032

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

OFFICE OF FINANCIAL REGULATION,

    Petitioner,

vs.                                    Case No. 19-2943

PAYSERVICES.COM, INC., d/b/a
PAYSERVICES.COM, AND LIONEL
DANENBERG,

    Respondents.

_____/

RECOMMENDED ORDER

This case came before Administrative Law Judge Darren A. Schwartz of the Division of Administrative Hearings ("DOAH") for final hearing by video teleconference on October 16, 2019, at sites in Tallahassee and West Palm Beach, Florida.

APPEARANCES

For Petitioner:  Joaquin Alvarez, Esquire
Office of Financial Regulation
Fletcher Building
200 East Gaines Street
Tallahassee, Florida  32399-0370

For Respondents:  Lionel Danenberg, pro se
Payservices.com, Inc.,
d/b/a Payservices.com
14061 Pacific Point Place, Suite 204
Delray Beach, Florida  33484

MX1-033

STATEMENT OF THE ISSUES

Whether Respondents violated the statutes and rules alleged in the Second Amended Administrative Complaint; and, if so, what is the appropriate penalty to be imposed against Respondents.

PRELIMINARY STATEMENT

On April 22, 2019, Petitioner, Office of Financial Regulation, Division of Consumer Finance ("OFR"), issued a four-count Amended Administrative Complaint against Respondents Payservices.com, Inc., d/b/a Payservices.com and Lionel Danenberg.[1/]  Subsequently, Respondents filed a "Response by Respondents" and "Notice to Cease and Desist."  On May 31, 2019, OFR referred the matter to DOAH to assign an Administrative Law Judge to conduct the final hearing.

On June 11, 2019, the undersigned set the final hearing for August 20, 2019.  On June 11, 2019, Respondents filed a motion to dismiss the Amended Administrative Complaint and motion for summary judgment.  On June 17, 2019, OFR filed a response in opposition to Respondents' motions.  On June 18, 2019, the undersigned entered an Order granting Mr. Danenberg's motion to dismiss without prejudice and with leave to amend.  On June 19, 2019, the undersigned entered an Order denying Payservices' motions.

On July 8, 2019, OFR filed a motion for leave to file its Second Amended Administrative Complaint.  On July 11, 2019,

2

Respondents filed a response in opposition to the motion.  On July 15, 2019, the undersigned entered an Order granting the motion.

The Second Amended Administrative Complaint contains three counts against Respondents.  In Count I, OFR alleges that Respondents failed to submit their annual financial audit report within 120 days after the end of their fiscal year, in violation of section 560.202(2), Florida Statutes.  In Count II, OFR alleges that Respondents failed to timely submit their Security Device Calculation Form by January 31, 2018, as required by OFR Form 560-07, incorporated by reference in Florida Administrative Code Rule 69V-560.1012 pursuant to rule 69V-560.402.  In Count III, OFR alleges that Respondents failed to notify OFR of a change in Payservices' registered agent name and address within 30 days, in violation of section 560.126(2) and rules 69V-560.1012 and 69V-560.102(5).

As to Count I, OFR seeks an administrative fine of $3,500 and a ten-day license suspension.  As to Count II, OFR seeks an administrative fine of $3,500 and a ten-day license suspension.  As to Count III, OFR seeks an administrative fine of $2,000.  Thus, OFR seeks a total administrative fine of $9,000 and a 20-day license suspension.

On July 30, 2019, OFR filed a motion to compel Mr. Danenberg's deposition and to continue the final hearing

3

scheduled for August 20, 2019, based on Mr. Danenberg's failure to cooperate in the setting of his deposition.  On July 31, 2019, Payservices filed a response in opposition to the motion. On August 1, 2019, the undersigned entered an Order granting OFR's motion to compel and ordered Mr. Danenberg to appear for his deposition on August 20, 2019, the date Mr. Danenberg had represented he was available for the final hearing.  The Order also granted the motion for continuance, and the final hearing was rescheduled for October 16, 2019.

The next day, August 2, 2019, Respondents filed a motion for protective order, seeking to prevent OFR from requiring Mr. Danenberg to travel from outside the United States to West Palm Beach, Florida for his deposition on August 20, 2019.  In the motion, Mr. Danenberg stated that he "is not a U.S. Citizen and neither a permanent resident of the United States of America."  He further stated that he "has an E-2 Treaty Investor Visa which allows him to come and go to the United States for certain periods of time, up to 2 years at once within the limits of his visa."  Mr. Danenberg further stated that to require him to appear in south Florida for his deposition on August 20, 2019, would cause a financial burden.  On August 5, 2019, OFR filed a response in opposition to the motion.

On August 5, 2019, the undersigned entered an Order granting the motion for protective order, concluding that

4

MX1-036

Mr. Danenberg is not required to appear in south Florida on August 20, 2019, for his deposition. Nevertheless, because the final hearing was continued to October 16, 2019, the undersigned ordered that the parties confer within the next seven business days and discuss, in detail, future arrangements for the taking of Mr. Danenberg's deposition because of OFR's right to depose Mr. Danenberg prior to the final hearing. In this regard, the undersigned ordered that:

> [T]he parties should determine whether there is a mutually convenient date prior to the October [16], 2019, final hearing, in which Mr. Danenberg will be in the south Florida area and, therefore, available to be deposed in south Florida prior to the final hearing. If not, the parties should determine alternative arrangements for taking Mr. Danenberg's deposition prior to the final hearing, such as by video teleconference or telephone. In any event, by no later than August 15, 2019, the parties shall file a joint status report advising the undersigned of the results of their conferral.

On August 15, 2019, the parties filed unilateral status reports, which show they were unable to reach an agreement regarding the rescheduling of Mr. Danenberg's deposition.

In his continuous efforts to reschedule Mr. Danenberg's deposition, OFR's counsel emailed Mr. Danenberg on Thursday, August 22, 2019, at 12:33 p.m., requesting that by noon on Monday, August 26, 2019, Mr. Danenberg provide answers to various questions, including:

5

MX1-037

1.   When will you be in south Florida?

2.   Where are you currently?

3.   When are you available for a telephonic or video teleconference deposition?

Having not received a response by noon on Monday, August 26, 2019, at 12:48 p.m., that same day, OFR's counsel emailed Mr. Danenberg, indicating his intent to file a motion to compel or in the alternative a motion for an order to show cause.  OFR's counsel inquired of Mr. Danenberg whether he agreed or objected.  In response, on August 26, 2019, Mr. Danenberg emailed OFR's counsel.  In his response, Mr. Danenberg refused to even acknowledge or address any of the aforementioned questions previously asked of him that prior Thursday.  Nevertheless, on August 27, 2019, at 4:45 p.m., OFR's counsel emailed Mr. Danenberg again requesting whether he would object to a motion to compel regarding the requested deposition information.

On August 29, 2019, OFR filed a Motion to Compel Production of Documents and to Compel Deposition Information.  On September 3, 2019, Payservices filed a response in opposition to the motions.  In the motion to compel deposition information, OFR asked for nothing more than for Mr. Danenberg to provide basic information necessary for the scheduling of his deposition

6

MX1-038

and to specify all dates, that are at least three weeks prior to the final hearing, on which he is available for deposition.

On September 6, 2019, the undersigned entered an Order denying OFR's motion to compel production of documents and granting the motion to compel deposition information. In granting the motion to compel deposition information, the undersigned ordered that by no later than Friday, September 13, 2019, Mr. Danenberg must provide to OFR's counsel, in writing, information which will permit OFR to schedule his deposition, including, but not limited to, answering the three questions above, and specifying all dates, that are at least three weeks prior to the hearing, on which he is available for deposition. The Order specifically stated: "Failure to provide this information will result in the imposition of sanctions, including the preclusion of Mr. Danenberg testifying as a witness or party at the final hearing in this matter." On September 16, 2019, OFR filed a motion to preclude Mr. Danenberg from testifying at trial based on Mr. Danenberg's repeated refusal of OFR's efforts to depose him prior to the final hearing and failure to comply with the undersigned's September 6, 2019, Order.

On October 11, 2019, OFR filed its witness and exhibit lists. Respondents did not file any witness or exhibit list.

7

The final hearing was held on October 16, 2019, with all parties present. At the outset of the hearing, which commenced at 9:00 a.m., the undersigned addressed OFR's motion to preclude Mr. Danenberg from testifying at trial. Even though Mr. Danenberg had failed to comply with the undersigned's September 6, 2019, Order, the undersigned indicated that he could order that a break be taken which would allow Mr. Danenberg to be deposed by video teleconference that morning. Mr. Danenberg stated he would not abide by such an order. Accordingly, the undersigned granted OFR's motion to preclude Mr. Danenberg from testifying at trial and Mr. Danenberg was precluded from testifying at hearing on his individual behalf and on behalf of Payservices.

At the hearing, OFR presented the testimony of William C. Morin, Jr., and Andrew Grosmaire. OFR's Exhibits 1, 2, and 4 through 8 were received into evidence. Respondents did not present any witness testimony and no exhibits were received into evidence.[2/] The undersigned granted OFR's ore tenus motion for official recognition of section 560.1401.

At the conclusion of the hearing, the undersigned informed the parties that "within ten days after the final hearing transcript is filed at the Division of Administrative Hearings," they will have the opportunity to file proposed recommended orders, which should consist of proposed findings of fact and

8

conclusions of law based on the evidence presented at the hearing. Tr. p. 200.[3/]

The one-volume final hearing Transcript was filed on November 14, 2019. The parties timely filed proposed recommended orders, which were considered in the preparation of this Recommended Order.

Unless otherwise indicated, citations to the Florida Statutes and Florida Administrative Code provisions are to those versions in effect at the time of the alleged violations.

<u>FINDINGS OF FACT</u>

1. OFR is the state agency charged with administering and enforcing chapter 560, Florida Statutes, including part II related to money services businesses.

2. At all times material hereto, Payservices has been a foreign corporation and part II licensee pursuant to chapter 560, specifically a "money services business," as defined in section 560.102(22), and "money transmitter," as defined in section 560.102(23).[4/]

3. At all times material hereto, Mr. Danenberg has been the chief executive officer, compliance officer, and an owner of Payservices. As such, Mr. Danenberg is an "affiliated party" and a "responsible person" as defined in sections 560.103(1) and 560.103(33).

9

Count I

4.    Licensees, such as Payservices, are required to annually file a financial audit report within 120 days after the end of the licensee's fiscal year.

5.    The financial audit report is prepared by a certified public accountant and is used to demonstrate to OFR that the licensee has the financial health to conduct its business and transmit funds within the State of Florida.

6.    Payservices' fiscal year ends December 31st.

7.    Respondents were required to provide Payservices' 2016 financial audit report to OFR by no later than May 1, 2017.

8.    On December 20, 2017, William C. Morin, Jr., OFR's Chief of the Bureau of Registration, contacted Payservices by email with regard to Payservices' failure to timely file a financial audit report within 120 days after the 2016 fiscal year ended.

9.    Mr. Danenberg responded by email that same day, telling Mr. Morin that Payservices' accountant had prepared a financial audit report "many months ago," and that it was his "impression" that it had been uploaded to the REAL system "at some point when we filed the quarterly reports." Mr. Danenberg attached to his December 20, 2017, email what OFR accepted as the financial audit report that same day. Notably, the document indicated it

10

MX1-042

was prepared by a certified public accountant on June 15, 2017, after the May 1, 2017, deadline.

10.  In any event, Mr. Morin reviewed the REAL system regarding Payservices and determined there were no problems with the REAL system's ability to accept uploaded documents.

11.  Mr. Morin testified that he could see on the REAL system that Payservices successfully uploaded a quarterly report and Security Device Calculation Form on January 26, 2017, which created a transaction number.  Mr. Morin also observed that Payservices started to upload its financial audit report, which would create a transaction number, but no financial audit report was actually attached and uploaded to the REAL system on January 26, 2017, under that transaction number.

12.  According to Mr. Morin, Payservices may have attempted to start to file a financial audit report on January 26, 2017, but it did not complete the transaction because no financial audit report was attached.  At hearing, Mr. Morin acknowledged that:  "When I looked at the Financial Audit Report transaction, nothing was attached.  And I also know that the functionality of the REAL system will kind of allow for the transaction to be completed and nothing attached."  Tr. p. 100.

13.  Mr. Morin testified that Mr. Danenberg was cooperative when he was contacted on Decemeber 20, 2017, and submitted the financial audit report.

11

MX1-043

14. The persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not submit their financial audit report to OFR until December 20, 2017, almost eight months after the May 1, 2017, deadline.

Count II

15. Licensees, such as Payservices, are required to annually file Form OFR-560-07, Security Device Calculation Form, by January 31st of each calendar year for the preceding calendar year.

16. The Security Device Calculation Form requires licensees to report to OFR the dollar amount of transactions with Florida consumers. The dollar amount of transactions identified in the form is then utilized by OFR to determine if additional collateral is necessary to protect Florida consumers in the event a claim is made against the collateral for monies that were not properly transmitted by the licensee.

17. Andrew Grosmaire, OFR's Chief of Enforcement in the Division of Consumer Finance, acknowledged at hearing that a licensee has 60 days to amend the face value of its surety bond, should an increase be required, and that at all times material hereto, the value of Payservices' surety bond has been correct for the minimum amount required.

12

18.  Nevertheless, Mr. Morin testified that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

19.  The persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

Count III

20.  Licensees, such as Payservices, are required to update information contained in an initial application form, or any amendment to such application, within 30 days after the change is effective.

21.  In Payservices' initial application dated September 25, 2015, Respondents identified Corporate Access, Inc., as its registered agent with an address for service of process at 236 East 6th Avenue, Tallahassee, Florida 32303.

22.  According to the Department of State, Division of Corporation's records, on January 10, 2017, Mr. Danenberg was appointed as Payservices' registered agent with a new address for service of process at 300 West Palmetto Park Road, A210, Boca Raton, Florida 33432.

23.  Respondents filed an amended license application with OFR on August 28, 2017, which still listed Corporate Access, Inc., as the registered agent for service of process.

13

24.  On February 26, 2018, Respondents amended their registered agent information with the Department of State listing a new address for Mr. Danenberg at 14061 Pacific Pointe Place, No. 204, Delray Beach, Florida 33484.

25.  Mr. Morin testified that at no time have Respondents updated their initial application with OFR to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.[5/]

26.  Mr. Morin and Mr. Grosmaire testified that the reason a licensee needs to update a change in the registered agent's name and address is so that OFR may effectuate service of process against the licensee.  Yet, Mr. Grosmaire acknowledged that OFR has access to the Division of Corporation's records.

27.  Nevertheless, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not update their initial application with OFR to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.

CONCLUSIONS OF LAW

28.  DOAH has jurisdiction over the parties and subject matter of this proceeding pursuant to sections 120.569 and 120.57(1), Florida Statutes (2019).

14

29. Pursuant to section 560.105, OFR is charged with the responsibility of administering and enforcing the provisions of chapter 560.

30. OFR has the burden of proving its allegations by clear and convincing evidence. Ferris v. Turlington, 510 So. 2d 292 (Fla. 1987). The "clear and convincing evidence" standard requires that:

> [T]he evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.

In re Davey, 645 So. 2d 398, 404 (Fla. 1994)(quoting Slomowitz v. Walker, 429 So. 2d 797, 800 (Fla. 4th DCA 1983)).

31. Pursuant to section 560.114(1)(a), failure of a money services business or affiliated party to comply with any provision of chapter 560 or related rules constitutes grounds for disciplinary action.

32. The phrase "Affiliated party" is defined in section 560.103(1) as follows:

> (1) "Affiliated party" means a director, officer, responsible person, employee, or foreign affiliate of a money services business, or a person who has a controlling

15

interest in a money services business as provided in s. 560.127.

§ 560.103(1), Fla. Stat. (2016).

33. As to Count I, section 560.209(2) specifically provides, in pertinent part:

(2) A licensee must obtain an annual financial audit report, which must be submitted to the office within 120 days after the end of the licensee's fiscal year, as disclosed to the office.

§ 560.209(2), Fla. Stat. (2016).

34. Rule 69V-560.606 further provides:

(1) Each licensed money transmitter and payment instrument seller shall annually submit financial audit reports to the Office in accordance with section 560.209(2), F.S., for the licensee's most recent fiscal year.

(2) Annual financial audit reports must be received by the Office within one hundred twenty (120) days after the licensee's fiscal year end.

(3) A report is "past due" if it is received by the Office one or more days beyond the period defined in subsection (2).

Fla. Admin. Code R. 65V-560.606.

35. As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not submit their financial audit report to OFR until December 20, 2017, almost eight months after the May 1, 2017, deadline.

16

36. As to Count II, pursuant to rules 69V-560.402 and 69V-560.1012(g), licensees, such as Payservices, are required to annually file Form OFR-560-07, Security Device Calculation Form, by January 31st of each calendar year for the preceding calendar year. As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not file Form OFR-560-07, Security Device Calculation Form, until February 10, 2018, ten days late.

37. As to Count III, pursuant to section 560.126(2), licensees, such as Payservices, are required to report, on a form adopted by rule, any change in the information contained in an initial license application form, or any amendment to such application within 30 days after the change is effective. Rule 69V-560.102(5) further provides that if the information contained in an application form for licensure as a money services business, or in any amendment thereto, becomes inaccurate for any reason, the applicant must file an amendment correcting such information within 30 days of the change on Form OFR-560-01, which is incorporated by reference in rule 69V-560.1012. As detailed above, the persuasive and credible evidence adduced at hearing clearly and convincingly establishes that Respondents did not update their initial application to reflect Mr. Danenberg as the registered agent for Payservices and his address as the registered agent.

17

Penalty

38.  Pursuant to sections 560.114(1)(a) and 560.1141, OFR imposes penalties upon licensees in accordance with disciplinary guidelines set forth in rule 69V-560.1000.

39.  As to Count I, the penalties are within a range of an administrative fine between $3,500 to $7,500, a ten-day to 20-day suspension, or revocation.  As to Count II, the penalties are within a range of an administrative fine between $3,500 to $7,500, a ten-day to 20-day suspension, or revocation.  As to Count III, the penalty is within a range of an administrative fine between $1,000 to $3,500.

40.  Rule 69V-560.1000(148) requires that OFR consider the following circumstances in determining an appropriate penalty within the range of penalties for each violation.  Rule 69V-560.1000(148) also requires that OFR consider these circumstances in determining a penalty that deviates from the range of penalties for each violation:

>    (a)  Whether the violation rate is less than 5% when compared to the overall sample size reviewed;
>
>    (b)  The degree of harm to the customers or the public;
>
>    (c)  The disciplinary history of the licensee;
>
>    (d)  Whether the licensee detected and voluntarily instituted corrective responses or measures to avoid the recurrence of a

18

violation prior to detection and intervention by the Office;

(e) Whether the licensee's violation was the result of willful misconduct or recklessness;

(f) Whether at the time of the violation, the licensee had developed and implemented reasonable supervisory, operational or technical procedures, or controls to avoid the violation;

(g) Where the violation is attributable to an individual officer, director, responsible person, or authorized vendor, whether the licensee removed or otherwise disciplined the individual prior to detection and intervention by the Office;

(h) Whether the licensee attempted to conceal the violation or mislead or deceive the Office;

(i) The length of time over which the licensee engaged in the violations;

(j) Whether the licensee engaged in numerous violations or a pattern of misconduct;

(k) The number, size and character of the transactions in question;

(l) Whether the licensee provided substantial assistance to the Office in its examination or investigation of the underlying misconduct;

(m) Other relevant, case-specific circumstances.

41. Applying the relevant circumstances to the particular facts of the instant case, each of the violations entailed the failure to comply with various reporting requirements. As to

19

MX1-051

Count I, Mr. Danenberg was cooperative with Mr. Morin on December 20, 2017, the same day he was contacted by Mr. Morin. In fact, Mr. Danenberg filed a document that same day, which was accepted by OFR as Payservices' financial audit report.

42. As to Count II, Respondents' filing of Form OFR-560-07, Security Device Calculation Form, was only ten days late. Even then, Payservices' surety bond was correct for the minimum amount required. Had an increase been required, Payservices would have had a 60-day grace period to amend the face of its surety bond. Taking these mitigating factors into account, and pursuant to the second sentence of rule 69V-560.1000(148), a downward deviation of the penalty is appropriate for Count II.

43. As to Count III, the failure to update the registered agent name and address is only one question among many within the initial application. No evidence was presented at hearing that OFR was unable to serve Payservices because of the change of the registered agent name and address and OFR has had access to the Division of Corporation's records and actual knowledge of the changes.

44. There was no proven harm to the customers or the public resulting from any of the violations. There is no disciplinary history. Indeed, OFR concedes that the lack of any disciplinary history is a mitigating factor.

20

45.    Based on the particular case-specific circumstances and facts of this case, the undersigned recommends an administrative fine of $3,500 for Count I, an administrative fine of $1,500 for Count II, and an administrative fine of $1,000 for Count III, for a total administrative fine of $6,000, with no suspension or revocation for any of the violations.

<u>RECOMMENDATION</u>

Based on the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED that OFR impose an administrative fine against Respondents in the amount of $6,000.

DONE AND ENTERED this 16th day of December, 2019, in Tallahassee, Leon County, Florida.

DARREN A. SCHWARTZ
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 16th day of December, 2019.

<u>ENDNOTES</u>

[1/]  Respondents shall be referred to herein collectively as "Respondents" or by their individual names ("Mr. Danenberg" and "Payservices").

21

MX1-053

[2] At hearing, Respondents requested to question Mr. Joaquin Alvarez, Ms. Melinda Butler, Assistant General Counsel for OFR, and Ms. Wilkinson, Chief Counsel of OFR. OFR objected at the hearing and made an ore tenus motion for protective order, which was granted.

[3] The undersigned further stated at the hearing:

> Now, if you want to order a copy of the transcript, then I believe you will need to get with the court reporter who's there today to make those arrangements. And you should monitor the docket to see when the transcript is filed. Sometimes the court reporter files it herself. Sometimes the agency files it.
>
> But you just need to realize that the deadline to file your Proposed Orders turn on--the clock starts ticking ten days from the date the transcript is filed at DOAH. So just keep an eye on the docket. Since you're both registered for electronic filing, you should be notified when that's done.

Tr. P. 200.

[4] Pursuant to section 560.103(22), Florida Statutes, a "money services business" includes a corporation, qualified to do business in Florida, which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, within this country, or to or from this country.

Pursuant to section 560.103(23), a "money transmitter" includes a corporation, qualified to do business in Florida, which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, within this country, or to or from this country.

[5] Notably, the Amended Adminitrative Complaint referred by OFR to DOAH indicated it was served on Mr. Danenberg at 14061 Pacific Point Place, No. 204, Delray Beach, Florida 33484.

22

COPIES FURNISHED:

Joaquin Alvarez, Esquire
Office of Financial Regulation
Fletcher Building
200 East Gaines Street
Tallahassee, Florida  32399-0370
(eServed)

Lionel Danenberg
Payservices.Com, Inc.,
d/b/a Payservices.com
14061 Pacific Point Place, Suite 204
Delray Beach, Florida  33484
(eServed)

Commissioner
Office of Financial Regulation
200 East Gaines Street
Tallahassee, Florida  32399-0350

Anthony Cammarata, General Counsel
Office of Financial Regulation
Fletcher Building, Suite 118
200 East Gaines Street
Tallahassee, Florida  32399-0370
(eServed)


## NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 15 days from the date of this Recommended Order.  Any exceptions to this Recommended Order should be filed with the agency that will issue the Final Order in this case.

23

MX1-055

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION

IN RE:

PAYSERVICES.COM, INC. d/b/a
PAYSERVICES.COM and LIONEL
DANENBERG

Respondents.

Administrative Proceeding Docket
Number: 89320

## AMENDED ADMINISTRATIVE COMPLAINT

The State of Florida, Office of Financial Regulation, ("Office") files this Amended

Administrative Complaint against PAYSERVICES.COM, INC. d/b/a PAYSERVICES.COM

and LIONEL DANENBERG (together as "Respondents"), alleging:

### GENERAL ALLEGATIONS

1. Pursuant to sections 560.105 and 560.109, Florida Statutes, the Office is charged with administering and enforcing the provisions of chapter 560, Florida Statutes, and conducting examinations and investigations to determine whether any provision of chapter 560, Florida Statutes, has been violated.

2. Pursuant to section 560.114(1)(a), Florida Statutes, failure to comply with any provision of chapter 560, Florida Statutes, or related rule constitutes grounds for disciplinary action.

3. At all times material, Respondents are or have been a Part II licensee pursuant to chapter 560, Florida Statutes, and specifically a "money services business," as defined in section 560.103(22), Florida Statutes, having been issued license number FT230000158.

4. Payservices.com, Inc.'s business is in located in Delray Beach, Florida, and Lionel Danenberg is Payservices.com, Inc.'s CEO/President/Compliance Officer and an owner.

5. The Office conducted a limited examination (#88578) of Respondents' compliance

1

MX1-056

with the money services business filing requirements.

6.     Pursuant to Rule 69V-560.1000(150), Florida Administrative Code, the range for an "A" level fine is between $1,000 and $3,500.

7.     Pursuant to Rule 69V-560.1000(150), Florida Administrative Code, the range for a "B" level fine is between $3,500 and $7,500; and, pursuant to Rule 69V-560.1000(151), Florida Administrative Code, the range for a "B" level suspension is 10 to 20 days.

## COUNT I

8.     The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

9.     Pursuant to section 560.209(2), Florida Statutes, and Rule 69V-560.606, Florida Administrative Code, a licensee must annually submit a financial audit report to the Office within 120 days after the end of the licensee's fiscal year.

10.     Respondents' fiscal year ends on December 31st.

11.     Thereby, Respondents' 2016 financial audit report was due on May 1, 2017. The Office did not receive Respondents' submission until December 20, 2017.

12.     Respondents failed to submit their annual financial audit report within 120 days after the end of their fiscal year, in violation of section 560.209(2), Florida Statutes.

13.     Pursuant to Rule 69V-560.1000(64), Florida Administrative Code, a licensee cited for a violation of 560.209(2), Florida Statutes, is subject to a "B" fine, and a "B" suspension or revocation.

14.     Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

## COUNT II

15.     The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

2

16.    Pursuant to section 560.209(2), Florida Statutes, and Rule 69V-560.606, Florida Administrative Code, a licensee must annually submit a financial audit report to the Office within 120 days after the end of the licensee's fiscal year.

17.    Pursuant to section 560.103(15), Florida Statutes, a "financial audit report" is defined, among other things, must be conducted by a certified public accountant licensed to do business in the United States, and must include the expression of an opinion.

18.    Pursuant to sections 473.302(8)(a), 473.3101, 473.3141, and 473.322(1)(c), Florida Statutes, an expression of an opinion regarding financial statements is lawful only if made by a person who holds an active license in Florida or another state and is either 1) a licensed firm or 2) provides such services through a licensed firm.

19.    On March 28, 2018, the office timely received a financial audit report for fiscal year 2017, which was prepared by a Georgia certified public accountant who was not affiliated with a licensed firm.

20.    Respondents failed to submit a lawful financial audit report within 120 days after the end of their fiscal year, in violation of section 560.209(2), Florida Statutes.

21.     Pursuant to Rule 69V-560.1000(64), Florida Administrative Code, a licensee cited for a violation of 560.209(2), Florida Statutes, is subject to a "B" fine, and a "B" suspension or revocation.

22.    Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

## COUNT III

23.    The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

24.    Pursuant to section 560.209(5), Florida Statutes, a licensee must maintain a surety bond or collateral deposit in the required amount.

3

25.    Form OFR-560-07, incorporated by reference in Rule 69V-560.1012, Florida Administrative Code Pursuant to Rule 69V-560.402, Florida Administrative Code ("Form 560-07") (Security Device Calculation Form) is the form used by money services business licensees to calculate the required amount of their surety bond, collateral deposit, combination thereof. A money services business licensee must file Form OFR-560-07, annually, no later than January 31.

26.    On February 10, 2018, Respondents filed their Form OFR-560-07 which was due January 31, 2018.

27.    Respondents failed to file the Security Device Calculation Form within the time required by Form 560-07, as adopted by rule.

28.    Pursuant to Rule 69V-560.1000(12), Florida Administrative Code, a licensee cited for failing to comply with a provision of chapter 560, Florida Statutes, or related rule is subject to a "B" fine and a "B" suspension.

29.    Therefore, the Office is seeking an administrative fine of $3,500 and a 10 day suspension.

## COUNT IV

30.    The above general allegations are hereby re-alleged and incorporated by reference as if fully stated herein.

31.    Pursuant to section 560.126(2), Florida Statutes, and Rules 69V-560.1012, and 69V-560.102(5), Florida Administrative Code, licensees are required to notify the Office of any change in information within 30 days of its occurrence.

32.    In their initial license application dated December 6, 2015, Respondents were required to list the name and address of their registered agent for service of process. Respondents listed Corporate Access Inc. as their registered agent, and identified the address for service of process as 236 East 6th Avenue, Tallahassee, FL 32303.

4

MX1-059

33. After reviewing the Florida Division of Corporations ("Sunbiz") records, the Office discovered that Respondents appointed Lionel Danenberg as their registered agent on January 10, 2017 and listed their registered agent address as 300 W Palmetto Park Road, A210, Boca Raton, FL 33432. Respondents amended their registered agent information on Sunbiz again on February 26, 2018, by listing the address of their registered agent as 14061 Pacific Point Place, #204, Delray Beach, FL 33484.

34. Respondents have not amended their application information to reflect their updated registered agent name and address information.

35. Respondents failed to timely report the change in the name and address of their registered agent, in violation of section 560.126(2), Florida Statutes, and Rule 69V-560.102(5), Florida Administrative Code.

36. Pursuant to Rule 69V-560.1000(52), Florida Administrative Code, a licensee cited for the first time for failing to report any change in application information of the licensee is subject to an "A" fine.

37. Therefore, the Office is seeking an administrative fine of $2,000

WHEREFORE, Respondents, **PAYSERVICES.COM, INC.** d/b/a **PAYSERVICES.COM** and **LIONEL DANENBERG** are hereby notified that the Office intends to enter an Order imposing an administrative fine of $12,500 and a 30-day license suspension.

5

## NOTICE OF RIGHTS

The licensee is entitled to be represented by counsel or other qualified representative. The licensee also has the right to request a hearing pursuant to sections 120.569 and 120.57, Florida Statutes. Such request must comply with Rules 28-106.2015 and 28-106.104, Florida Administrative Code. An Election of Proceeding form is attached for your convenience.

Any such request must be filed as follows:

**By Mail or Fax**                    OR                    **By Hand Delivery**

Office of Financial Regulation                    Office of Financial Regulation
P.O. Box 8050                    General Counsel's Office
Tallahassee, FL 32314-8050                    The Fletcher Building, Suite 118
Phone: (850) 410-9987                    101 East Gaines Street
Fax: (850) 410-9914                    Tallahassee, FL 32399-0379
                    Phone: (850) 410-9987

**TO PRESERVE THE RIGHT TO A HEARING, A WRITTEN RESPONSE MUST BE FILED WITH THE OFFICE OF FINANCIAL REGULATION WITHIN TWENTY-ONE (21) DAYS AFTER THE RECEIPT OF THE AMENDED ADMINISTRATIVE COMPLAINT. SAID RESPONSE MUST BE RECEIVED BY THE OFFICE NO LATER THAN 5:00 P.M. ON THE TWENTY-FIRST DAY AFTER THE RECEIPT OF THE AMENDED ADMINISTRATIVE COMPLAINT. A FAILURE TO TIMELY RESPOND IN WRITING WILL CONSTITUTE A WAIVER OF THE LICENSEE'S RIGHT TO REQUEST A HEARING AND A FINAL ORDER MAY BE ENTERED WITHOUT FURTHER NOTICE.**

You may not make an oral request for an administrative hearing. With regard to a written request, if you fail to follow the outlined procedure, your request may be dismissed. Any request for an administrative proceeding received prior to the date of this notice is deemed abandoned and to be considered, must be timely renewed in compliance with the procedure set forth above.

Mediation of this matter pursuant to section 120.573, Florida Statutes, is not available.

6

MX1-061

## NOTICE TO RESPONDENTS

In accordance with the Americans with Disabilities Act, persons with disabilities needing special accommodation to participate in this proceeding should contact the Agency Clerk no later than seven (7) days prior to the filing deadline or proceeding, at the Office of Financial Regulation, The Fletcher Building, Suite 118, 101 East Gaines Street, Tallahassee, Florida 32399-0379, Phone: (850) 410-9889, or by Email: agencyclerk@flofr.com.

DATED and SIGNED this 22ⁿᵈ day of April, 2019.

RONALD L. RUBIN, Commissioner
Office of Financial Regulation

By: _____
Joaquin Alvarez
Assistant General Counsel
Office of Financial Regulation
Fla. Bar No. 113647
101 E. Gaines Street
Tallahassee, FL 32399-0379
(850) 410-9554
Joaquin.alvarez@flofr.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Administrative Complaint has been sent for service by U.S. certified mail to Lionel Danenberg at 14061 Pacific Point Place #204 Delray Beach, Florida 33484 on this 22ⁿᵈ day of April, 2019

_____
Joaquín Alvarez

91 7199 9991 7039 5682 4255

7

MX1-062

Index: OFR 2023 - 238



DOCKETED
10/17/2023
LEGAL
BH

## STATE OF FLORIDA
## OFFICE OF FINANCIAL REGULATION

IN RE:

PAYSERVICES, INC., and
LIONEL DANENBERG,

        Respondents.

Case Number: 108042

## FINAL ORDER

This cause came on for consideration and final agency action. Upon review of the record, including the attached Recommended Order in the Division of Administrative Hearings ("DOAH") Case No. 23-0732, and being otherwise fully advised in the premises, the Office of Financial Regulation (the "Office") hereby finds:

1.      The Office has jurisdiction over the subject matter of this case and the parties hereto.

2.      Section 120.57(1)(l), Florida Statutes, states in pertinent part as follows:

> The agency in its final order may reject or modify the conclusions of law over which it has substantive jurisdiction and interpretation of administrative rules over which it has substantive jurisdiction. When rejecting or modifying such conclusion of law or interpretation of administrative rule, the agency must state with particularity its reasons for rejecting or modifying such conclusion of law or interpretation of administrative rule and must make a finding that its substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected or modified.

3.      The entry of this Final Order shall conclude the above-referenced administrative proceeding.

MX1-063

**IT IS ACCORDINGLY ORDERED:**

A. The attached Recommended Order (Exhibit A) is adopted by the Office and incorporated by reference as if fully stated herein, with a modification as to the conclusions of law in paragraphs 90 and 111.

B. Specifically, solely as to paragraphs 90 and 111, the Recommended Order is hereby modified to reflect that it is the Financial Services Commission (the "Commission"), not the Office, which adopted Rule 69V-560.1000, Florida Administrative Code, and it is the Commission which is required to adopt the Disciplinary Guidelines pursuant to section 560.1141, Florida Statutes. The Office finds that this modification is reasonable since it is in accordance with the plain text of sections 560.105 and 560.1141, Florida Statutes.

C. Within thirty (30) days of the docketing of this Final Order, Respondents shall pay an **ADMINISTRATIVE FINE of Ten Thousand Dollars ($10,000.00).** This administrative fine shall be submitted either via wire transfer, or via money order or cashier's check made payable to the **Office of Financial Regulation** and shall be sent to the attention of **Agency Clerk, c/o Joaquin Alvarez, Esq., Post Office Box 8050, Tallahassee, Florida 32314-8050.**

**DONE and ORDERED** this 17th day of October, 2023, in Tallahassee, Leon County, Florida.

Russell C. Weigel, III,
Commissioner

## NOTICE OF RIGHTS

A PARTY WHO IS ADVERSELY AFFECTED BY THIS FINAL ORDER IS ENTITLED TO JUDICIAL REVIEW PURSUANT TO SECTION 120.68, FLORIDA STATUTES. REVIEW PROCEEDINGS ARE GOVERNED BY THE FLORIDA RULES OF APPELLATE PROCEDURE. SUCH PROCEEDINGS ARE COMMENCED BY FILING THE ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AS FOLLOWS:

| By Mail or Email | OR | By Hand Delivery |
|---|---|---|
| Agency Clerk<br>Office of Financial Regulation<br>P.O. Box 8050<br>Tallahassee, Florida 32314-8050<br>Phone: (850) 410-9889<br>Agency.clerk@flofr.gov | | Agency Clerk<br>Office of Financial Regulation<br>General Counsel's Office<br>The Fletcher Building, Suite 504<br>101 East Gaines Street<br>Tallahassee, Florida 32399-0379<br>Phone: (850) 410-9889 |

A COPY OF THE NOTICE OF APPEAL, ACCOMPANIED BY THE FILING FEES AS REQUIRED BY LAW, MUST ALSO BE FILED WITH THE DISTRICT COURT OF APPEAL, FIRST DISTRICT, 2000 DRAYTON DRIVE, TALLAHASSEE, FLORIDA 32399-0950, OR WITH THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE PARTY RESIDES. **THE NOTICE OF APPEAL MUST BE FILED WITH BOTH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AND THE DISTRICT COURT OF APPEAL WITHIN 30 DAYS OF THE RENDITION OF THE ORDER TO BE REVIEWED.**

MX1-065

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of this Final Order has been furnished

via by electronic mail to PayServices, Inc., c/o Lionel Danenberg, at lionel@payservices.com, and

via U.S. mail to PayServices, Inc. at 2234 North Federal Highway, #3035, Boca Raton, FL 33431,

on this 17th day of October, 2023.

Agency Clerk
Florida Office of Financial Regulation
Tallahassee, FL 32314-8050
Post Office Box 8050
Email: Agency.Clerk@flofr.com
Tel: (850) 410-9889

**Exhibit A**

# STATE OF FLORIDA
## DIVISION OF ADMINISTRATIVE HEARINGS

OFFICE OF FINANCIAL REGULATION,

    Petitioner,

vs.

                                     Case No. 23-0732

PAYSERVICES, INC., AND LIONEL
DANENBERG,

    Respondents.

_____/

## RECOMMENDED ORDER

Pursuant to notice, a final hearing was held before Robert L. Kilbride, an Administrative Law Judge ("ALJ") of the Florida Division of Administrative Hearings ("DOAH"), on July 25, 2023. The hearing was held by Zoom video conference.

## APPEARANCES

For Petitioner:    Joaquin Alvarez, Esquire
Office of Financial Regulation
Fletcher Building
200 East Gaines Street
Tallahassee, Florida 32399-0376

For Respondents:  Lionel Danenberg, pro se
PayServices, Inc.
14061 Pacific Point Place
Delray Beach, Florida 33484

## STATEMENT OF THE ISSUES

Whether Respondents committed the acts alleged in Counts I through IV of the Office of Financial Regulation's Amended Administrative Complaint ("Amended Complaint") and, if so, what penalty should be imposed.

MX1-067

The counts of the Amended Complaint are summarized as follows: Count I alleges that Respondents failed to place assets that are the property of customers in a segregated account in a federally insured institution and failed to maintain separate accounts for the clearing of customer funds and for operating capital, in violation of section 560.208(4), Florida Statutes. Count II alleges that Respondents failed to timely file their 2017 Financial Crimes Enforcement Network ("FinCEN") registration renewal pursuant to the requirements of 31 C.F.R. § 1022.380, in violation of section 560.1235(1). Count III alleges that Respondents failed to timely report the opening and closing of certain bank accounts used for licensed activities in their license application, in violation of section 560.126(2) and Florida Administrative Code Rule 69V-560.102(5). Count IV alleges that Respondents failed to timely report that Respondents' officers serve as directors of PayServices Bank in their license application, in violation of section 560.126(2) and rule 69V-560.102(5).

## PRELIMINARY STATEMENT

PayServices, Inc. ("PayServices"), is licensed with the Office of Financial Regulation ("the Office" or "Petitioner") as a Part II money services business, and specifically a funds transmitter ("licensee").

Lionel Danenberg ("Danenberg") has been the CEO, owner, and compliance officer of PayServices, making him both a control person and an affiliated party of PayServices.

On December 7, 2022, the Office issued an Administrative Complaint ("Complaint") against PayServices and Danenberg (together "Respondents"), which alleged various violations of chapter 560. On February 23, 2023, the Office referred the matter to DOAH.

On April 14, 2023, the Office moved for permission to amend its Complaint and to substitute the new Amended Complaint. On April 18, 2023, DOAH granted the Office's motion for leave to amend the Complaint, over Respondents' objection.

During the hearing, the ALJ took official recognition of chapter 560, rule 69V-560, and 31 C.F.R. § 1022.380.

The Office filed its exhibit list and witness list on July 21, 2023. Respondents filed an exhibit list on July 21, 2023, but did not file a witness list.

Petitioner's Exhibits 1, 2, 2-A, 2-B, 3, 3-A, 3-B, 3-C, 4, 5, 5-A, 6 through 8, 8-A, 8-B, 8-C, 9, and 11 through 17 were admitted into evidence. Respondents Exhibits 5 through 14 and 16 through 19 were admitted into evidence.

Petitioner called three witnesses at the hearing from the Office: Gregory Oaks, Division of Consumer Finance Director ("Director Oaks"); Kris Ignatowicz, Bureau of Financial Investigations Financial Examiner Analyst Supervisor ("Supervisor Ignatowicz"); and Stephen Stokes, Division of Consumer Finance Financial Examiner ("Examiner Stokes"). Respondents called Lionel Danenberg as their only witness.

In compliance with the Order Granting Extension of Time, the parties submitted proposed recommended orders on September 18, 2023.

References to laws, statutes, regulations, or rules refer to those in effect on the date of the act, omission, or occurrence.

MX1-069

References to Exhibits are denoted as "P. Ex. #" for Petitioner's Exhibits and "R. Ex. #" for Respondent's exhibits.

## FINDINGS OF FACT

Upon a full and complete review of the record in this case and consideration of the evidence presented at the hearing, the following findings of fact are made.

General

1. PayServices, at all times material to this case, has been a money services business licensee, and specifically a funds transmitter, pursuant to chapter 560, part II. P. Ex. 11, at 173.

2. Danenberg has been the CEO, owner, and compliance officer of PayServices. P. Ex. 11, at 173.

3. The Office is required to conduct an examination of each business licensed under chapter 560 every five years.

4. Consistent with this requirement, Examiner Stokes conducted an examination of PayServices.

Count I

5. As part of its examination, the Office evaluated whether Respondents conducted their money transmission activity in accordance with Florida law.

6. As a brief backdrop, Florida law requires that a licensee place assets that are the property of customers in a segregated account in a federally insured institution and maintain separate accounts for the clearing of customer funds and for operating capital.

7. The purpose of requiring a licensee to maintain separate accounts for the clearing of customer funds and for operating capital is to protect customer funds by reducing the risk of customers losing funds if the company becomes insolvent or bankrupt.

8. Additionally, maintaining separate accounts reduces the risk of fraud or misuse. If a licensee fails to maintain separate accounts, it is more difficult for the Office to account for and protect customer funds.

9. PayServices reported four money transmission transactions (one inbound and three outbound) in a Money Services Business Quarterly Report Form ("Quarterly Report") for the third quarter of 2020. Specifically, PayServices reported that: (1) $45,950 was sent to PayServices in August 2020, (2) $9,120 was sent out by PayServices to recipients in the USA in August 2020 in two transactions; and (3) $35,000.10 was sent by PayServices to Mexico in one transaction in August 2020. P. Ex. 1, at 5-8; and P. Ex. 11, at 173.

10. PayServices used a TD Bank account ending in 6987, which was used to transmit money for customers during the month of August 2020. The TD Bank account statements reflected a $45,950 deposit on July 31, 2020, i.e., the same amount reported as the inbound money transmission for August 2020.

11. The TD Bank account statements reflected $44,120.10 in outgoing wire transfers to the following individuals in the following amounts: Jose Valdemar Rangel Cruz, $35,000.10; Yuchuan, $8,160; and Alejandro Garcia, $960. P. Ex. 2, at 21-23.

12. PayServices also used the TD Bank account to pay for its own operational expenses. P. Ex. 11, at 173-74; and P. Ex. 12, at 276.

13. Danenberg had a Discover Card account ending in 4303 between July and August 2020. P. Ex. 4, at 83-86; and P. Ex. 11, at 173-74.

14. PayServices paid $919 from the TD Bank account to the Discover Card account on August 7, 2020, and paid the same amount again on August 17, 2020. P. Ex. 11, at 173-74.

15. PayServices used the Discover card during July and August 2020 to pay for the business's operating expenses. Examiner Stokes testified that the Discover Card appeared to be primarily used for PayServices' operational

expenses. The Discover Card statements show payments made to Upwork, Google Ads, United States Postal Service, and other business services providers. P. Ex. 4, at 83-86; and P. Ex. 11, at 173-74.

16. The totality of the evidence proved that Respondents failed to place assets that were the property of customers in a segregated account in a separate federally insured financial institution ("FIFI"), and failed to maintain separate accounts for the licensee's operating capital and the clearing of customer funds.

Count II

17. As part of its examination, the Office also examined whether Respondents maintained their required federally regulated FinCEN registration at all times.

18. As a condition of licensure, licensees must maintain and timely renew their registration with FinCEN. After the initial registration period, a licensee is required to file its FinCEN renewal registration on or before the last day of the calendar year preceding the renewal period.

19. The purpose of requiring a licensee to maintain a FinCEN registration is to ensure that a licensee is operating in compliance with federal anti-money laundering regulations. Maintaining a FinCEN registration helps protect the public against money laundering or terrorist financing activities, by requiring that money transmitters report suspicious activity and large monetary transactions to FinCEN.

20. Respondents filed their initial FinCEN registration on or about June 21, 2013. P. Ex. 5, at 96-98. By law, Respondents' registration renewals were due every 24 months thereafter, by December 31 in 2015, 2017, and 2019. *See also* 31 C.F.R. § 1022.380(b)(2) & (3).

21. Respondents' 2017 FinCEN registration renewal was due on December 31, 2017.

22. Respondents' registration with FinCEN ended on December 31, 2017. P. Ex. 11, at 176.

23. Respondents filed their 2017 FinCEN registration renewal on October 10, 2018, which was 283 days after it was due.

24. In their October 10, 2018, filing, Respondents reported an account maintained at Wells Fargo Bank. P. Ex. 5, at 90-91.

25. Respondents provided no evidence to the examiner that they attempted to renew their 2017 FinCEN registration prior to the deadline of December 31, 2017. P. Ex. 6 and 7.

26. Respondents failed to timely renew and maintain their 2017 FinCEN registration. P. Ex. 11, at 176.

Count III

27. As part of its examination, the Office reviewed whether Respondents used any bank accounts for licensed activities that were not reported on their initial or amended applications.

28. As a condition of licensure, licensees must notify the Office of any change in application information within 30 days of its occurrence.

29. The requirement for a licensee to notify the Office of any change in its application information on file with the Office protects consumers by ensuring that the Office has accurate information regarding the licensee. When a licensee fails to update its application information, it is difficult for the Office to examine their licensed business activity and to ensure compliance with Florida law.

30. Respondents are required to list all bank accounts through which Respondents will engage in licensed activities. P. Ex. 8, at 124, 140, 156.

31. In their initial license application dated March 11, 2016, Respondents identified one bank account at PNC Bank. P. Ex. 8, at 124-26.

32. On August 28, 2017, Respondents filed an amended application listing one bank account at Comerica Bank. P. Ex. 8, at 140-42.

33. On October 26, 2020, Respondents filed an amended application with no bank accounts identified. P. Ex. 8, at 156-58.

34. During its examination, the Office found that Respondents had opened a bank account with TD Bank in March 2020. P. Ex. 2, at 9.

35. Respondents used this TD Bank account to transmit money for customers throughout July and August 2020. P. Ex. 1, at 5-7; P. Ex. 2, at 21-24; and P. Ex. 11, at 173.

36. The TD Bank account remained open until, at least, April 2021. P. Ex. 11, at 174.

37. However, Respondents did not amend their license application to reflect the opening of the TD Bank account, despite having used the account to conduct licensed money transmission. P. Ex. 11, at 174.

38. Additionally, the Office found that Respondents opened a bank account with Wells Fargo Bank on November 25, 2017. P. Ex. 3, at 37-40.

39. Respondents used this Wells Fargo Bank account to transmit money for customers throughout July and August 2018. P. Ex. 1, at 1-4; and P. Ex. 3, at 68-75.

40. The Wells Fargo Bank account was closed in October 2018. P. Ex. 3, at 81.

41. Likewise, Respondents did not amend their application to reflect the opening and closing of the Wells Fargo Bank account, despite having used the account to conduct regulated money transmissions. P. Ex. 8, at 105-69; and P. Ex. 9, at 170-71.

42. Respondents failed to update or report on their license applications the opening and closing of the TD Bank account, and the opening and closing of the Wells Fargo Bank account.

Count IV

43. On March 3, 2023, the Office discovered that PayServices was advertising itself as a bank on its website.

44. In their initial license application dated December 6, 2015, PayServices' officers responded to question K of the Biographical Summary for each officer. Question K of the application asks the following: "Are you

presently an officer, director, member, or shareholder of 10% or more of the outstanding stock of any firm, company, corporation, partnership or other business organization other than the applicant or licensee?" Respondent's officers, Lionel and Willy Danenberg, both answered "[y]es," and disclosed that they served as officers of "Protecsign Corporation." P. Ex. 8, at 128, 133.

45. However, on October 26, 2020, Respondents filed an amended application which changed both responses to question K to "No." P. Ex. 8, at 161, 166.

46. As a part of its investigation and examination, on March 2, 2023, the Office discovered that Respondents' website displays and advertises the services of a "Payment Bank" and "PayServices Bank." P. Ex. 14, at 410, 414-15.

47. After a thorough review of applicable public records, the Office discovered that on September 12, 2022, Danenberg registered PayServices Bank with the Idaho Secretary of State. The articles of incorporation filed with the Idaho Secretary of State list both Lionel and Willy Danenberg as directors and shareholders of PayServices Bank. P. Ex. 13, at 403-06.

48. Respondents have not amended their responses to question K to disclose that Lionel and Willy Danenberg are currently directors of PayServices Bank.

49. Respondents failed to report that Lionel and Willy Danenberg serve as directors of PayServices Bank on their money transmitter license application.

Penalty Calculation

50. In determining the appropriate penalties, the Office referred to and relied on rule 69V-560.1000, and to Form OFR-560-09, which is incorporated by reference within rule 69V-560.1000 (collectively "the Disciplinary Guidelines"). Tr. Vol 2, at 131-32.

Mitigating and Aggravating Circumstances

51. The Office properly considered mitigating and aggravating circumstances as authorized by rule 69V-560.1000(3).

52. The Office properly found two relevant mitigating circumstances for Counts I, II, and III, and one relevant aggravating circumstance as to Count IV.

53. Rule 69V-560.1000(3)(a)5. states that it is a mitigating factor if "the money services business is responsive to the Office's requests or inquiries or made no attempt to impede or delay the Office in its examination or investigation of the underlying misconduct."

54. The Office considered and found that Respondents were cooperative with the Office's examination to determine whether rule 69V-560.1000(3)(a)5. applied to Respondents.

55. Rule 69V-560.1000(3)(a)6., and (3)(b)6. also allows for consideration of "[o]ther relevant, case-specific circumstances" to reduce the penalty.

56. The Office found it to be a mitigating circumstance pursuant to rule 69V-560.1000(3)(a)6. that Respondents conducted a low volume of business.

57. As to Count IV, the Office properly found it to be an aggravating circumstance pursuant to rule 69V-560.1000(3)(b)6. that Respondents' failure to update their application information as to PayServices Bank was an ongoing violation.

58. After a careful review of the case circumstances and applicable law, the Office correctly determined that a total $10,000 administrative fine and no license suspension constituted an appropriate penalty for the charges brought in the Amended Complaint.

59. The undersigned concurs with these findings and the penalty assessment imposed by the Office.

Danenberg's Testimony

60. Danenberg's testimony and the explanations he offered in response to the charges were carefully considered, but were not persuasive or credible.

61. In summary, Danenberg testified and claimed the following: (1) PayServices' business plan permits the company to commingle funds, and the Office approved of the business plan back in 2016; (2) PayServices maintains

its own separate accounts within its own records; (3) the FinCEN registration lapsed because of a compatibility issue with his Mac Computer and Adobe Acrobat; (4) he did not have to report the TD Bank and Wells Fargo Bank accounts in his application because the banks told him that the accounts would be closed shortly after they were used for money transmission; (5) he disclosed the TD Bank and Wells Fargo Bank accounts during the examination; (6) no amendment was necessary on the license application because he is only an incorporator of PayServices Bank; (7) no consumers were harmed by PayServices' actions; and (8) no consumers complained about PayServices.

62. However, as outlined more fully below: (1) the Office cannot grant a waiver from the requirements of the Florida Statutes; (2) PayServices is not a FIFI, and needed to maintain a segregated and separate account at a FIFI, not just in its own books and records; (3) there is no evidence that the compatibility issues with the FinCEN program were an issue at the time the 2017 renewal was due; (4) both the TD Bank and Wells Fargo Bank accounts remained open for more than 30 days after the money transmission activity; (5) disclosing the bank accounts during the 2021 examination is irrelevant to whether they were disclosed on the license application; (6) Lionel and Willy Danenberg are the directors of PayServices Bank, in accordance with the Idaho Statutes; (7) consumer harm is an aggravator, not a mitigator, within the disciplinary guidelines; and (8) a consumer complaint is not a prerequisite to an enforcement action.

63. Danenberg focused his testimony primarily upon denials of any wrongdoing in response to the violations charged within the Amended Complaint. However, Danenberg did not refer to the Disciplinary Guidelines within rule 69V-560.1000(3)(a) to identify and explain any mitigating circumstances.

64. During cross examination, Danenberg willfully and improperly refused to answer basic questions regarding the facts of the case.

65. Danenberg evasively declared that he had already answered them in his deposition, and that he was not required to respond to the questions at the hearing.

66. Despite being warned by the undersigned that negative inferences might be drawn from his refusal to answer the questions, Danenberg persisted in providing evasive and nonresponsive answers, such as: (1) he did not remember what he said in his deposition; (2) he was not prepared to answer any questions at the hearing; and (3) he did not have to disclose anything about PayServices Bank to Petitioner at the hearing.

67. Danenberg's continuing lack of candor is an additional reason to reject Danenberg's testimony and version of the events as not being credible.

## CONCLUSIONS OF LAW

68. The Division of Administrative Hearings has jurisdiction over the subject matter and parties to this proceeding pursuant to section 120.57(1), Florida Statutes.

69. Pursuant to section 560.105 the Office is charged with the responsibility of administering and enforcing the provisions of chapter 560.

70. Petitioner has jurisdiction to investigate, examine, and sanction PayServices as a Part II money services business in Florida.

71. Petitioner has jurisdiction to investigate, examine, and sanction Danenberg as both a responsible person and an affiliated party of a licensed Part II money services business in Florida.

72. The Office has the burden of proving its allegations by clear and convincing evidence. *Ferris v. Turlington*, 510 So. 2d 292 (Fla. 1987). Stated another way, this means that the evidence must produce in the mind of the trier of fact a firm belief or conviction, without hesitancy, that the allegations of the Amended Complaint are true. *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. 4th DCA 1983).

73. *Slomowitz* outlines that "clear and convincing" evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit; and the witnesses must be lacking in confusion as to the facts at issue.

74. Applying *Slomowitz* to the facts of this case, the Office presented sufficient documentary and testimonial evidence to establish the factual allegations in the Amended Complaint by clear and convincing evidence.

75. More specifically, Examiner Stokes testified persuasively and clearly about his examination, his findings, his process in conducting the examination, and the underlying documents he relied upon to support his findings.

76. Supervisor Ignatowicz likewise testified precisely and clearly about her review of the PayServices website and the records she found relating to PayServices Bank.

77. Director Oaks also testified convincingly about the basis for the penalty recommendation, and the applicable mitigating and aggravating circumstances considered by the Office.

78. Respondents failed to provide any persuasive or credible evidence that sufficiently contradicted or called into question the Office's witnesses or documentary evidence, nor did Respondents persuasively establish any applicable mitigating factors that would reduce the penalties sought by the Office.

Conclusions Regarding the Amended Complaint

Count I

79. Pursuant to section 560.208(4), a money transmitter licensed pursuant to chapter 560 "shall place assets that are customer property into a segregated account in a FIFI, and maintain separate accounts for the licensee's operating capital and the clearing of customer funds."

80. Under a plain meaning reading of the statute, the requirement to maintain a segregated account means that licensees must have a segregated

and separate account at a FIFI that is dedicated solely to holding assets that are customer property and the clearing of customer funds. Licensees cannot commingle customer funds in that account with operating capital.

81. Respondents failed to place assets that are property of customers in a segregated account in a federally insured institution, and to maintain separate accounts for the clearing of customer funds and for operating capital, in violation of section 560.208(4). No evidence was presented to the contrary at the hearing and the explanation offered by Danenberg was not persuasive.

82. At the hearing, Danenberg testified that Respondents did not violate section 560.208(4) because Respondents maintained their own segregated accounts in their own financial records. Danenberg reasoned that it was PayServices's responsibility to maintain segregated accounts, and not the bank's responsibility to maintain segregated accounts. Alternatively, Danenberg also testified that he was allowed to comingle funds because his business plan requires commingling funds, and the Office granted him a license after reviewing his business plan. As evidence of this, Danenberg provided a PowerPoint slide he sent to the Office in 2016, which show the purported flow of funds in his business plan.

83. Respondents' reasoning is misplaced. Respondents bear the responsibility to maintain a segregated account for the holding of customer property. However, they must hold that account at a separate FIFI. PayServices is not a FIFI. The bank will not segregate the accounts for PayServices. It is PayServices' responsibility to ensure that the accounts are segregated.

84. Respondents' explanation and interpretation of the statute is unreasonable because it would render the statute a nullity. Simply put, PayServices' maintenance of customer accounts *within its own records* does not satisfy the clear requirement that licensees are required to maintain a

segregated account for customer assets and are not to commingle client funds with operating capital.

85. Respondents used the same bank account at TD Bank for customer property and operating capital. In July and August of 2020, PayServices conducted money transmission transactions through the TD Bank account and paid for its operating expenses out of that same bank account. Thus, PayServices did not maintain a segregated account for money transmission.

86. Regarding Respondents' waiver argument, the Office cannot waive the Florida Statutes. It is well settled law that agencies cannot grant variances from or waivers of the Florida Statutes. *See Boone, et al. v. Dep't of Bus. & Pro. Regul.*, Case No. 13-2421 (Fla. DOAH Oct. 10, 2013; Fla. DBPR Nov. 4, 2013), *quoting Hanbali v. Bd. of Pro. Eng'g.*, Case No. 09-2266 (Fla. DOAH Oct. 26, 2009; Fla. Bd. of Pro. Eng'g. Dec. 21, 2009).

87. Likewise, waivers cannot be used to modify the operation of statutes. *See Booker Creek Pres., Inc. v. S.W. Fla. Water Mgmt. Dist.*, 534 So. 2d 419, 423 (Fla. 5th DCA 1988).

88. The fact that Respondents provided a PowerPoint slide as part of their business plan does not mean that the Office has waived the right to enforce Florida law regarding the improper commingling of funds. Further, it is in no way apparent from that PowerPoint slide that Respondents intended to combine operating capital and customer funds in one bank account.

89. In determining the penalty recommendation, the Office applied section 560.114(1) and (7) and rule 69V-560.1000. Under rule 69V-560.1000, the penalty for a first-time violation of section 560.208(4) is classified as a level "B" violation. A level "B" violation may be punished by a fine in the range of $3,500 to $7,500 and a license suspension between 10 and 20 days.

90. The failure to place assets that are customer property into a segregated account in a FIFI and maintain separate accounts for the licensee's operating capital and the clearing of customer funds is not a minor violation of law. The purpose of that law is to ensure the safety and

soundness of a money services business in transacting business with consumers. Further, the Office was required by section 560.1141(2), enacted in 2008, to adopt disciplinary guidelines by rule that distinguish minor violations from those that endanger the public health, safety, or welfare. Nowhere in rule 69V-560.1000, adopted by the Office in 2009, does it deem the commingling of customer funds with operating capital to be a minor violation. Therefore, this violation is considered as one that potentially endangers the health, safety, or welfare of the public.

91. The Office considered all of the circumstances described in rule 69V-560.1000 in its determination of the penalty within the range. The Office properly determined that a "high-end" fine of $3,500 is the appropriate penalty for this violation.

Count II

92. Pursuant to section 560.1235(1), licensees must comply with all state and federal laws and rules relating to money laundering.

93. Pursuant to federal regulation, 31 C.F.R. § 1022.380(b), licensees must timely renew their money services business registration with FinCEN.

94. Respondents failed to timely renew their money services business registration with FinCEN, in violation of section 560.1235(1) and 31 C.F.R. § 1022.380(b). No persuasive evidence was presented to the contrary at the hearing.

95. At the hearing, Danenberg admitted that PayServices's FinCEN registration had lapsed but claimed that Respondents were unable to renew their registration because of a compatibility issue with Adobe Acrobat and his Mac computer. Danenberg reasoned that because of the technical obstacle it was not PayServices' fault that its registration had lapsed. He also asserted that FinCEN should have been the one to enforce the registration requirement.

96. Respondents' after-the-fact reasoning is not afforded any significant weight. Respondents provided no evidence that they attempted to renew the

registration *prior to* December 31, 2017. The fact that Respondents had computer compatibility problems 10 months after the renewal date does not show that Respondents attempted to timely renew their FinCEN registration.

97. The failure to timely renew a money services business registration with FinCEN is more in the nature of a minor violation of law. The purpose of that law is to ensure that money transmitters comply with federal anti-money laundering laws, which ultimately helps the federal government combat money laundering and terrorist financing. However, the Respondents' late compliance did not substantially jeopardize or compromise the federal anti-money laundering laws.

98. The Office considered all of the circumstances described in rule 69V-560.1000 in its determination of a penalty within the range. The Office properly determined that a "low end" fine of $1,000 was an appropriate penalty.

<u>Count III</u>

99. Pursuant to section 560.126(2) and rule 69V-560.201(2), licensees must notify the Office of any change in application information within 30 days of its occurrence.

100. Pursuant to rule 69V-560.102(5), if the information contained in any application form for licensure as a money services business, or in any amendment thereto, becomes inaccurate for any reason, the applicant must file an amendment correcting the information within 30 days of the change on Form OFR-560-01, which is incorporated by reference in rule 69V-560.1012.

101. Respondents failed to timely report the opening and closing of the TD Bank and Wells Fargo Bank accounts within their license application in violation of section 560.126(2) and rule 69V-560.201(2). No persuasive evidence was presented to the contrary at the hearing.

102. At the hearing, Danenberg offered multiple reasons why Respondents did not update their application to reflect the two bank accounts. Danenberg

emphasized that they disclosed the accounts to the examiner during the examination. He also stated that Respondents were afraid to disclose the bank accounts on their license application because they had been a victim of bank fraud on the Wells Fargo Bank account. Respondents reasoned that the Office's licensing system was not secure because it relies on Google's ReCAPTCHA product, which would compromise their security. Danenberg also stated that they were not required to report the opening and closing of the bank accounts because the banks told them that they would close their accounts shortly after they were used for money transmission.

103. Respondents' explanations and reasoning are not persuasive. Disclosing the TD and Wells Fargo Bank accounts during the 2021 examination does not relieve Respondents of the obligation to timely disclose the two bank accounts on an updated license application. The fact that Respondents disclosed the bank accounts to the examiner during the examination several years after they were used for money transmission activity is unavailing and not convincing.

104. Respondents were not persuasive in explaining how disclosing the Wells Fargo Bank account on the license application would subject them to a bank fraud system's use of the ReCAPTCHA product from Google. The example of bank fraud was not reported to the Office until the 2021 examination.

105. Likewise, Respondents have misinterpreted the 30-day rule for updating application information. Whether a bank closes or intends to close an account is irrelevant to Respondents' duty to disclose the bank accounts on their license application. Respondents should have reported the bank accounts within 30 days after they were used for licensed activity, and then should have reported when they were closed.

106. Moreover, all of the accounts stayed open more than 30 days from the date they were used for money transmission. Respondents asserted that they did not have to report these accounts on their license application because

Wells Fargo Bank and TD Bank had told them that the accounts would be closed shortly after the money transmissions took place.

107. Nonetheless, Respondents reported the Wells Fargo Bank account to FinCEN on October 10, 2018, even though Wells Fargo Bank closed Respondents' bank account on October 30, 2018. It simply does not make sense why Respondents reported the Wells Fargo Bank account to FinCEN, but not to the Office.

108. Finally, Respondents' interpretation of the 30-day amendment rule is unreasonable and unworkable. The Office does not and cannot know when a bank intends to close an account. The Office relies upon its licensees to timely update their application information to perform its regulatory responsibilities.

109. By Respondents' interpretation of the rule, a licensee could engage in licensed money transmission activity in a bank account, and never report that bank account on the license application, so long as the bank tells that licensee that it intends to shut down the account within the 30-day window, regardless of whether the account is actually shut down. This is nonsensical and invalid reasoning.

110. In determining the penalty recommendation, the Office applied section 560.126(2) and rule 69V-560.1000. Under rule 69V-560.1000, the penalty for a first-time violation of section 560.126(2) is classified as a level "A" violation. A level "A" violation may be punished by a fine in the range of $1,000 to $3,500 and a license suspension between three and 10 days.

111. The failure to report any change in application or renewal information within 30 days after the change is not a minor violation of law. The purpose of that law is to ensure that licensees maintain accurate application information to enable the Office to protect consumers and effectively regulate licensees. Further, the Office was required by section 560.1141(2) to adopt disciplinary guidelines by rule that distinguish minor violations from those that endanger the public health, safety, or welfare. This

violation is considered to be one that potentially endangers the health, safety, or welfare of the public.

112. The Office considered all of the circumstances described in rule 69V-560.1000 in its determination of a penalty within the range. The Office properly determined that a "mid-range" fine of $2,000 was an appropriate penalty

Count IV

113. Pursuant to section 560.126(2) and rule 69V-560.201(2), licensees must notify the Office of any change in application information within 30 days of its occurrence.

114. Respondents failed to update their license application to reflect that Lionel and Willy Danenberg are directors of PayServices Bank. No persuasive evidence was presented at hearing to the contrary.

115. Danenberg testified that he did not have to report his new position with PayServices Bank because, under Idaho law, individuals do not become directors of a banking corporation unless a bank charter is issued. Danenberg testified that he and Willy Danenberg are not currently directors of PayServices Bank. Danenberg asserted that he and his father are merely incorporators and will remain as such until a bank charter is issued. According to Danenberg, PayServices Bank has no directors, no shareholders, and no officers even though it is an active Idaho corporation.

116. Danenberg's explanation for not reporting his new position with PayServices Bank is misguided. Both Lionel and Willy Danenberg are clearly listed as directors for PayServices Bank in the Articles of Incorporation filed with the Idaho Secretary of State. P. Ex. 13, at 405.

117. Moreover, PayServices Bank filed a lawsuit against the Federal Reserve Bank of San Francisco in the United States District Court for the District of Idaho. Notably, the complaint states that "Plaintiff, PayServices, is a private banking corporation incorporated under the Idaho Bank Act, at

Title 26 of Idaho Code." P. Ex. 16, at 419. Respondents' position at the hearing is inconsistent with the position it took in its lawsuit.

118. Likewise, the complaint also states that "PayServices' Chief Financial Officer for the Bank—an important role for the soundness of any financial institution—is both a licensed Certified Bank Examiner and Certified Public Accountant with close to forty years in bank supervision, auditing, treasury management, and financial reporting." P. Ex. 16, at 429.

119. Respondents have also misinterpreted Idaho Law. Danenberg is no longer merely an incorporator, but is now an initial director for PayServices Bank.

120. The undersigned considered the provisions of section 26-201, Idaho Statutes, in effect when PayServices Bank was incorporated on September 12, 2022, when the articles of incorporation were filed with the Idaho Secretary of State. The Articles of Incorporation clearly listed all of the initial directors for PayServices Bank. Once PayServices Bank was incorporated, the job of the incorporators was completed, and they became the initial directors of PayServices Bank.

121. Thus, Lionel and Willy Danenberg are currently the initial directors of PayServices Bank. Whether they've taken the oath of director or whether the bank charter has been issued is irrelevant to whether PayServices Bank currently has initial directors. Thus, Respondents were required to disclose their new positions on their license application with the Office.

Disciplinary Guidelines

122. The Office's authority to impose an administrative fine upon Respondents pursuant to chapter 560 for violations of sections 560.208(4), 560.1235(1), or 560.126(2) is discretionary pursuant to the Disciplinary Guidelines.

123. The Disciplinary Guidelines, at violation (51), state that a licensee who has failed to place assets that are the property of a customer in a segregated account in a federally insured institution or the failure to

maintain separate accounts for operating capital and the clearing of customer funds is subject to a fine ranging from $3,500 to $7,500, and a suspension ranging from 10 to 20 days, or revocation.

124. The Disciplinary Guidelines, at violation (36), state that a licensee who has failed to comply with 31 C.F.R. § 1022.80 is subject to a fine ranging from $3,500 to $7,500, and a suspension ranging from 10 to 20 days, or revocation.

125. The Disciplinary Guidelines, at violation (46), state that a licensee who has failed to report any change in an initial or amended license application within 30 days after the change, is subject to a fine ranging from $1,000 to $3,500.

126. Given the aggravating and mitigating circumstances relating to the violations, it reasonably follows that the Office may exercise its discretion by levying an administrative fine near or at the bottom of the permissible penalty range for Counts I, II and III, as well as a fine at the top of the permissible range for Count IV.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby recommended that the Office of Financial Regulation impose and enforce the collection of an administrative fine of $10,000 against PayServices, Inc., and Lionel Danenberg, in a manner authorized by law.

DONE AND ENTERED this 25th day of September, 2023, in Tallahassee, Leon County, Florida.

_Robert L. Kilbride_

ROBERT L. KILBRIDE
Administrative Law Judge
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 25th day of September, 2023.

COPIES FURNISHED:

Joaquin Alvarez, Esquire
(eServed)

Lionel Danenberg
(eServed)

George C. Bedell, III, Esquire
(eServed)

Russell C. Weigel, Commissioner
(eServed)

Anthony Cammarata, General Counsel
(eServed)

NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 15 days from the date of this Recommended Order. Any exceptions to this Recommended Order should be filed with the agency that will issue the Final Order in this case.

MX1-089

Index:   OFR 2026 - 276



**STATE OF FLORIDA**
**OFFICE OF FINANCIAL REGULATION**

In Re:

PAYSERVICES, INC.,                                                Case Number: 125893

    Respondent.

## FINAL ORDER

This cause came on for consideration and final agency action. Upon review of the complete record in this case, including the attached Recommended Order, and being otherwise fully advised in the premises, the Office of Financial Regulation ("Office") hereby finds:

1.    This case was initiated by the Office filing an Administrative Complaint alleging the Respondent violated section 560.114(1)(u), Florida Statutes, by failing to timely pay an administrative fine imposed against the Respondent by the Final Order entered by the Office in Case Number 108042. As further set forth in the Administrative Complaint, Respondent holds a money services business license, license number FT230000158.

2.    Respondent did not appear at the administrative hearing held in this case.

3.    The Office has jurisdiction over the subject matter of this case and the parties hereto.

4.    The entry of this Final Order shall conclude Case Number 125893.

**IT IS ACCORDINGLY ORDERED:**

A.    The attached Recommended Order is hereby adopted by the Office and incorporated by reference as if fully stated herein.

MX1-090

B.     Respondent violated section 560.114(1)(u), Florida Statutes, and is subject to discipline as addressed in the Recommended Order.

C.     Respondent's money services business license, license number FT230000158, is **REVOKED**.

D.     Respondent shall **CEASE and DESIST** from any further violations of chapter 560, Florida Statutes, and the rules promulgated thereto.

**DONE and ORDERED** this _27_ day of May, 2026, in Tallahassee, Leon County, Florida.

Pury Lopez Santiago
Chief Operating Officer
Office of Financial Regulation
Authorized Signatory
By Delegation

2

MX1-091

NOTICE OF RIGHTS

A PARTY WHO IS ADVERSELY AFFECTED BY THIS FINAL ORDER IS ENTITLED TO JUDICIAL REVIEW PURSUANT TO SECTION 120.68, FLORIDA STATUTES. REVIEW PROCEEDINGS ARE GOVERNED BY THE FLORIDA RULES OF APPELLATE PROCEDURE. SUCH PROCEEDINGS ARE COMMENCED BY FILING THE ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AS FOLLOWS:

By Mail or Email          OR          By Hand Delivery

Agency Clerk                              Agency Clerk
Office of Financial Regulation            Office of Financial Regulation
P.O. Box 8050                             General Counsel's Office
Tallahassee, Florida 32314-8050           The Fletcher Building
Phone: (850) 410-9889                     101 East Gaines Street, Suite 504
Agency.Clerk@flofr.gov                    Tallahassee, Florida 32399
                                          Phone: (850) 410-9889

A COPY OF THE NOTICE OF APPEAL, ACCOMPANIED BY THE FILING FEES AS REQUIRED BY LAW, MUST ALSO BE FILED WITH THE DISTRICT COURT OF APPEAL, FIRST DISTRICT, 2000 DRAYTON DRIVE, TALLAHASSEE, FLORIDA 32399-0950, OR WITH THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE PARTY RESIDES. THE NOTICE OF APPEAL MUST BE FILED WITH BOTH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AND THE DISTRICT COURT OF APPEAL WITHIN 30 DAYS OF THE RENDITION OF THE ORDER TO BE REVIEWED.

3

MX1-092

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Final Order was furnished via electronic mail to Respondent, PayServices, Inc. at info@payservices.com and lionel@payservices.com, on this 27th day of May, 2026.

Agency Clerk
Office of Financial Regulation
Post Office Box 8050
Tallahassee, FL 32314-8050
Email: Agency.Clerk@flofr.gov
Tel: (850) 410-9889

4

MX1-093



Index:  OFR 2021-458

## STATE OF FLORIDA
## OFFICE OF FINANCIAL REGULATION

IN RE:

PAYSERVICES, INC., Petition for
Waiver of Rule 69U-105.207(1), Florida
Administrative Code,

Petitioner.

Administrative Proceeding Docket
Number: 107323-FI

## FINAL ORDER

The Office of Financial Regulation ("Office"), has fully considered the Petition for Waiver of Rule 69U-105.207, Florida Administrative Code ("Petition") filed on October 6, 2021, by PayServices, Inc. ("Petitioner").

Section 120.542(8), Florida Statutes, provides that an order granting or denying a petition for variance or waiver "shall contain a statement of the relevant facts and reasons supporting the agency's action." Having considered all relevant facts and pertinent law, and pursuant to section 120.569(2)(l), Florida Statutes, which provides that "a final order in a proceeding which affects substantial interests must be in writing and include findings of fact, if any, and conclusions of law separately stated," the Office therefore, states the following:

## FACTUAL FINDINGS

1.      On February 22, 2021, Petitioner filed with the Office an Application for Authority to Organize a Bank, a Savings Bank, or Association pursuant to Chapters 659 and 665, Florida Statutes ("Application to Organize a Bank").

2.      On October 6, 2021, the Office received a "Petition for Waiver of Rule 69U-

1

MX1-094

105.207, Florida Administrative Code" filed by PayServices, Inc. (attached hereto as Exhibit A)

3.    Petitioner requests that the Office:

> ...permanently waive (a) the directive to file an application for insurance of accounts with the Federal Deposit Insurance Corporation ("FDIC") and (b) its authority to terminate or revoke a final order that the Office issues approving PayServices' application based solely on a final order of denial issued by the FDIC. Petition at p. 4.

4.    The Office has considered all information provided by Petitioner and has taken such information as fact for the purpose of the request. Any modification of the assertions of fact could alter the Office's conclusions. The facts set forth in the Petition are hereby adopted and incorporated herein by reference as the findings of fact of the Office.

5.    Pursuant to and in compliance with section 120.542(6), Florida Statutes, the Office published notice of the Petition. The notice appeared in the Florida Administrative Register at Volume 47, Number 197, published October 11, 2021.

6.    The Office received a written comment from Nestor Suarez, Ph.D., in support of the Petition.

## CONCLUSIONS OF LAW

7.    The Office has jurisdiction in this matter as the state agency responsible for the regulation and enforcement of Chapter 658, Florida Statutes, and the rules promulgated thereunder.

8.    The Office has jurisdiction over the subject matter and the Petition pursuant to section 20.121(3)(a)2., Florida Statutes, and chapters 658 and 120, Florida Statutes. The Office is therefore the proper state agency to receive, process, and render a ruling on a petition for waiver involving chapter 658, Florida Statutes, and the rules promulgated thereunder.

9.    Section 120.542(1), Florida Statutes, provides in part:

> Strict application of uniformly applicable *rule* requirements can lead to unreasonable, unfair, and unintended results in particular instances. The

2

Legislature finds that it is appropriate in such cases to adopt a procedure for agencies to provide relief to persons subject to regulation.

[Emphasis added]

10.    Section 120.542(2), Florida Statutes, provides:

Variances and waivers shall be granted when the person subject to the *rule* demonstrates that the purpose of the underlying statute will be or has been achieved by other means by the person and when application of a *rule* would create a substantial hardship or would violate principles of fairness...

[Emphasis added]

11.    Petitioner seeks a permanent waiver of Rule 69U-105.207(1), Florida Administrative Code, which provides as follows:

(1) Approval by Federal Regulatory Agencies. Upon approval by OFR, a copy of the final order shall be forwarded to the Federal Deposit Insurance Corporation for insurance of accounts, to the Federal Reserve System for approval of membership in the Federal Reserve System and/or for formation of a bank holding company, and the Office of Thrift Supervision for the formation of an association holding company. Within three months after approval by OFR, the applicant must have provided sufficient information to all appropriate federal regulatory agencies to have its federal application(s) considered complete for processing. The failure of applicant to accomplish this filing with all the appropriate federal regulatory agencies within three months after approval by OFR, a final order of denial by any federal regulatory agency, or a revocation of the final order issued by any federal regulatory agency will terminate and revoke the final order issued by OFR approving the application.

12.    Rule 69U-105.207(1), Florida Administrative Code, implements section 658.22, Florida Statutes, which provides as follows:

Upon approval by the office of the application for authority to organize a state bank, the office shall forward a copy of its final order to the appropriate federal regulatory agencies. The failure of an applicant to apply for membership in the Federal Reserve System or apply for the insurance of accounts by the Federal Deposit Insurance Corporation within 3 months after approval by the office or a final order by the Federal Deposit Insurance Corporation denying an applicant's application for insurance of accounts, terminates and revokes the final order issued by the office approving the application.

3

13.    Section 658.38, Florida Statutes, requires that each "state bank must, prior to opening, obtain and thereafter maintain insurance of its deposits by the Federal Deposit Insurance Corporation."

14.    Section 120.542, Florida Statutes, makes a distinction between "variances . . . to statutes," which are prohibited, and "variances and waivers to requirements of [agency] rules," which are permitted." *State v. Beach Group Invs., LLC*, 201 So. 3d 679, 686 (Fla. 4th DCA 2016).

15.    It is well-settled law that section 120.542, Florida Statutes, does not authorize agencies to grant variances from, or waivers of, statutes. *See Boone, et al. v. Dep't of Bus. & Prof'l Regulation*, Case No. 13-2421 (Fla. DOAH Oct. 10, 2013; Fla. Dep't of Bus. & Prof'l Regulation Nov. 4, 2013), *quoting Hanbali v. Bd. of Prof. Eng.*, Case No. 09-2266 (Fla. DOAH Oct. 26, 2009; Fla. Bd. of Prof. Eng. Dec. 21, 2009).

16.    As a matter of law, waivers cannot be used to directly or indirectly modify the operation of statutes. *See Booker Creek Pres., Inc. v. Southwest Fla. Water Mgmt. Dist.*, 534 So. 2d 419, 423 (Fla. 5th DCA 1988).

17.    Filing an application for insurance of accounts with the FDIC is not only necessitated by section 658.22, Florida Statutes, to avoid termination or revocation of the final order issued by the Office approving the application, but is also necessitated by section 658.38, Florida Statutes, which requires a state bank to obtain insurance of its deposits from the FDIC prior to opening. As such, a waiver of the requirement within Rule 69U-105.207(1), Florida Administrative Code, that an applicant must have provided sufficient information to all appropriate federal regulatory agencies, i.e., the FDIC, within the specified timeframe would fail to provide Petitioner with the requested relief, because a final order approving Petitioner's Application to Organize a Bank is still subject to termination or revocation for failure to apply for insurance of

4

accounts by the FDIC pursuant to section 658.22, Florida Statutes, and Petitioner is still required by Section 658.38, Florida Statutes, to obtain, and thereafter maintain, insurance of deposits by FDIC prior to opening.

18. Additionally, the termination or revocation of a final order approving Petitioner's Application to Organize a Bank, based upon a final order of denial issued by the FDIC, is nondiscretionary as it is prescribed by section 658.22, Florida Statutes. As such, the Office finds that waiving its authority to terminate or revoke a final order that the Office may issue approving Petitioner's Application to Organize a Bank based solely on a final order of denial issued by any federal regulatory agency (such as the FDIC) pursuant to Rule 69U-105.207(1), Florida Administrative Code, would not result in Petitioner obtaining the requested relief because section 658.22, Florida Statutes, expressly provides that a final order by the FDIC denying an applicant's application for insurance of accounts terminates and revokes a final order issued by the Office approving the application.

19. Notwithstanding the issues stated above, the Petition fails to show how waiving the rule would serve the purpose (and intent) of the underlying law implemented by the rule. Because the rule essentially mirrors the statutory requirements of section 658.22, Florida Statutes, granting a waiver of Rule 69U-105.207(1), Florida Administrative Code, in this case serves no legal purpose because Petitioner must nevertheless comply with the same statutory requirements of section 658.22, Florida Statutes, that are mirrored in the rule.

20. As a result of the foregoing analysis, the Office does not consider the written statement provided by Nestor Suarez, Ph.D to be relevant to the disposition of the Petition.

5

## ORDER

Based on the foregoing Findings of Fact and Conclusions of law, the Petition is hereby **DENIED**.

**DONE and ORDERED** this 7th day of December, 2021, in Tallahassee, Leon County, Florida.

Russell C. Weigel, III
Commissioner

## NOTICE OF RIGHTS

THE OFFICE'S PROPOSED AGENCY ACTION WILL BECOME FINAL UNLESS A TIMELY PETITION FOR AN ADMINISTRATIVE HEARING IS FILED UNDER SECTIONS 120.569 AND 120.57, FLORIDA STATUTES. REQUESTS FOR SUCH A HEARING MUST COMPLY WITH THE PROVISION OF RULES 28-106.104(2), FLORIDA ADMINISTRATIVE CODE, RULE 28-106.201, FLORIDA ADMINISTRATIVE CODE, OR RULE 28-106.301, FLORIDA ADMINISTRATIVE CODE, AND MUST BE FILED WITH:

| By Mail or Email | OR | By Hand Delivery |
|---|---|---|
| Office of Financial Regulation<br>General Counsel's Office<br>P.O. Box 8050<br>Tallahassee, Florida 32314-8050<br>Phone: (850) 410-9889<br>Agency.Clerk@flofr.gov | | Office of Financial Regulation<br>General Counsel's Office<br>The Fletcher Building<br>101 East Gaines Street<br>Tallahassee, Florida 32399<br>Phone: (850) 410-9889 |

6

MX1-099

PETITIONS MUST BE FILED WITH THE AGENCY WITHIN TWENTY-ONE (21) DAYS OF THE DATE OF RECEIPT OF THIS NOTICE. FAILURE TO RESPOND TO THIS NOTICE WITHIN TWENTY-ONE (21) DAYS OF RECEIPT WILL CONSTITUTE A WAIVER OF YOUR RIGHT TO REQUEST A HEARING AND THE OFFICE'S PROPPOSED AGENCY ACTION WILL BECOME FINAL. IF YOU REQUEST A HEARING, YOU WILL HAVE THE RIGHT TO BE REPRESENTED BY COUNSEL OR OTHER QUALIFIED REPRESENTATIVE; TO OFFER TESTIMONY, EITHER ORAL OR WRITTEN; TO CALL AND CROSS-EXAMINE WITNESSES, AND TO HAVE SUBPOENAS AND SUBPOENAS DUCES TECUM ISSUED ON YOUR BEHALF. PURSUANT TO SECTION 120.573, FLORIDA STATUTES, MEDIATION IS NOT AVAILABLE.

ONCE THIS ACTION BECOMES FINAL, ANY PARTY TO THE FINAL AGENCY ACTION HAS THE RIGHT TO SEEK JUDICIAL REVIEW OF IT UNDER SECTION 120.68, FLORIDA STATUTES. REVIEW PROCEEDINGS ARE GOVERNED BY THE FLORIDA RULES OF APPELLATE PROCEDURE. SUCH PROCEEDINGS ARE COMMENCED BY FILING THE ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AS FOLLOWS:

| By Mail or Email | OR | By Hand Delivery |
|---|---|---|
| Agency Clerk | | Agency Clerk |
| Office of Financial Regulation | | Office of Financial Regulation |
| P.O. Box 8050 | | The Fletcher Building |
| Tallahassee, Florida 32314-8050 | | 101 East Gaines Street |
| Phone: (850) 410-9889 | | Tallahassee, Florida 32399 |
| Agency.Clerk@flofr.gov | | Phone: (850) 410-9889 |

A COPY OF THE NOTICE OF APPEAL, ACCOMPANIED BY THE FILING FEES AS REQUIRED BY LAW, MUST ALSO BE FILED WITH THE DISTRICT COURT OF APPEAL,

7

FIRST DISTRICT, 2000 DRAYTON DRIVE, TALLAHASSEE, FLORIDA 32399-0950, OR WITH THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE PARTY RESIDES. **THE NOTICE OF APPEAL MUST BE FILED WITH BOTH THE AGENCY CLERK FOR THE OFFICE OF FINANCIAL REGULATION AND THE DISTRICT COURT OF APPEAL WITHIN 30 DAYS OF THIS ACTION BECOMING FINAL.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS MATTER, PLEASE CONTACT ANN MICHELLE PALECKI, OFFICE OF FINANCIAL REGULATION, P.O. BOX 8050, TALLAHASSEE, FLORIDA 32314-8050, (850)410-9704, ANNMICHELLE.PALECKI@FLOFR.GOV.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by e-mail and U.S. Certified Mail to Jade A. Craig, Attorney for Petitioner, 2910 Rubideaux St. #1, Tampa, Florida 33629, jade@jadeacraigpa.com, on this 8th day of December, 2021.

Agency Clerk
Florida Office of Financial Regulation
Post Office Box 8050
Tallahassee, FL 32314-8050
Email: Agency.Clerk@flofr.gov
Tel: (850) 410-9889

91 7199 9991 7039 5465 3581

8

813    EXHIBIT A                                03:22:01 p.m.    10-06-2021        1/22

# OXFORD EXCHANGE

# FAX

OXFORD EXCHANGE, LLC
420 WEST KENNEDY BOULEVARD
TAMPA, FLORIDA 33606
N° 813.253.0222
Fax 813.251.4373

To _Agency Clerk - Office of Financial Regulation_

From _Jode A. Craig, Esq. - ProServices, Inc_

Date _10/6/2021_    Number of Pages (*including cover page*) _22_

Message

_Petition for Waiver - also served via certified
U.S. Mail on this date. Please confirm receipt to
jode @ jodeacraigpa com_

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile message is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any disclosure, photocopying, distribution, or the taking of any action in reliance on the contents of this facsimile is unauthorized and prohibited. If you have recieved this transaction in error, please immediately notify us by telephone so that we can arrange for the return of the facsimile message / documents to us at no cost to you. Thank you.

MX-1-102

813                                           03:22:32 p.m.    10-06-2021     2 /22

# OFFICE OF FINANCIAL REGULATION
# STATE OF FLORIDA


## PETITION FOR WAIVER OF RULE 69U-105.207


IN RE: Application of PayServices, Inc. for Authority to Organize A State Bank

To the Agency Clerk
Florida Office of Financial Regulation
200 E. Gaines Street, Suite 504
Tallahassee, FL 32399-0379
Email: agency.clerk@flofr.gov

Jade A. Craig, Esq.
Florida Bar No. 121805
Jade A. Craig, P.A.
2910 Rubideaux St, #1
Tampa, Florida 33629
Email: jade@jadeacraigpa.com
Secondary Email: jadecraig@gmail.com
Telephone: (813) 459-1309
Facsimile: (813) 251-4373
Attorney for Petitioner/Applicant
PayServices, Inc.

MX4×403

813                                                                03:22:56 p.m.    10-06-2021        3/22

## TABLE OF CONTENTS

CITATION TO STATUTE IMPLEMENTED ........................................................................ 4

ACTION REQUESTED ........................................................................................................ 4

STANDARD OF REVIEW .................................................................................................... 4

FACTUAL BACKGROUND .................................................................................................. 5

ARGUMENT .......................................................................................................................... 7

    I.   The Commissioner of OFR has the power to waive the FDIC application requirement ...................................................................................................................... 7

        A.  The Florida Financial Institutions Codes provide the Commissioner of OFR with the discretion to modify traditional bank application requirements. .................................... 7

        B.  OFR's regulations also grant the Commissioner discretion to waive the FDIC application requirement. ........................................................................................................ 9

    II.  The FDIC application requirement constitutes a substantial hardship and violates principles of fairness in the case of PayServices' proposed bank. ............................... 10

        A.  The FDIC's oversight requirements do not focus on deposits not used for the issuance of loans or credit ...................................................................................................... 11

        B.  PayServices' business model removes the core risks that impair a bank's capital. ............... 12

    III.  The waiver requested serves the purposes of the underlying statute. ......................... 17

        A.  PayServices protects all deposits in reserves, which exceeds even the Federal Reserve's reserve requirements. ............................................................................................ 17

        B.  PayServices is eligible to become a member bank of the Federal Reserve and its deposits will be protected in a Federal Reserve Master Account. ............................................... 18

        C.  The Office has the authority to approve the application subject to membership in the Federal Reserve rather than the FDIC ........................................................................... 19

REQUEST FOR PERMANENT WAIVER ........................................................................ 20

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Bay National Bank & Trust Co. v. Dickinson*, 229 So. 2d 302 (Fla. 1st DCA 1969) ..................... 8, 9

*McDonald v. Department of Banking & Finance*, 346 So. 2d 569 (Fla. 1st DCA 1977) ............ 9, 10, 20

*National Bank of Tampa v. Green*, 175 So. 2d 545 (Fla. 1st DCA 1965) .......................................... 8, 9

**Statutes**

12 U.S.C. § 1815 ............................................................................................................................... 6

12 U.S.C. § 1817 ............................................................................................................................... 6

12 U.S.C. § 202 ................................................................................................................................. 6

12 U.S.C. § 248a ............................................................................................................................. 18

12 U.S.C. § 329 ............................................................................................................................... 18

12 U.S.C. § 342 ............................................................................................................................... 18

MX-1-104

813                                      03:23:33 p.m.    10-06-2021         4/22

12 U.S.C. § 461 .................................................................................................................18
Fla. Stat. § 120.542 ...................................................................................4, 5, 11
Fla. Stat. § 655.001 ...........................................................................................7, 9
Fla. Stat. § 655.015 ...............................................................................................7
Fla. Stat. § 658.19 ................................................................................................7
Fla. Stat. § 658.20 ................................................................................................8
Fla. Stat. § 658.21 ................................................................................................8
Fla. Stat. § 658.22 .........................................................................................4, 20
Fla. Stat. § 658.23 ..............................................................................................17
Fla. Stat. § 658.35 ..............................................................................................17
Fla. Stat. § 658.37 ..............................................................................................17

**Other Authorities**
"Incipient," *Oxford English Dictionary* (2d. ed. 1997) ...................................10
*A Brief History of Deposit Insurance in the United States*, FDIC (Sept. 1998)...........10
FDIC Risk Management Manual of Examination Policies...........................11, 16
FDIC Statement of Policy on Applications for Deposit Insurance ...................13
FDIC, Deposit Insurance Fund: Assessment Rates and Methodology.................11
Federal Reserve Board invites public comment on proposed guidelines to evaluate requests for accounts and payment services at Federal Reserve Banks, Federal Reserve Press Release (May 5, 2021).........................................................................19
Policy Tools: Reserve Requirements, Federal Reserve System ..........................18
Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25865 (May 5, 2021).........................................................................19
*Supervisory Insights - Lending Viewpoint: Results from the FDIC's Credit and Consumer Products/Services Survey,* FDIC (Winter 2015) ...........................................................10

**Rules and Regulations**
12 C.F.R. § 324.10 ........................................................................................14, 17
12 C.F.R. § 324.2 .................................................................................................15
12 C.F.R. § 324.201 ............................................................................................16
12 C.F.R. § 324.22 ..............................................................................................17
12 C.F.R. § 327.8 ................................................................................................11
12 C.F.R. § 327.9 ...................................................................................12, 13, 14
12 C.F.R. pt. 325, App'x A ................................................................................14
Fla. Admin. Code r. 28-104.002 .......................................................................5, 7
Fla. Admin. Code r. 69U-105.206 ........................................................................9
Fla. Admin. Code r. 69U-105.207 ...................................................................4, 11

## APPLICABLE RULE

The applicable rule which must be waived is as follows:

(1) Approval by Federal Regulatory Agencies. Upon approval by OFR, a copy of the final order shall be forwarded *to the Federal Deposit Insurance Corporation for insurance of accounts*, to the Federal Reserve System for approval of membership in the Federal Reserve System and/or for formation of a bank holding company, and the Office of Thrift Supervision for the formation of an association holding company. Within three months after approval by OFR, the applicant must have provided sufficient

Page 3 of 21

MX-1-105

information to all appropriate federal regulatory agencies to have its federal application(s) considered complete for processing. *The failure of applicant to accomplish this filing with all the appropriate federal regulatory agencies within three months after approval by OFR, a final order of denial by any federal regulatory agency, or a revocation of the final order issued by any federal regulatory agency will terminate and revoke the final order issued by OFR approving the application.*

Fla. Admin. Code r. 69U-105.207(1) (emphasis added).

## CITATION TO STATUTE IMPLEMENTED

The citation to the statute the rule above purports to implement is as follows:

658.22. Coordination with federal agencies

Upon approval by the office of the application for authority to organize a state bank, the office shall forward a copy of its final order to the appropriate federal regulatory agencies. *The failure of an applicant to* apply for membership in the Federal Reserve System or *apply for the insurance of accounts by the Federal Deposit Insurance Corporation within 3 months after approval by the office or a final order by the Federal Deposit Insurance Corporation denying an applicant's application for insurance of accounts, terminates and revokes the final order issued by the office approving the application.*

Fla. Stat. § 658.22 (2003).

## ACTION REQUESTED

PayServices, Inc. ("PayServices") requests that the Florida Office of Financial Regulation (the "Office" or "OFR") permanently waive (a) the directive to file an application for insurance of accounts with the Federal Deposit Insurance Corporation ("FDIC") and (b) its authority to terminate or revoke a final order that the Office issues approving PayServices' application based solely on a final order of denial issued by the FDIC.

## STANDARD OF REVIEW

Florida's Administrative Procedure Act provides: "Variances and waivers shall be granted when the person subject to the rule demonstrates that the purpose of the underlying statute will be or has been achieved by other means by the person and when application of a rule would create a

Page 4 of 21

MX4-406

substantial hardship or would violate principles of fairness." Fla. Stat. § 120.542(5). This petition articulates "[t]he specific facts that demonstrate a substantial hardship or a violation of principles of fairness that would justify a waiver or variance for the petitioner[.]" Fla. Admin. Code r. 28-104.002(2)(g). The Act defines "substantial hardship" as "a demonstrated economic, technological, legal, or other type of hardship to the person requesting the variance or waiver. "'Principles of fairness' are violated when the literal application of a rule affects a particular person in a manner significantly different from the way it affects other similarly situated persons who are subject to the rule." Fla. Stat. § 120.542(5).

## FACTUAL BACKGROUND

PayServices was established in 2012 to provide payment processing solutions and compliance assistance services by using modern software technologies. PayServices offers payment processing solutions, including an online platform for the commodity exchanges between merchants and buyers. It also collects customs fees, customs duties, and tariffs ("customs fees") from import-export transactions on behalf of the customs authorities of sovereign governments. These services shall be provided through the acceptance of demand deposits which buyers may use to send money to merchants for the sale of products. PayServices also accepts electronic checks for deposit into demand deposit accounts. See Amendments to Application, Business Plan: Legal Authority to Establish A Bank.

PayServices has reiterated during the process of applying for the authority to organize a state bank that its business model does not include the core features that create risk to customer deposits. PayServices explained in its Business Plan:

> For a traditional bank, deposits are a form of debt because the traditional bank lends portions of deposits as loans or as sources of credit, and the bank must constantly chase the dragon of ensuring that it has not distributed an excessive amount of the deposits that it risks not being able to pay out funds to depositors. By contrast,

Page 5 of 21

813                                          03:25:22 p.m.    10-06-2021         7/22

> PayServices' bank does not issue loans. It does not issue credit. It does not pay interest on deposit because the deposits are available on demand. Customer deposits are used exclusively to pay for (a) transactions that the customers enter into; (b) the collection of customs fees in the cases of international transactions subject to such fees; and (c) PayServices' transaction fee. **Customer deposits are not used to finance any other transaction, such as a bank loan or purchase of securities.** PayServices' bank is completely online. It offers certain banking products and services globally with no branches or ATMs. All of these elements make for a rather different type of bank.

Business Plan, PayServices' Business, §§ B. & C. (emphasis added).

PayServices' business model excludes nearly every risk factor that burdens traditional banks. There is no lending. There are no credit cards. There are no lines of credit. There are no mortgages. There is no interest on deposits. These are the functions which pose the greatest risk to depositors. PayServices' limited banking services, namely holding deposits, involves the least amount of risk where it is not attached to lending and credit: it accepts deposits to process immediate transactions and payments. It moves money from one business to another, and one person to another, to facilitate exchanges of goods and services.

PayServices' whole business model involves one of the smallest features of a traditional bank. In fact, traditional banks consider demand deposits a *liability* rather than an asset. The Federal Deposit Insurance Act, which established the FDIC, consistently refers to deposits as liabilities.[1] Traditional banks view deposits a risk associated with the cost of doing their bigger business: lending and issuing credit. By contrast, demand deposits are the lifeblood of PayServices. Money comes in, however, and money goes out immediately to process a transaction. Any deposit kept in an account for a user of Payservices' platform has no lien associated with it. It is constantly available on demand because it is not used for lending. PayServices generates revenue from processing fees, not

---

[1] *See, e.g.*, 12 U.S.C. § 1815(e)(2)(C)(iii) (referring to deposits as "liabilities" and an "obligation" to which a member bank's other specific obligations are subordinate); 12 U.S.C. § 1817(a)(1) ("Each insured State nonmember bank . . . shall make to the Corporation reports of condition," including the condition of its "deposit liabilities"); 12 U.S.C. § 202 (defining "voluntary dissolution and liquidation" as referring to a "transaction . . . that involves the assumption of the bank's insured deposit liabilities").

Page 6 of 21

from interest associated with lending a depositor's money. This business model warrants reconsideration of an FDIC membership requirement in this case.

## ARGUMENT

This petition also articulates "[t]he reason why the variance or the waiver requested would serve the purposes of the underlying statute[.]" Fla. Admin. Code r. 28-104.002(2)(h).

I.    THE COMMISSIONER OF OFR HAS THE POWER TO WAIVE THE FDIC APPLICATION REQUIREMENT.

A.    The Florida Financial Institutions Codes provide the Commissioner of OFR with the discretion to modify traditional bank application requirements.

The Legislature has provided OFR with broad discretion in carrying out its duties under the Florida Financial Institutions Codes. "The financial institutions codes shall be liberally construed and applied to promote their purposes and policies." Fla. Stat. § 655.015(1). The Codes delegate to OFR "adequate administrative discretion, subject to the provisions of the financial institutions codes and to the purposes and policies stated in this section, in order that the supervision and regulation of financial institutions may be *flexible and readily responsive to changes in economic conditions, in technology, and in financial institution practices.*" Fla. Stat. § 655.001(j) (emphasis added). The provisions in section 655.001 "constitute standards to be observed by the commission and office in the exercise of their discretionary powers under the financial institutions codes . . . in the examination and supervision of financial institutions, and in all matters of construction and application of the financial institutions codes required for any determination or action." Fla. Stat. § 655.015(2).

Chapter 658, Florida Statutes, provides a very specific process for evaluating applications for authority to organize a bank in Florida. A written application "shall include" seven specific pieces of information which are enumerated in the statute, including in summary background information on the proposed directors and executive officer; the proposed corporate name; the initial capital; and

Page 7 of 21

MX4-109

community in which the bank would be located; and a request for trust powers if the bank desires them. *See* Fla. Stat. § 658.19(1)(a)-(g). The Financial Services Commission prescribes the form and it includes any "additional information as the commission or office reasonably requires[.]" Fla. Stat. § 658.19(2). The Office must investigate three specific issues: the character and business qualifications of the proposed officers and directors; the need for bank facilities in the "primary service area"; and the ability of the primary service area to support a new bank. *See* Fla. Stat. § 658.20(1)(a)-(c). The statute then provides that "[t]he office shall approve the application" if it makes certain specific findings, which include the "reasonable promise of successful operation"; sufficient proposed capitalization and capital structure; the experience of the officers and directors; approval of the corporate name; and "suitable quarters at the location in the application." *See* Fla. Stat. § 658.21

The Legislature and OFR's regulations provide a clear structure for the process of approving a state bank charter. There are specific areas that must be considered. Yet none of the statutory provisions cited above requires that the application include proof of membership in the FDIC or that the Office must consider this issue in approving a banking charter application.

Florida courts have also reiterated in multiple decisions that OFR has broad discretion in approving banking charter applications. More than fifty years ago, in *National Bank of Tampa v. Green*, 175 So. 2d 545 (Fla. 1st DCA 1965), the First District Court of Appeal ("DCA") agreed with the head of OFR's predecessor agency that the Florida Legislature "rel[ied] upon the special competence in the field of banking that is possessed by the Comptroller, designated him as State Commissioner of Banking and delegated to him the duty as well as the discretion to authorize the organization of a banking institution." *Id.* at 549. In *Bay National Bank & Trust Co. v. Dickinson*, 229 So. 2d 302 (Fla. 1st DCA 1969), the court cited *Green* as the court interpreted the provision that serves as the predecessor for sections 658.19 & 658.20, Florida Statutes. *Id.* at 304. "Upon receipt of such

application, the Commissioner is required to make an investigation of certain enumerated factors, and based upon a consideration of such factors he shall *in his discretion* determine whether the application shall be approved." *Id.* (emphasis added). "In performing this function the Commissioner is required to comply with the provisions of the Code, and to *exercise a sound discretion* in reaching his final decision." *Id.* (emphasis added).

In *McDonald v. Department of Banking & Finance*, 346 So. 2d 569 (Fla. 1st DCA 1977), the First DCA started its analysis of a challenge to the denial of bank charter with the principle that "[t]he legislature has committed to the Department and Comptroller *wide discretion* in determining applications for banking authority." *Id.* at 577 (citing *Green* and *Dickinson*) (emphasis added). Additionally, "[t]he [Administrative Procedures Act] does not compromise the Department's ultimate authority over banking applications. Nor does it strip the Comptroller, a constitutional officer who is head of the Department, of *the discretion in such matters which is finally his*." *Id.* (emphasis added).

**B.    OFR's regulations also grant the Commissioner discretion to waive the FDIC application requirement.**

"Florida's APA has the purpose, uniformly endorsed by students of the modern administrative process, of encouraging agencies by rulemaking to close the gap between what the agency and its staff know about the agency's law and policy and what an outsider can know." *McDonald*, 346 So. 2d at 580 (internal quotation marks omitted). OFR's regulations governing the review of bank charter applications establish that the agency must be guided by both the statutes and "the *broader purposes of the financial institutions codes*, including the maintenance of public confidence in financial institutions and the protection of the interests of the public in the safety and soundness and the preservation of the financial institution system in this state." Fla. Admin. Code r. 69U-105.206(1) (citing Fla. Stat. § 655.001). Rule 69U-105.206 provides specific topics that the agency

Page 9 of 21

MX-1-411

813                                                        03:27:51 p.m.   10-06-2021        11 /22

considers in reviewing the application under section 658.21, Florida Statutes. None of them, however, involve membership in the FDIC.

The courts and the Administrative Procedures Act have also specifically empowered OFR to look at particular cases and circumstances it has never addressed to make its policies responsive to emerging financial practices. The Florida APA "recognizes the inevitability and desirability of refining incipient agency policy through adjudication of individual cases. There are quantitative limits to the detail of policy that can effectively be promulgated as rules, or assimilated, and even the agency that knows its policy may wisely sharpen its purposes through adjudication before casting rules." *McDonald*, 346 So. 2d at 581. PayServices' business model is nothing if not incipient – "in an initial stage, beginning to happen or develop."[2]

## II. THE FDIC APPLICATION REQUIREMENT CONSTITUTES A SUBSTANTIAL HARDSHIP AND VIOLATES PRINCIPLES OF FAIRNESS IN THE CASE OF PAYSERVICES' PROPOSED BANK.

PayServices' business model is unique in a banking system that has historically revolved around debt. Congress established the FDIC in to protect depositors from banks that failed largely due to loans and credit. "In 1936, the problems cited most frequently by bank examiners were inadequate capital, excessive *insider lending*, excessive volume of *poor loans*, inadequate *credit* documentation and incompetent management."[3] The FDIC focuses heavily on "lending and its related risks" and "trends in credit risks."[4] The purpose of deposit insurance was to minimize the risk to depositors because each depositor would receive a guarantee that their bank would not lose all of the depositors' funds because the bank extended loans and credit to debtors who could not

---

[2] "Incipient," *Oxford English Dictionary* (2d. ed. 1997).

[3] *A Brief History of Deposit Insurance in the United States*, FDIC (Sept. 1998), p. 53, https://www.fdic.gov/bank.historical/brief/brhist.pdf.

[4] *See, e.g., Supervisory Insights - Lending Viewpoint: Results from the FDIC's Credit and Consumer Products/Services Survey*, FDIC (Winter 2015), https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin15/si_winter2015-article03.pdf; *Supervisory Insights - Credit Risk Trends and Supervisory Expectation Highlights*, FDIC (Winter 2016), https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin16/si_winter_16-article01.pdf.

Page 10 of 21

MX1-112

813                                                                    03:28:29 p.m.    10-06-2021              12/22

pay the debt. That position holds true today. The FDIC's current risk management manual emphasizes that debt is the greatest threat to a bank's stability and security. "Loans typically comprise a majority of a bank's assets and carry the greatest amount of risk to their capital."[5]

Despite the noble principles of the Federal Deposit Insurance Act, however, it violates principles of fairness to require PayServices to apply for deposit insurance from the FDIC because the literal application of Rule 69U-105.207 negatively affects PayServices' application "in a manner significantly different from the way it affects other similarly situated persons who are subject to the rule," namely other applicants who operate traditional banks that issue loans and credit. Fla. Stat. § 120.542(5).

A.      The FDIC's oversight requirements do not focus on deposits not used for the issuance of loans or credit.

Under FDIC regulations, the FDIC requires insured depository institutions to pay essentially an insurance premium known as an "assessment." the FDIC.[6] This method applies to newly insured institutions, which would be the category under which PayServices would fall under FDIC regulations if its deposits were considered insurable under the Federal Deposit Insurance Act ("FDI Act") and governing regulations. See 12 C.F.R. § 327.8(j) ("A new insured depository institution is a bank or savings association that has been federally insured for less than five years as of the last day of any quarter for which it is being assessed.").

---

[5] See, e.g., FDIC, Risk Management Manual of Examination Policies, § 3.1-2, https://www.fdic.gov/regulations/safety/manual/section2-1.pdf (Apr. 2015).
[6] See FDIC, Deposit Insurance Fund: Assessment Rates and Methodology, https://www.fdic.gov/resources/deposit-insurance/deposit-insurance-fund/dif-assessments.html (last updated July 20, 2021).

Page 11 of 21

813                                                                  03:29:02 p.m.    10-06-2021                13/22

| Total Base Assessment Rates for newly insured small institutions (those insured less than 5 years)* | | | |
|---|---|---|---|
| | Risk Category I | Risk Category II | Risk Category III | Risk Category IV |
| Initial Base Assessment Rate | 7 | 12 | 19 | 30 |
| Brokered Deposit Adjustment (added) | N/A | 0 to 10 | 0 to 10 | 0 to 10 |
| Total Base Assessment Rate | 7 | 12 to 22 | 19 to 29 | 30 to 40 |

\* Total base assessment rates do not include the depository institution debt adjustment.

"Each small insured depository institution shall be assigned to one of the following four Risk Categories based upon the institution's capital evaluation and supervisory evaluation" provided by the regulation. 12 C.F.R. § 327.9(a)(1). The core factors considered in the risk evaluation process involve leveraged deposits put at risk by products and services that PayServices' proposed bank explicitly does not offer. Additionally, neither do FDIC's brokered deposit adjustment rate or debt adjustment rate apply to PayServices. The deposits are 100% reserved for transactions only and are not brokered. The deposits do not require debt adjustment because they are not encumbered by debt.

**B.    PayServices' business model removes the core risks that impair a bank's capital.**

*1.    The FDIC's Risk Categories*

The FDIC provides four risk categories: Risk Category I, Risk Category II, Risk Category III, and Risk Category IV.  12 C.F.R. § 327.9(a)(1)(i)-(iv). Risk Category I includes "[s]mall institutions in Supervisory Group A that are Well Capitalized[.]" 12 C.F.R. § 327.9(a)(1)(i). "Small institutions in Supervisory Group A that are Adequately Capitalized, and small institutions in Supervisory Group B that are either Well Capitalized or Adequately Capitalized [are] assigned to

Page 12 of 21

Risk Category II." 12 C.F.R. § 327.9(a)(1)(ii). "Small institutions in Supervisory Groups A and B that are Undercapitalized, and small institutions in Supervisory Group C that are Well Capitalized or Adequately Capitalized [are] assigned to Risk Category III." 12 C.F.R. § 327.9(a)(1)(iii). The fourth risk category includes "[s]mall institutions in Supervisory Group C that are Undercapitalized[.]" 12 C.F.R. § 327.9(a)(1)(iv).

2.    *Well-Capitalized and Adequately Capitalized Institutions*

Institutions with assets of less than $10 billion based on data reported in their Report of Condition of Income during their quarterly assessment period. See 12 C.F.R. § 327.9(a)(2). "A Well Capitalized institution is one that satisfies each of the following capital ratio standards: Total risk-based capital ratio, 10.0 percent or greater; tier 1 risk-based capital ratio, 8.0 percent or greater; leverage ratio, 5.0 percent or greater; common equity tier 1 capital ratio, 6.5 percent or greater; and, if the institution is an insured depository institution subject to the enhanced supplementary leverage ratio standards under" the relevant regulations "a supplementary leverage ratio of 6.0 percent or greater." See 12 C.F.R. § 327.9(a)(2)(i).

"An Adequately Capitalized institution is one that does not satisfy the standards of Well Capitalized . . . but satisfies each of the following capital ratio standards: Total risk-based capital ratio, 8.0 percent or greater; tier 1 risk-based capital ratio, 6.0 percent or greater; leverage ratio, 4.0 percent or greater; common equity tier 1 capital ratio, 4.5 percent or greater; and, if the institution is subject to the advanced approaches risk-based capital rules under" the relevant regulations "a supplementary leverage ratio of 3.0 percent or greater." See 12 C.F.R. § 327.9(a)(2)(i)(ii).[7] An

---

[7] The FDIC's requirements for the adequacy of the capital structure of applicants for deposit insurance mirror these requirements. See FDIC Statement of Policy on Applications for Deposit Insurance, https://www.fdic.gov/regulations/laws/rules/5000-3000.html ("Normally, the initial capital of a proposed depository institution should be sufficient to provide a Tier 1 capital to assets leverage ratio (as defined in the appropriate capital regulation of the institution's primary federal regulator) of not less than 8.0% throughout the first three years of operation.").

813                                         03:30:12 p.m.    10-06-2021        15/22

"undercapitalized institution" is one that does not qualify under the other two metrics. See 12 C.F.R. § 327.9(a)(2)(iii).

For either well capitalized or adequately capitalized institutions, the analysis includes five factors: (1) total risk-based capital ratio; (2) tier 1 risk-based capital ratio; (3) leverage ratio; (4) common equity tier 1 capital ratio; and where applicable (5) the supplementary leverage ratio standards.[8] None of the elements included in these factors includes products that PayServices provides, elements of its corporate structure, or an element that is not already regulated by this Office under Florida law.

### 3.   *Components of Risk-Based Capital*

#### a.   *Total Capital Ratio*

"An FDIC-supervised institution's total capital ratio is the ratio of the FDIC-supervised institution's total capital to standardized total risk-weighted assets[.]" 12 C.F.R. § 324.10(b)(1).

#### b.   *Tier 1 Risk-Based Capital Ratio*

"An FDIC-supervised institution's tier 1 capital ratio is the ratio of the FDIC-supervised institution's tier 1 capital to standardized total risk-weighted assets[.]" 12 C.F.R. § 324.10(b)(2).

The definition of tier 1 capital under the FDIC's risk-based capital ratio includes three items. First, it includes common stockholders' equity capital, namely "common stock and related surplus, undivided profits, disclosed capital reserves that represent a segregation of undivided profits, and foreign currency translation adjustments, less net unrealized holding losses on available-for-sale equity securities with readily determinable fair values."[9] Second, it includes noncumulative perpetual

---

[8] Supplementary leverage ratio standards apply to Category III FDIC-supervised institutions. 12 C.F.R. § 324.10(c). This type of institution has anywhere from §75 to 250 billion in particular types of assets. PayServices' proposed bank does not meet this definition. See 12 C.F.R. § 324.2.

[9] See 12 C.F.R. pt. 325, App'x A, p. 433, § I.A.1.i, https://www.govinfo.gov/content/pkg/CFR-2017-title12-vol5/pdf/CFR-2017-title12-vol5-part325-app1.pdf.

Page 14 of 21

preferred stock, including any related surplus. Finally, including minority interests in the equity capital accounts of consolidated subsidiaries. Id., at § I.A.1.(ii)-(iii).

Of these three, only common stock is part of PayServices' corporate structure. The company's pro forma Subscription Agreement and proposed Contribution and Spinoff Agreement both provide only for the issuance of common stock. See Amended Application Materials, Business Plan, Corporate Information A.01; see also Business Plan, App'x G, Articles 1 & 2, and App'x L. The terms of the company's Business Plan show that it does not intend to issue preferred stock and it does not have a minority interest in the capital accounts of a subsidiary. See id.

All of the elements of the FDIC calculation method that do not deal with loans, securities, or debt are addressed and monitored under the Florida Financial Institutions Codes and the Office's regulations. The core elements of the FDIC's definition of standardized total risk-weighted assets are all assets that PayServices' proposed bank does not carry. The definition includes risk-weighted assets for (i) general credit risk; (ii) cleared transactions and default fund contributions; (iii) securitization exposures; (iv) equity exposures; and (v) standardized market risk-weighted assets for a market-risk FDIC-supervised institution. 12 C.F.R. § 324.2. Second, it adds "[a]ny amount of the FDIC-supervised institution's allowance for loan and lease losses or adjusted allowance for credit losses, as applicable, that is not included in tier 2 capital and any amount of 'allocated transfer risk reserves.'" Id.

As an initial matter, the proposed bank does not offer loans or credit. As a result, there is no general credit risk, equity exposure, or securitization exposure. There are no cleared transactions or default fund contributions.[III] PayServices is also not a "market risk" institution under the regulations.

---

[III] "Cleared transaction means an exposure associated with an outstanding derivative contract or repo-style transaction that an FDIC-supervised institution or clearing member has entered into with a central counterparty (that is, a transaction that a central counterparty [CCP] has accepted)." 12 C.F.R. § 324.2. "Default fund contribution means the funds contributed or commitments made by a clearing member to a CCP's mutualized loss sharing arrangement." Id. A central counterparty facilitates trades involving the bank

Subpart F to 12 C.F.R. pt. 324 applies to assessing "risk-weighted assets." All of the assets covered involve financial trading. See, e.g., 12 C.F.R. § 324.201(b) ("This subpart F applies to any FDIC-supervised institution with aggregate *trading assets and trading liabilities* . . . equal to" at least 10% of its total quarterly assets or at least $1 billion") (emphasis added). The Business Plan for the proposed bank specifically indicates that the bank does not engage in investment-based trading. See Business Plan, Operations, § C (Debt and Leveraging) ("The bank does not intend to engage in the stock market – either with customer deposits or with its revenue profits.").

### c.    *Leverage Ratio*

Leverage ratio is the divide between tier 1 capital and average total assets.[11] Given that PayServices provides no loans or credit, however, its assets contribute little to this calculation. In fact, it only adds to the security of customers' deposits. See id., § 3.1-2 ("Asset quality is one of the most critical areas in determining the overall condition of a bank. The primary factor affecting overall asset quality is the quality of the <u>loan</u> portfolio and the <u>credit</u> administration program.") (emphasis added).

### d.    *Common Equity Tier 1 Capital Ratio*

Basel III capital standards, which the FDIC and other federal banking regulators adopted in 2013, "emphasize common equity tier 1 capital as the predominant form of bank capital. Common equity tier 1 capital is widely recognized as the most loss-absorbing form of capital, as it is permanent and places shareholders' funds at risk of loss in the event of insolvency."[12] It includes qualifying common stock and related surplus net of treasury stock, retained earnings, and "certain

---

in the financial markets. PayServices' proposed bank does not engage in any trading on the financial markets and, as a result, does not enter into transactions with CCPs as defined in the regulation.

[11] See FDIC, Risk Management Manual of Examination Policies, § 2.1-7, https://www.fdic.gov/regulations/safety/manual/section2-1.pdf (Apr. 2015).

[12] FDIC, Risk Management Manual of Examination Policies, § 2.1-2, https://www.fdic.gov/regulations/safety/manual/section2-1.pdf (Apr. 2015).

accumulated other comprehensive income (AOCI)"[13] plus or minus regulatory deductions or adjustments as appropriate;[14] and qualifying common equity tier 1 minority interests. See id., § 2-1.3.

As noted above, PayServices' proposed bank does not carry treasury stock or minority interests. Thus, the main relevant items are (a) common stock; (b) retained earnings; and (c) deferred tax assets/liabilities included as regulatory deductions and adjustments. The FDIC expects "the majority of common equity tier 1 capital to be in the form of common voting shares." Florida's Financial Institutions Codes regulate common stock within a state bank's regulatory capital. See, e.g., Fla. Stat. §§ 658.23 (requiring disclosure of shares of common stock in articles of incorporation); 658.35 (allowing bank to hold and acquire authorized but unissued shares of its own capital stock with approval of holders of bank's common stock). Florida law also regulates the use of a bank's retained earnings and assets. See Fla. Stat. § 658.37 (authorizing declaration of dividends on bank's common stock only after a bank has "charg[ed] off bad debts, depreciation, and other worthless assets if any, and making provision for reasonably anticipated future losses on loans and other assets"). Therefore, Florida law and the Office's regulations directly address and oversee the only items related to the proposed bank's capitalization under FDIC rules that apply to PayServices' proposed bank. Deposit insurance from the FDIC offers no additional protection than that currently provided under Florida law.

III.    THE WAIVER REQUESTED SERVES THE PURPOSES OF THE UNDERLYING STATUTE.

A.    PayServices protects all deposits in reserves, which exceeds even the Federal Reserve's reserve requirements.

---

[13] The proposed bank meets the qualifications to exercise the FDIC's AOCI opt-out election given its size. See 12 C.F.R. § 324.22(b)(2). The election, however, includes deducting risks that the proposed bank does not incur based on its business model. See id. (providing for deductions of unrealized gains or losses related to securities, preferred stock, cash flow hedges, and retirement plans).

[14] The deductions and adjustments permitted also largely involves assets and liabilities that the proposed bank does not carry or requirements that govern other types of entities, such as state savings associations and banks primarily engaged in mortgage lending. See 12 C.F.R. § 324.22(a) & (b).

Page 17 of 21

Additionally, the FDIC insures deposits only up to $250,000. By contrast, the proposed bank protects 100% of each consumer's deposit and each deposit remains a high-quality, liquid asset. In fact, this mandate is more important now than ever because, on March 15, 2020, the Federal Reserve announced that it has set the reserve requirement ratio to _zero_, including for transaction accounts – the core of PayServices' proposed accounts.[15]

Expanding the security of customer deposits beyond the $250,000 limit is critical because the proposed bank has projected a large number of depositors who are merchants, corporate purchasers of goods, and sovereign governments. The projected transactions for these entities outlined in the Business Plan far exceed $250,000. As discussed below, PayServices does not offer high-risk categories of assets which impair its capital requirements. Thus, the capitalization requirement set by Florida's Financial Institutions Codes and regulations promulgated under the Codes also protect the sound operations of the institution.

**B.      PayServices is eligible to become a member bank of the Federal Reserve and its deposits will be protected in a Federal Reserve Master Account.**

The Federal Reserve Act provides that all state-chartered Federal Reserve member banks that receive deposits apart from trust funds must "possess capital stock and surplus in an amount equal to that which would be required for the establishment of a national banking association in the place in which it is located." See 12 U.S.C. § 329. If the proposed member bank meets this requirement, it may be approved for membership even if it does not possess deposit insurance from the FDIC. See id.

PayServices' proposed bank also intends to obtain a Master Account with the Federal Reserve. Both federally-insured and non-federally insured depository institutions are legally eligible for Reserve Bank accounts and services. See 12 U.S.C. § 461(b)(1)(A). The Federal Reserve Act also

---

[15]     See Policy Tools: Reserve Requirements, Federal Reserve System, https://www.federalreserve.gov/monetarypolicy/reservereq.htm (last updated Feb. 3, 2021).

Page 18 of 21

provides that a Federal Reserve Bank's payment services to both member and non-member depository institutions. See 12 U.S.C. § 248a. A Federal Reserve Bank has the authority to receive from a depository institution "deposits of current funds in lawful money, national-bank notes, Federal reserve notes, checks and drafts payable upon presentation or other items" "solely for the purposes of exchange or of collection." 12 U.S.C. § 342.

On May 11, 2021, the Federal Reserve System Board of Governors ("FRB") issued "Proposed Guidelines for Evaluating Account and Services Requests."[16] The FRB has recognized the need to provide more transparency and incentive for non-traditional fintech banks to obtain master accounts and have access to the U.S. payment system. According to Federal Reserve Board ("FRB") Governor Lael Brainard, "With technology driving rapid change in the payments landscape," the proposed guidelines "would ensure requests for access to the Federal Reserve payments system from novel institutions are evaluated in a consistent and transparent manner that promotes a safe, efficient, inclusive, and innovative payment system, consumer protection, and the safety and soundness of the banking system."[17] As a result, the FRB is in the process of streamlining the application process to the benefit of PayServices' type of proposed bank.

###     C.    The Office has the authority to approve the application subject to membership in the Federal Reserve rather than the FDIC.

The Office has the statutory authority to approve an application prior to a determination from a federal banking regulator. According to Section 658.22, Florida Statutes, once the Office approves "the application for authority to organize a state bank, the office shall forward a copy of its final order to the appropriate federal regulatory agencies." Furthermore, an applicant is only required to "apply for membership in the Federal Reserve System *or* apply for the insurance of accounts by

---

[16] *See* 86 Fed. Reg. 25865, https://www.federalregister.gov/documents/2021/05/11/2021-09873/proposed-guidelines-for-evaluating-account-and-services-requests.

[17] Federal Reserve Board invites public comment on proposed guidelines to evaluate requests for accounts and payment services at Federal Reserve Banks, Federal Reserve Press Release (May 5, 2021), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20210505a.htm.

the Federal Deposit Insurance Corporation within 3 months after approval by the office . . . ." Fla. Stat. § 658.22. It is not required to apply for insurance to the FDIC if it has applied for membership in the Federal Reserve. Only where an applicant has applied to the FDIC for deposit insurance (as opposed to the Federal Reserve) would a final order from the FDIC denying the application affect the Office's approval of the application. See id.

## REQUEST FOR PERMANENT WAIVER

PayServices requests a permanent waiver of the rule at issue.

## CONCLUSION

PayServices' business model is the kind of "incipient" model that the court in *McDonald* described more than forty years ago. OFR's clear discretion granted by the Florida Legislature and respected time and again by the courts of this state gives the agency the discretion to make decisions and exceptions which are flexible and responsive to changes in financial business models. Reconsideration of the deposit insurance requirement across the board in the context of a banking model where there is no risk posed to any customer's deposits is consistent with what the courts have granted OFR the authority to do: "the agency that knows its policy may wisely sharpen its purposes through adjudication." New business models call for the use of a scalpel rather than the hatchet of a one-size-fits all requirement that cuts down on innovation. This petition provides an opportunity for OFR to pursue this mandate in a unique case.

DATED October 6, 2021.

Respectfully submitted,

/s/ Jade A. Craig
Jade A. Craig, Esq.
Florida Bar No. 121805
Jade A. Craig, P.A.
2910 Rubideaux St., #1

Page 20 of 21

MX-1-122

813                                    03:34:26 p.m.    10-06-2021      22 /22

Tampa, Florida 33629
Email: jade@jadeacraigpa.com
Secondary Email: jadecraig@gmail.com
Telephone: (813) 459-1309
Facsimile: (813) 251-4373
Attorney for Petitioner/Applicant
PayServices, Inc.

MX1-123